# |B|Y|N|  BADER YAKAITIS & NONNENMACHER, LLP
## ATTORNEYS AT LAW – WWW.BYNLAW.NET

1430 BROADWAY/SUITE 1802 /NEW YORK, NY 10018
PHONE (212)465-1110 / FAX (212)279-8991

JEFFREY W. BADER
PAUL A. YAKAITIS
JOHN J. NONNENMACHER

DARLENE S. MILOSKI
ROBERT E. BURKE
JESSE M. YOUNG
ERIC HORN

August 19, 2014

Magistrate Judge Gary R. Brown
United States District Court
Eastern District of New York
100 Federal Plaza
P.O. Box 9014
Central Islip, NY 11722

        Re:  Kwame Opoku v. Town Of Southampton
        Docket No.: 13-CV-00940 (GRB)

Dear Judge Brown:

    I am writing this letter in further support of plaintiff's motion to compel discovery from the defendants, inclusive of depositions in excess of ten.

    Attached hereto are records that I received from various sources that cast serious doubts on defense counsel's contention that they have acted in good faith in providing discovery.

    The attached records should have been provided to me in response to plaintiff's discovery demands.  It is plaintiff's position that the defendants have intentionally withheld these documents, like the statement given by Mrs. Sickles, from me.

    It is now clear, that records relevant to this action exist that have not been turned over to plaintiff.  The court should order the defendant to produce every document relevant to this action.

    Finally, since I have absolutely no faith in defense counsel's representation as to the existence of documents relevant to this action, plaintiff should be able to question every person that was previously served with a subpoena even though it is in excess of ten.

    Your Honor's consideration of this matter is most respectfully appreciated.

        Respectfully submitted,

        John J. Nonnenmacher, Esq. (0007)

 **BADER YAKAITIS & NONNENMACHER, LLP**
**ATTORNEYS AT LAW – WWW.BYNLAW.NET**

1430 BROADWAY/SUITE 1802 /NEW YORK, NY 10018
PHONE (212)465-1110 / FAX (212)279-8991

JEFFREY W. BADER
PAUL A. YAKAITIS
JOHN J. NONNENMACHER

DARLENE S. MILOSKI
ROBERT E. BURKE
JESSE M. YOUNG
ERIC HORN

August 18, 2014

Kelly E. Wright, Esq.
Devitt Spellman Barrett, LLP
50 Route 111
Smithtown, NY 11787
Fax:  631-724-8010

    Re:  Kwame Opoku v. Town Of Southampton
     Docket No.: 13-CV-00940 (GRB)

Dear Ms. Wright,

  Enclosed please find copies of documents I recently received from the attorneys for Bernard Cooks which have never been provided to my office.

  Should you have any questions, please feel free to contact me.

      Very truly yours,

      John J. Nonnenmacher, Esq.

STATE OF NEW YORK
TOWN OF SOUTHAMPTON
————————————————————————X

IN THE MATTER OF THE DISCIPLINARY CHARGES
PREFERRED BY

WILLIAM WILSON, Jr., CHIEF OF POLICE

     against

JAMES KIERNAN, POLICE LIEUTENANT
————————————————————————X

     In accordance with Section 155 of the New York Town Law, the following formal Departmental disciplinary charges are hereby preferred against you as follows:

### CHARGE ONE
Rules & Regulations, Article VIII - Rule 1.2
FAILURE TO PERFORM A DUTY

     Lieutenant James Kiernan, while a Sergeant with the Southampton Town Police Department, violated Southampton Town Police Department Rules and Regulations, Article VIII, Rules of Conduct, Rule 2, in or about January 2010, by failing to train, direct, supervise, and/or evaluate Police Officer Sickles, a member assigned to the Street Crime Unit under the direct supervision of Sergeant Kiernan, upon observing a deficiency in Police Officer Eric Sickles' behavior. This is misconduct.

### CHARGE TWO
Rules & Regulations, Article VIII - Rule 1.2
FAILURE TO PERFORM A DUTY

     Lieutenant James Kiernan, while a Sergeant with the Southampton Town Police Department, violated Southampton Town Police Department Rules and Regulations, Article VIII, Rules of Conduct, Rule 2, in or about the summer of 2011, when Police Officer Sickles, a member assigned to the Street Crime Unit under the direct supervision of Lieutenant James Kiernan, fell asleep while on duty. Lieutenant Kiernan failed to train, direct, supervise, and/or evaluate Officer Sickles in his assigned duties, and/or recommend remedial or disciplinary action for inefficient, incompetent, and/or unsuitable members in violation of Southampton Town Police Department Rules and Regulations, Article IV, Duties of Supervisory Personnel, Rule 2.5. This is misconduct.

## CHARGE THREE
### Rules & Regulations, Article VIII - Rule 1.2
### FAILURE TO PERFORM A DUTY

Lieutenant James Kiernan, while a Sergeant with the Southampton Town Police Department, violated Southampton Town Police Department Rules and Regulations, Article VIII, Rules of Conduct, Rule 2 in or about the summer of 2011, when Police Officer Eric Sickles, a member assigned to the Street Crime Unit under the direct supervision of Lieutenant James Kiernan, fell asleep while on duty and Lieutenant James Kiernan failed to report to his superior officer a deficiency in men and/or equipment in violation of Southampton Town Police Department Rules and Regulations, Article IV, Duties of Supervisory Personnel, Rule 2.10. This is misconduct.

## CHARGE FOUR
### Rules & Regulations, Article VIII - Rule 1.9
### INCOMPETENCY OR INEFFICIENCY IN PERFORMANCE OF DUTY

Lieutenant James Kiernan violated Southampton Town Police Department Rules and Regulations, Article VIII, Rules of Conduct, Rule 9 on or about October 25, 2011, when Lieutenant James Kiernan received a call for help by Police Officer Sickles' wife, Erica Sickles, stating that her husband was suffering from the side effects of several prescribed medications that he was taking, that he was unable to drive a car without falling asleep, that he had fallen asleep at their kitchen table with his duty gun in hand the night prior, and that she felt she and her children were in danger. Upon receiving this complaint Lieutenant Kiernan failed to take decisive action for over 18 hours and permitted Police Officer Sickles to work full duty for the remainder of his 4 x 12 tour that date. Lieutenant James Kiernan's conduct constitutes incompetence.

## CHARGE FIVE
### Rules & Regulations, Article VIII - Rule 1.1
### CONDUCT THAT BRINGS DISCREDIT UPON THE DEPARTMENT

Lieutenant James Kiernan violated Southampton Town Police Department Rules and Regulations, Article VIII, Rules of Conduct, Rule 9 on or about October 25, 2011, when Lieutenant James Kiernan received a call for help by Police Officer Sickles' wife, Erica Sickles, stating that her husband was suffering from the side effects of several prescribed medications that he was taking, that he was unable to drive a car without falling asleep, that he had fallen asleep at their kitchen table with his duty gun in hand the night prior, and that she felt she and her children were in danger. Upon receiving this complaint, Lieutenant Kiernan failed to take decisive action for over 18 hours and allowed Police Officer Sickles to work full duty for the remainder of his 4 x 12 tour that date. Lieutenant James Kiernan's conduct brings discredit upon the Police Department and constitutes misconduct.

## CHARGE SIX
### Rules & Regulations, Article VIII - Rule 1.9
### INCOMPETENCY OR INEFFICIENCY IN PERFORMANCE OF DUTY

Lieutenant James Kiernan violated Southampton Town Police Department Rules and Regulations, Article VIII, Rules of Conduct, Rule 1.9, on or about October 25, 2011, when Lieutenant James Kiernan received a call for help by Police Officer Sickles' wife, Erica Sickles, stating that her husband was suffering from the side effects of several prescribed medications that he was taking, that he was unable to drive a car without falling asleep, that he had fallen asleep at their kitchen table with his duty gun in hand the night prior, and that she felt she and her children were in danger. Upon receiving this complaint, Lieutenant Kiernan failed to take decisive action for over 18 hours and permitted Police Officer Sickles to work full duty for the remainder of his 4 x 12 tour that date. Lieutenant James Kiernan's conduct endangered the lives of others and was reckless and/or negligent by failing to secure Officer Sickles' duty weapon and/or any other weapons in his possession. This is incompetence.

## CHARGE SEVEN
### Rules & Regulations, Article VIII - Rule 1.2
### FAILURE TO PERFORM A DUTY

Lieutenant James Kiernan violated Southampton Town Police Department Rules and Regulations, Article VIII, Rules of Conduct, Rule 1.2 on or about October 25, 2011, when Lieutenant James Kiernan received a call for help by Police Officer Sickles' wife, Erica Sickles, stating that her husband was suffering from the side effects of several prescribed medications that he was taking, that he was unable to drive a car without falling asleep, that he had fallen asleep at their kitchen table with his duty gun in hand the night prior, and that she felt she and her children were in danger. Lieutenant Kiernan failed to report to his superior officer a deficiency in men and/or equipment in violation of Southampton Town Police Department Rules and Regulations, Article IV, Duties of Supervisory Personnel, Rule 2.10. This is misconduct

## CHARGE EIGHT
### Rules & Regulations, Article VIII - Rule 1.9
### INCOMPETENCY OR INEFFICIENCY IN PERFORMANCE OF DUTY

Lieutenant James Kiernan violated Southampton Town Police Department Rules and Regulations, Article VIII, Rules of Conduct, Rule 1.9, on or about October 25, 2011, when Lieutenant James Kiernan received a call for help by Police Officer Sickles' wife, Erica Sickles, stating that her husband was suffering from the side effects of several prescribed medications that he was taking, that he was unable to drive a car without falling asleep, that he had fallen asleep at their kitchen table with his duty gun in hand the night prior, and that she felt she and her children were in danger. Lieutenant James Kiernan failed to notify the Duty Officer that Police Officer Sickles was working and may be a danger to himself and/or others. Lieutenant Kiernan's conduct was reckless and/or negligent and constitutes incompetence.

### CHARGE NINE
Rules & Regulations, Article VIII - Rule 1.2
#### FAILURE TO PERFORM A DUTY

Lieutenant James Kiernan violated Southampton Town Police Department Rules and Regulations, Article VIII, Rules of Conduct, Rule 1.2 on or about October 25, 2011, when Lieutenant James Kiernan received a call for help by Police Officer Sickles' wife, Erica Sickles, stating that her husband was suffering from the side effects of several prescribed medications that he was taking, that he was unable to drive a car without falling asleep, that he had fallen asleep at their kitchen table with his duty gun in hand the night prior, and that she felt she and her children were in danger. Lieutenant James Kiernan failed to immediately report that another member of the Department may be using and/or abusing a drug, or report this information to a superior officer in violation of Southampton Town Police General Order 3-93, Drug Testing Procedures. This is misconduct.

### CHARGE TEN
Rules & Regulations, Article VIII - Rule 1.9
#### INCOMPETENCY OR INEFFICIENCY IN PERFORMANCE OF DUTY

Lieutenant James Kiernan violated Southampton Town Police Department Rules and Regulations, Article VIII, Rules of Conduct, Rule 1.9 on or about October 26, 2011, when Lieutenant James Kiernan, Police Officer Sickles' direct supervisor, failed to properly adjust Police Officer Sickles' work schedule to reflect time off from his regularly scheduled 4 x 12 tour. This is incompetence.

### CHARGE ELEVEN
Rules & Regulations, Article VIII - Rule 1.9
#### INCOMPETENCY OR INEFFICIENCY IN PERFORMANCE OF DUTY

Lieutenant James Kiernan violated Southampton Town Police Department Rules and Regulations, Article VIII, Rules of Conduct, Rule 1.9 on or about October 26, 2011, when Lieutenant James Kiernan failed to properly secure Police Officer Sickles' duty weapon, a Glock .40. Lieutenant James Kiernan permitted Police Officer Sickles to secure his duty weapon in the Street Crime Office locker where Officer Sickles continued to have full access to the weapon. This is incompetence.

### CHARGE TWELVE
Rules & Regulations, Article VIII - Rule 1.9
#### INCOMPETENCY OR INEFFICIENCY IN PERFORMANCE OF DUTY

Lieutenant James Kiernan violated Southampton Town Police Department Rules and Regulations, Article VIII, Rules of Conduct, Rule 1.9 on or about October 25, 2011 through approximately December 3, 2011, when Lieutenant James Kiernan repeatedly failed to assure that an officer assigned to him was fit for duty, uninjured, unimpaired, and able to perform duties incumbent of a police officer as per Southampton Town General Order 24-97 - Section 4.1. This is incompetence.

## CHARGE THIRTEEN
### Rules & Regulations, Article VIII - Rule 1.1
### CONDUCT WHICH BRINGS DISCREDIT UPON THE DEPARTMENT

Lieutenant James Kiernan violated Southampton Town Police Department Rules and Regulations, Article VIII, Rules of Conduct, Rule 1.1 on or about October 31, 2011 through approximately December 3, 2011, when Lieutenant James Kiernan permitted Police Officer Sickles to return to full police duty and/or to carry departmental guns, departmental weapons, operate departmental vehicles, conduct investigations, and/or to make arrests while under the influence of narcotics and anti-depressants, such as Oxycontin and/or Zoloft.  This is misconduct.

## CHARGE FOURTEEN
### Rules & Regulations, Article VIII - Rule 1.9
### INCOMPETENCY OR INEFFICIENCY IN PERFORMANCE OF DUTY

Lieutenant James Kiernan violated Southampton Town Police Department Rules and Regulations, Article VIII, Rules of Conduct, Rule 1.9 on or about October 26, 2011 through approximately December 3, 2011, when Lieutenant James Kiernan failed to request a copy of Police Officer Sickles' prescriptions and/or the prescription bottles confirming that he was legally permitted to possess and/or use these controlled substances and/or the prescribed amounts. This is incompetence.

## CHARGE FIFTEEN
### Rules & Regulations, Article VIII - Rule 1.20
### KNOWINGLY MAKE A FALSE REPORT, WRITTEN OR ORAL

Lieutenant James Kiernan violated Southampton Town Police Department Rules and Regulations, Article VIII, Rules of Conduct, Rule 1.20 on or about March 29, 2012, while being interviewed by Suffolk County Internal Affairs Investigators, by falsely stating in sum or substance that he never observed any changes in Police Officer Sickles' behavior or demeanor. Lieutenant Kiernan knowingly made a false report. This is misconduct.

## CHARGE SIXTEEN
### Rules & Regulations, Article VIII - Rule 1.20
### KNOWINGLY MAKE A FALSE REPORT, WRITTEN OR ORAL

Lieutenant James Kiernan violated Southampton Town Police Department Rules and Regulations, Article VIII, Rules of Conduct, Rule 1.20 on or about March 29, 2012, while being interviewed by Suffolk County Internal Affairs Investigators, by falsely stating in sum or substance that Police Officer Sickles was transferred from the Street Crime Unit to the Community Response Unit to work with Police Officer Harrigan.  Lieutenant Kiernan knowingly made a false report.  This is misconduct.

## CHARGE SEVENTEEN
### Rules & Regulations, Article VIII - Rule 1.20
### KNOWINGLY MAKE A FALSE REPORT, WRITTEN OR ORAL

Lieutenant James Kiernan violated Southampton Town Police Department Rules and Regulations, Article VIII, Rules of Conduct, Rule 1.20 on or about March 29, 2012, while being interviewed by Suffolk County Internal Affairs Investigators, by falsely stating in sum or substance that he did not know why Police Officer Eric Sickles and Police Officer Jane Harrigan were wearing plain clothes or who gave them permission to wear plain clothes. Lieutenant Kiernan knowingly made a false report. This is misconduct.

## CHARGE EIGHTEEN
### Rules & Regulations, Article VIII - Rule 1.20
### KNOWINGLY MAKE A FALSE REPORT, WRITTEN OR ORAL

Lieutenant James Kiernan violated Southampton Town Police Department Rules and Regulations, Article VIII, Rules of Conduct, Rule 1.20 on or about March 29, 2012, while being interviewed by Suffolk County Internal Affairs Investigators, by falsely stating in sum or substance that the first time he became aware that Police Officer Eric Sickles had a drug problem was on December 3, 2011. Lieutenant Kiernan knowingly made a false report. This is misconduct.

## CHARGE NINETEEN
### Rules & Regulations, Article VIII - Rule 1.20
### KNOWINGLY MAKE A FALSE REPORT, WRITTEN OR ORAL

Lieutenant James Kiernan violated Southampton Town Police Department Rules and Regulations, Article VIII, Rules of Conduct, Rule 1.20 on or about March 29, 2012, while being interviewed by Suffolk County Internal Affairs Investigators, by falsely stating in sum or substance that he did not know who Police Officer Eric Sickles and Police Officer Jane Harrigan reported their activities to while they worked together. Lieutenant Kiernan knowingly made a false report. This is misconduct.

## CHARGE TWENTY
### Rules & Regulations, Article VIII - Rule 1.20
### KNOWINGLY MAKE A FALSE REPORT, WRITTEN OR ORAL

Lieutenant James Kiernan violated Southampton Town Police Department Rules and Regulations, Article VIII, Rules of Conduct, Rule 1.20 on or about March 29, 2012, while being interviewed by Suffolk County Internal Affairs Investigators, by falsely stating in sum or substance that he notified the Chief of Police prior to November 4, 2011, of the October 25, 2011 incident in which Police Officer Sickles' wife, Erica Sickles, called Lieutenant Kiernan regarding Police Officer Sickles prescription drug use. Lieutenant Kiernan knowingly made a false report. This is misconduct.

### CHARGE TWENTY-ONE
Rules & Regulations, Article VIII - Rule 1.1
CONDUCT WHICH BRINGS DISCREDIT UPON THE DEPARTMENT

Lieutenant James Kiernan violated Southampton Town Police Department Rules and Regulations, Article VIII, Rules of Conduct, Rule 1.1 on or about March 29, 2012, while being interviewed by Suffolk County Internal Affairs Investigators, by falsely stating in sum or substance that he never saw any changes in PO Sickles behavior or demeanor.  General Order 18-97 Code of Conduct: 2.1.9 requires that "Members are to speak the truth at all times, whether under oath or not, in giving testimony, or in conjunction with any official order or duties." Lieutenant Kiernan knowingly made a false statement which brings discredit upon the Department. This is misconduct.

### CHARGE TWENTY-TWO
Rules & Regulations, Article VIII - Rule 1.1
CONDUCT WHICH BRINGS DISCREDIT UPON THE DEPARTMENT

Lieutenant James Kiernan violated Southampton Town Police Department Rules and Regulations, Article VIII, Rules of Conduct, Rule 1.1 on or about March 29, 2012, while being interviewed by Suffolk County Internal Affairs Investigators, by falsely stating in sum or substance that Police Officer Sickles was transferred from the Street Crime Unit to the Community Response Unit and assigned to work with Police Officer Harrigan.  General Order 18-97 Code of Conduct: 2.1.9 requires that "Members are to speak the truth at all times, whether under oath or not, in giving testimony, or in conjunction with any official order or duties." Lieutenant Kiernan knowingly made a false statement which brings discredit upon the Department. This is misconduct.

### CHARGE TWENTY-THREE
Rules & Regulations, Article VIII - Rule 1.1
CONDUCT WHICH BRINGS DISCREDIT UPON THE DEPARTMENT

Lieutenant James Kiernan violated Southampton Town Police Department Rules and Regulations, Article VIII, Rules of Conduct, Rule 1.1 on or about March 29, 2012, while being interviewed by Suffolk County Internal Affairs Investigators, by falsely stating in sum or substance that he did not know why Police Officer Eric Sickles and Police Officer Jane Harrigan were wearing plain clothes and/or who permitted them to wear plain clothes.  General Order 18-97 Code of Conduct: 2.1.9 requires that "Members are to speak the truth at all times, whether under oath or not, in giving testimony, or in conjunction with any official order or duties." Lieutenant Kiernan knowingly made a false statement which brings discredit upon the Department. This is misconduct.

## CHARGE TWENTY-FOUR
### Rules & Regulations, Article VIII - Rule 1.20
### CONDUCT WHICH BRINGS DISCREDIT UPON THE DEPARTMENT

Lieutenant James Kiernan violated Southampton Town Police Department Rules and Regulations, Article VIII, Rules of Conduct, Rule 1.20 on or about March 29, 2012, while being interviewed by Suffolk County Internal Affairs Investigators, by falsely stating in sum or substance that the first time he became aware that Police Officer Eric Sickles may have a drug problem was on December 3, 2011. General Order 18-97 Code of Conduct: 2.1.9 requires that "Members are to speak the truth at all times, whether under oath or not, in giving testimony, or in conjunction with any official order or duties." Lieutenant Kiernan knowingly made a false statement which brings discredit upon the Department. This is misconduct.

## CHARGE TWENTY-FIVE
### Rules & Regulations, Article VIII - Rule 1.20
### CONDUCT WHICH BRINGS DISCREDIT UPON THE DEPARTMENT

Lieutenant James Kiernan violated Southampton Town Police Department Rules and Regulations, Article VIII, Rules of Conduct, Rule 1.20 on or about March 29, 2012, while being interviewed by Suffolk County Internal Affairs Investigators, by falsely stating in sum or substance that he did not know who Police Officer Eric Sickles and Police Officer Harrigan reported their activities to while they worked together. General Order 18-97 Code of Conduct: 2.1.9 requires that "Members are to speak the truth at all times, whether under oath or not, in giving testimony, or in conjunction with any official order or duties." Lieutenant Kiernan knowingly made a false statement which brings discredit upon the Department. This is misconduct.

## CHARGE TWENTY-SIX
### Rules & Regulations, Article VIII - Rule 1.20
### CONDUCT WHICH BRINGS DISCREDIT UPON THE DEPARTMENT

Lieutenant James Kiernan violated Southampton Town Police Department Rules and Regulations, Article VIII, Rules of Conduct, Rule 1.20 on or about March 29, 2012, while being interviewed by Suffolk County Internal Affairs Investigators, by falsely stating in sum or substance that he notified the Chief of Police prior to November 4, 2011 of the October 25, 2011 incident in which Police Officer Sickles' wife, Erica Sickles, called Lieutenant Kiernan regarding Police Officer Sickles prescription drug use. General Order 18-97 Code of Conduct: 2.1.9 requires that "Members are to speak the truth at all times, whether under oath or not, in giving testimony, or in conjunction with any official order or duties." Lieutenant Kiernan knowingly made a false statement which brings discredit upon the Department. This is misconduct.

## CHARGE TWENTY-SEVEN
### Rules & Regulations, Article VIII - Rule 1.2
### FAILURE TO PERFORM A DUTY

Lieutenant James Kiernan violated Southampton Town Police Department Rules and Regulations, Article VIII, Rules of Conduct, Rule 1.2 beginning on or about May 15, 2011 until on or about April 24, 2012, by failing to oversee that drugs in the Street Crime Office were properly packaged.  Said drugs were left open and unsealed, initialed, and/or placed in proper property tubing.  General Order 1-90, 2.4 requires that "drugs and/or money must be placed in the plastic property tube cut and sealed at both ends using the heat sealer.  Both seals must be initialed by the office processing the property."  Lieutenant Kiernan's failure to oversee and/or secure these items constitutes misconduct.

## CHARGE TWENTY-EIGHT
### Rules & Regulations, Article VIII - Rule 1.2
### FAILURE TO PERFORM A DUTY

Lieutenant James Kiernan violated Southampton Town Police Department Rules and Regulations, Article VIII, Rules of Conduct, Rule 1.2 beginning on or about May 15, 2011 until on or about April 24, 2012, when he left drugs in a Street Crime Office that were not properly marked, sealed, and/or identified with a Property Bureau Receipt.  General Order 1-90, 2.1, requires that "All property and/or evidence taken into custody by an employee will be properly tagged, marked, or sealed in bags or envelopes provided for that purpose and a Property Bureau Invoice Receipt will be completed."  Lieutenant Kiernan's failure to oversee and/or secure these items in compliance with General Order 1-90 constitutes misconduct.

## CHARGE TWENTY-NINE
### Rules & Regulations  Article VIII - Rule 1.2
### FAILURE TO PERFORM A DUTY

Sergeant James Kiernan violated Southampton Town Police Department Rules and Regulations, Article VIII, Rules of Conduct, Rule 1.2, beginning on or about May 15, 2011 until on or about April 24, 2012, when he failed to ensure that drugs in the Street Crime Office were properly documented with a corresponding central complaint case number, Property Bureau Number, item number, and/or arrest documentation.  General Order 1-90 - Section 2.2, requires that "evidence will be marked for future identification with a Computer generated Property Bureau Number, a Central Complaint Number and an item number.  A copy of the incident and/or arrest report shall be attached."  Lieutenant Kiernan's failure to oversee and/or secure these items in compliance with General Order 1-90 constitutes misconduct.

## CHARGE THIRTY
### Rules & Regulations, Article VIII - Rule 1.2
### FAILURE TO PERFORM A DUTY

Sergeant James Kiernan violated Southampton Town Police Department Rules and Regulations, Article VIII, Rules of Conduct, Rule 1.2, beginning on or about May 15, 2011 until on or about April 24, 2012, when he failed to safeguard drugs by leaving them unsecured and in an unauthorized location. General Order 1-90, Section 2.7, requires that "All evidence /property will be placed in either the evidence chute, an evidence locker, in the evidence storage room located across the hall from the training classroom, in the fenced in impound area or in the refrigerator located at the property processing center in the front of the property room." Lieutenant Kiernan's failure to oversee and/or secure these items in compliance with General Order 1-90 constitutes misconduct.

## CHARGE THIRTY-ONE
### Rules & Regulations, Article VIII - Rule 1.2
### FAILURE TO PERFORM A DUTY

Lieutenant James Kiernan violated Southampton Town Police Department Rules and Regulations, Article VIII, Rules of Conduct, Rule 1.2, beginning on or about May 15, 2011 until on or about April 24, 2012, when he failed to ensure that drugs kept in the Street Crime Office were properly marked. As per General Order 1-90, Section 2.9, "All items are to be properly marked to insure accurate identification". Lieutenant Kiernan's failure to oversee and/or secure these items in compliance with General Order 1-90 constitutes misconduct.

## CHARGE THIRTY-TWO
### Rules & Regulations, Article VIII - Rule 1.3
### DISOBEDIENCE OF AN ORDER

Lieutenant James Kiernan violated Southampton Town Police Department Rules and Regulations, Article VIII, Rules of Conduct, Rule 1.3, in or about the first week in September of 2011, when Chief William Wilson directed Lieutenant James Kiernan to turn over all Confidential Informants maintained by the Street Crime Unit to the East End Drug Task Force. Lieutenant James Kiernan failed to obey this order and/or de-registered approximately 15 Confidential Informants without the knowledge of the Chief of Police or the East End Drug Task Force and/or in contravention of a direct order. Lieutenant Kiernan's conduct in disobeying a direct order constitutes misconduct.

You are entitled to answer the above charges within five (5) days of the date that the charges are served upon you, not counting the day you receive the charges. The answer should be served upon the Office of the Chief of Police. You have the right to a hearing on these charges and to be represented by counsel at the hearing. If you are found guilty of one of more of the charges the penalty imposed upon you may be any of the following: a reprimand, forfeiture of and withholding of salary or compensation for a period not exceeding 20 days, by extra tours of duty not exceeding twenty days, by suspension without pay not exceeding twenty days, or by dismissal from the Department. This is to advise you that the penalty the Department is seeking

is your dismissal.  Please be further advised that in accordance with the resolution of the Town Board, dated _____, you are suspended without pay pending the trial of these charges.

The Department reserves the right to add to or amend these charges at a future date.

_____

William Wilson, Jr.
Chief of Police

STATE OF NEW YORK
TOWN OF SOUTHAMPTON

————————————————————————— X

IN THE MATTER OF THE DISCIPLINARY CHARGES
PREFERRED BY

WILLIAM WILSON, Jr., CHIEF OF POLICE

      against

ERIC SICKLES, POLICE OFFICER

————————————————————————— X

    In accordance with Section 155 of the New York Town Law, the following Departmental disciplinary charges are hereby preferred against you as follows:

### CHARGE ONE
Rules & Regulations, Article VIII - Rule 1.1
CONDUCT WHICH BRINGS DISCREDIT UPON THE DEPARTMENT

    Police Officer Eric Sickles, while a Police Officer with the Southampton Town Police Department, violated Southampton Town Police Department Rules and Regulations, Article VIII, Rules of Conduct, Rule 1, on various dates between January 2010 and December 2011, by working in his assignment as a Police Officer while under the influence of a controlled substance. This is misconduct.

### CHARGE TWO
Article VIII, Rule 1.9
INCOMPETENCE

    Police Officer Eric Sickles, while a Police Officer with the Southampton Town Police Department, violated Southampton Town Police Department Rules and Regulations, Article VIII, Rules of Conduct, Rule 9, on various dates between January 2010 and December 2011, by working in his assignment as a Police Officer while under the influence of a controlled substance. Police Officer Sickles' conduct rendered him unfit for duty. This constitutes incompetence.

### CHARGE THREE
Rules & Regulations, Article VIII - Rule 1.6
LOUNGING OR SLEEPING ON DUTY

    Police Officer Eric Sickles, while a Police Officer with the Southampton Town Police Department, violated Southampton Town Police Department Rules and Regulations, Article VIII, Rules of Conduct, Rule 6, in or about the summer of 2011, when Police Officer Sickles, a member assigned to the Street Crime Unit, fell asleep while on duty. This is misconduct.

## CHARGE FOUR
### Rules & Regulations, Article IX - Rule 4
### FAILURE TO BE FIT FOR DUTY

Police Officer Eric Sickles, while a Police Officer with the Southampton Town Police Department, violated Southampton Town Police Department Rules and Regulations, Article IX, Rules of Conduct, Rule 4, in or about the summer of 2011, when, as a member assigned to the Street Crime Unit, he fell asleep while on duty. Southampton Town Police Rules and Regulations require a member of the Department to be fit for duty and subject to duty at all times except when on sick report. This is misconduct.

## CHARGE FIVE
### Rules & Regulations, Article IX - Rule 4
### FAILURE TO BE FIT FOR DUTY

Police Officer Eric Sickles violated Southampton Town Police Department Rules and Regulations, Article IX, Rules of Conduct, Rule 4 on or about October 24, 2011, when Police Officer Sickles' wife, Erica Sickles, observed Officer Sickles asleep at their kitchen table with his duty gun in hand. Erica Sickles also reported to the Southampton Town Police Department that Officer Sickles was unable to drive a car without falling asleep, and/or that she felt she and her children were in danger. Southampton Town Police Rules and Regulations require a member of the Department to be fit for duty and subject to duty at all times except when on sick report. Police Officer Sickles' conduct rendered him unfit for duty and/or endangered his family. This is incompetence.

You are entitled to answer the above charges within five (5) days of the date that the charges are served upon you, not counting the day you receive the charges. The answer should be served upon the Office of the Chief of Police. You have the right to a hearing on these charges and to be represented by counsel at the hearing. If you are found guilty of one of more of the charges the penalty imposed upon you may be any of the following: a reprimand, forfeiture of and withholding of salary or compensation for a period not exceeding 20 days, by extra tours of duty not exceeding twenty days, by suspension without pay not exceeding twenty days, or by dismissal from the Department. This is to advise you that the penalty the Department is seeking is your dismissal. Please be further advised that in accordance with the resolution of the Town Board, dated _____, you are suspended without pay pending the trial of these charges.

The Department reserves the right to add to or amend these charges at a future date.

_____

William Wilson, Jr.
Chief of Police

| CC# | DATE OF REPORT 10-28-2011 | POLICE DEPARTMENT TOWN OF SOUTHAMPTON | COMMAND SCU | DATE OF OCCURRENCE |
|---|---|---|---|---|
| INCIDENT Confidential Investigation | | SUPPLEMENTARY REPORT | | PAGE 1 OF 1 |
| COMPLAINANT | | ADDRESS | | |

On Tuesday, October 25, 2011, at about 1900 hrs undersigned received a voice mail message from Erica Sickles, wife of PO Eric Sickles, requesting a call back in reference to her husband.  At about 2139 hrs on the same date undersigned called back Mrs. Sickles on the cell phone number that she left on the prior voice mail, 631-767-7861. During the conversation Mrs. Sickles reported that she needed help because her husband was being prescribed several different medications and the side effects were dangerous to herself and her children.  She reported that Officer Sickles was locking his gun up on the previous evening and fell asleep with the gun in his hands while sitting at their kitchen table.  She also reported that he was unable to drive a car because he would fall asleep while operating.  Mrs. Sickles reported being scared of theses symptoms and reported that discussions with her husband about them did not help because he was unaware of his own symptoms and denied having them.  Undersigned reported to Mrs. Sickles that I would speak to Officer Sickles about the matter.  Mrs. Sickles requested that her report of the matter be kept anonymous.

It should be noted that undersigned did speak to Officer Sickles several months prior to this report about being drowsy at work.  At that time officer Sickles reported that he was on medication that was making him drowsy and that he would correct the situation with the help of his Doctor.  During that time the symptoms seized to be noticed by undersigned and Officer Sickles reported to have rectified the medication problem with his Doctor.

On Wednesday, October 26, 2011 at about 1645 hrs undersigned spoke with Officer Sickles in the Street Crime office.  At that time Officer Sickles was told that his duty weapon was to remain locked in the Street Crime gun locker and that he was not permitted to drive departmental vehicles.  He was also instructed that he will be restricted to desk duty until such time that he addresses his drowsiness symptoms.  Officer Sickles reported that he did recently change back to a medication that he was taking when undersigned spoke to him about these symptoms several months ago and that he believed that medication is what was causing the drowsiness to return.  He reported that he will confer with his physician and rectify the problem.  He further reported that he was having difficulty sleeping and would confer with medical experts about that matter as well.

During that conversation undersigned further informed Officer Sickles that a doctor's note clearing him for "full duty" would be required before he would be considered to return to his normal duties.

On Thursday, October 27, 2011 at about 1700 hrs Officer Sickles called undersigned and reported that he had conferred with his physician and that he obtained a note from the doctor explaining the rectification of his drowsiness symptoms.  He further reported that he was going to confer with another physician that he was seeing in reference to a sleep deprivation matter that he was having.

On Monday, October 31, 2011 at about 1000 hrs officer Sickles provided undersigned with a note from his Doctor, indicating that he was fit for "full duty". The prescription indicated that Officer Sickles had been taking a prescribed medication which attributed to his drowsiness symptoms and that Officer Sickles has discontinued taking this medication.  A copy of the note is attached to this report.
Based on the recommendation of the physician along with the observation of the undersigned, indicating the lack of physical symptoms of drowsiness at this time, gives reason to the return of Officer Sickles to "full duty" status.

| FOUNDED | CASE STATUS | | TELETYPE # | DATE |
|---|---|---|---|---|
| REPORTING OFFICER Lt. James Kiernan #9 | | | | |



TOWN of SOUTHAMPTON

110 Old Riverhead Road
Hampton Bays, New York 11946

Emergency: 911
Anonymous Tip Hotline: (631) 728-3451
General Business: (631) 728-5000
Police Reports: (631) 728-5007
(631) 728-5008
FAX: (631) 728-5440

**William Wilson Jr.**
*Chief of Police*

March 28, 2012

Lieutenant James Kiernan
Southampton Town Police Department
110 Old Riverhead Road
Hampton Bays, NY 11946

Lieutenant Kiernan,

You are directed to report to the Suffolk County Police Department Internal Affairs Bureau, located at 30 Yaphank Avenue, Yaphank, NY on Thursday March 29, 2012 at 1100 hours, in reference to an interview.

Any and all questions posed to you will be answered honestly and without subterfuge.

William Wilson Jr.
Chief of Police

      

Accredited by:
New York State Law Enforcement Accreditation Program

**Lt James Kiernan, Southampton Town PD**
**IAB Interview**

- Lt Kiernan was never ordered to respond to IAB and answer questions. Captain Pearce called him at home and told him to come to Yaphank the following day.
- There was no department order issued regarding his promotion (promoted on October 11, 2011).
- Once promoted he was instructed to shadow Lt Pearce to learn his job.
- 6 years as CO of Street Crime Unit. 2 years as an undercover. Department order to assign him to SCU.
- Lt Kiernan supervised PO Sickles in SCU for 6 years. Not social friends.
- Lt Kiernan never noticed a change in PO Sickles demeanor/behavior.
- SCU does undercover narcotics investigations. PO Sickles did undercover work as well as investigations.
- PO Sickles advised Lt Kiernan counseled him on October 26 he told painkillers anti anxiety pain killers and blood pressure medicine as well as a sleeping disorder. Never observed him taking medications at work.
- Lt Kiernan got a phone call from PO Sickles wife, said he had fallen asleep with his gun in his hand while he was putting it away.
- Lt Kiernan told Lt. Pearce on 10/26 about the incident. Lt Kiernan informed the chief of the incident when the chief got back from Florida (prior to 11/4/2011). I sat in the chief's office and introduced myself as a lieutenant because he was not here when I was promoted. I told him I got a call from Mrs Sickles and I told him what I had done. He asked me if there were pain killers involved and I said yes and he said that could happen to anyone, is Eric alright and I said that he appeared to be fine. Mrs Sickles called Lt Kiernan's cell phone, she had never called him prior.
- PO Sickles told Lt Kiernan that he assumed an anti anxiety med that had just been added to his medications probably caused the issue.
- Lt Kiernan ordered PO Sickles to lock up his weapon in the Street Crime office. Decision made after a conversation with Lt Pearce. Gun was never invoiced, just locked in a locker that was accessible to Lt Kiernan and PO Sickles.
- Lt Kiernan told PO Sickles that he was going to be restricted to working in the office with Lt Kiernan until he was medically cleared by a doctor to work full duty. PO Sickles never came to work on the desk.
- Lt Kiernan never observed any indication of drowsiness or a problem.
- In the summer of 2011 PO Sickles told Lt Kiernan that he had fallen asleep on a surveillance. Lt Kiernan felt that the officers of Street Crime made PO Sickles tell Lt Kiernan about the incident. PO Sickles told Lt Kiernan that he had sleep apnea which was the cause.
- Lt Kiernan talked to Lt Pearce about ordering PO Sickles to remain on desk duty. Pearce told Kiernan to tell the chief when he came back.
- PO Sickles was ordered to stay on desk duty when he arrived to work a 4-12 on 10/26and he went home instead (his wife came and picked him up). PO Sickles did not come back to work until he came back with a doctor's note.

- Lt Kiernan never ordered/suggested PO Sickles respond to Employee Assistance.
- PO Sickles came back to work on 10/31 with a doctors note, Lt Kiernan brought it to Lt Pearce who asked him how PO Sickles looked. Lt Kiernan said that he thought PO Sickles looked fine so Pearce said to go ahead and return him to full duty.
- The only time that PO Sickles was on a modified assignment was between 10/26 and 10/31 (and all of those days were taken off). PO Sickles was never at work in a light duty/modified capacity.
- When he came back Lt Kiernan had a conversation with PO Sickles about returning to full duty was where he was going to go. The detective division or patrol division. PO Sickles seemed fully normal he said he had stopped taking the anti anxiety medications. Never questioned whether or not he should work while taking the medications. Not sure if any of the meds were narcotics. Lt k continued to observe but did no further investigation.
- Lt Pearce asked for a supplementary regarding the situation which Lt Kiernan submitted and it was filed in the "I folder".
- Lt Kiernan did not consider requiring PO Sickles to submit to a drug test or any type of evaluation. PO Sickles behavior gave Lt Kiernan no cause for concern.
- Lt Kiernan remained in Street Crime for a brief period after his promotion. He was still using the Street Crime office in the month of October.
- PO Sickles did not display any signs of drug addiction or emotional problems.
- 12/3 was the first time Lt Kiernan heard of a drug problem.
- PO Harrigan was never assigned to SCU; PO Sickles was assigned to CRU to work with PO Harrigan. At the time Lt Schuerick oversaw the CRU unit. At this time Lt Kiernan does not know who oversees the CRU unit because of the current department structure.
- No personnel order assigning PO Sickles and PO Harrigan to work together. The assignment was made orally from the chief. When the chief came back from FLA and I advised him of the situation. I asked what PO Sickles should be doing now, he said he showed an interest in CRU working with PO Harrigan he should go there.
- Lt Kiernan told PO Sickles and PO Harrigan that they were going to work together. He would ask Lt Kiernan for a day off but PO Harrigan would ask Sgt Briton. The officers were assigned to do proactive work on their own. Lt Kiernan did not know who decided if they should work in plain clothes or uniform, he thought they decided that on their own.
- All narcotics investigations were being forwarded to the East End Drug Task Force.
- Lt Kiernan does not know how PO Sickles and PO Harrigan reported their activity. Possibly CRU had some type of activity report by Lt Kiernan did not require any type of report.
- There was no official department document for the assignment of PO Harrigan and PO Sickles. They worked together up until 12/4. PO Sickles was being assigned to patrol and Lt Kiernan does not know where PO Harrigan works now.

- PO Gwynn called Lt Kiernan to tell him that he had heard reports that PO Sickles was seen "out of it" at work. Lt Kiernan told PO Gwynn that it was old info because it had been addressed. PO Gwynn said it was only a couple of days ago. PO Gwynn said that he had info from a pharmacy that PO Sickles was filling prescriptions for oxycodone that were more than prescribed (Gwynn would not give any more detail). Lt Kiernan immediately called the chief and told him that the problem with PO Sickles medication that they had discussed earlier was not resolved. The chief told him to investigate and get back to him.
- Lt Kiernan told PO Sickles to meet with him the following day and met together with PO Gwynn. Lt Kiernan told PO Gwynn to tell PO Sickles about his info. PO Sickles denied any problems. After about an hour of discussion PO Gwynn asked PO Sickles if he could stop taking the meds on his own and PO Sickles said no which shocked Lt Kiernan.
- PO Gwynn and PO Sickles left with the understanding that Lt Kiernan would take care of the situation. They had not left the house when Lt Kiernan called the chief and asked him to find PO Sickles help. Lt Kiernan did not observe any indication of a problem until he heard PO Sickles admit to a problem.
- Lt Kiernan never secured his weapon. PO Sickles told Lt Kiernan that PO Gwynn came to get his weapon a little while ago.
- The chief told Lt Kiernan to stay out of the situation he was dealing with the union and trying to get him a disability retirement. Lt Kiernan objected that the injury was not job related and the chief replied that he would decide what was job related.
- Lt Kiernan did not recall telling anyone that PO Sickles had a "pill problem" prior to sending him back to patrol.
- The only communication with PO Sickles was Sickles text messaging him.
- Lt Kiernan asked to see PO Sickles supplementary report and Sickles agreed to show him the report.
- On 2/10 the chief had PO Gwynn and Sgt Costa find PO Sickles and write a supp report.
- Lt Kiernan recalled that the chief asked for Lt Kiernan's supp report immediately after leaving an executive meeting on 2/10. Lt Pearce gave the chief Lt Kiernan's report that was in the "I folder".
- The chief never discussed Lt Kiernan's report with him in Feb.
- Lt Kiernan never heard anything about the situation (except to be praised by the chief shortly after the Oct incident) until he was told to come up to IAB.
- Lt Kiernan knew that PO Sickles normally left his weapon in the SCU office. Lt Kiernan never addressed why PO Sickles had his gun home.
- After a short break Lt Kiernan clarified the question about a "pill problem". Prior to PO Sickles going to patrol Lt Kiernan went to Sgt Ralph, PO Sickles' supervisor, and told her to keep an eye on him. She asked if it was a pill problem and Lt Kiernan told her it was a back injury and he is working on it.
- PO Sickles told Lt Kiernan that he is doing well and ready to work.
- Sgt Ralph happy with PO Sickles coming to her squad. She agreed to keep an eye on him and get back to Lt Kiernan if any problem.

SON Jr.
lice

110 Old Riverhead Road
Hampton Bays, New York 11946

# SUPPORTING DEPOSITION
## STATEMENT

Page 1 of ___

:W YORK )
SUFFOLK )
UTHAMPTON )

CC# _____

___ Date

ᔑ𝓂ᵤᵧ Sₗcₗₗₑₛ _____ being duly sworn, deposes and state

rs old, born on _____, in _BROOKₗᵧ_

le at _____

ɪone number is _____. I am currently ~~employed~~

~~m~~ _____, My work telephone number is (

nent to _ᔑ/Sgt Lisa Costa_ of the Southampton Town Po

is true to the best of my knowledge and belief and is freely given.

:BAND OF 6 YEARS, ERIC SICKLES, HAS BEE

PENDANCY. I THINK ITS BEEN NEIL A

TO A DOCTOR IN SETAUKET WHO PRESCRIBES

HE USED A DOCTOR LOCATED ON. EAST MA

. WHO PUSHED DRUGS WITHOUT CONCERNS

HE SUMMER OF 2011 I NOTICED A CHANGE IN N

. HE WAS COUNST CONSTANTLY FALLING A

STATE OF NEW YORK )
COUNTY OF SUFFOLK ) SS:
TOWN OF SOUTHAMPTON)

_____ ERIC SICKLES _____, being duly sworn, deposes and says:

BUT HE WOULD DENY HE HAD A PROBLEM. AROUND SEPTEMBER 2011 I WENT TO HIS DOCTOR ON EAST MAIN STREET IN RIVERHEAD AND PLEADED WITH HIM TO CUT ERIC BACK. HE WAS ON OXY CODONE AND XANAX AT THE TIME AND THE DOCTOR JUST DISREGARDED ME. I WENT BACK AND ASKED HIM TO HELP ERIC. INSTEAD HE CALLED ERIC AND TOLD HIM I CAME THERE BY MYSELF.

I ALSO TRIED CALLING OUR INSURANCE COMPANY TO SEE IF HE WAS SEEING MORE THAN ONE DOCTOR AT ONCE IF THERE WAS ANYTHING I COULD DO OR FIND OUT. I TOOK VIDEOS OF ERIC TO SHOW HIM HOW BAD HE WAS BUT HE WOULD JUST DELETE THEM. I EVEN ASKED HIS MOM, GALE SICKLES, FOR HELP. I DIDN'T GET ANY SO MID OCTOBER 2011, ERIC CAME HOME WITH HIS WORK BAG. THAT HAD HIS GUN AND WORK GEAR IN IT. I THOUGHT IT WAS ODD BECAUSE HE ALWAYS KEEPS IT LOCKED UP AT POLICE HQ. HE LEFT IT ON THE KITCHEN TABLE AND THEN PROCEEDED TO FALL ASLEEP BY HIS BAG. I KEPT WATCHING HIM BECAUSE HE HAD HIS WORK GUN IN THE BAG. I DIDN'T WANT THE KIDS TO GET HURT AND I COULDN'T GET HIM UP. I WAS REALLY WORRIED AND DIDN'T KNOW WHAT TO DO. ERIC HAD QUALIFIED SO THAT WAS PROBABLY WHY HE BROUGHT IT HOME. ERIC TOLD ME THAT JIMMY (HIS BOSS, JIMMY KIERNAN) TOLD ERIC HE DIDN'T LOOK RIGHT AT WORK. IT WAS RECENTLY AND THAT STUCK OUT IN MY MIND. I FIGURED IF JIMMY NOTICED THAT ERIC WAS NOT RIGHT THEN I COULD CALL HIM FOR HELP. IT WOULDN'T BE ME REACHING OUT AND GETTING ERIC IN TROUBLE BECAUSE JIMMY ALREADY KNEW SOMETHING WAS WRONG. ON OCTOBER 25th AROUND 715 PM I CALLED JIMMYS HOME PHONE AND LEFT A MESSAGE. HE CALLED BACK AROUND 745 pm BUT I DIDN'T RECOGNIZE THE NUMBER OF HIS CELL AND DIDN'T PICK UP. AROUND 9³⁵p

Reporting Officer ___N. SANTORO___   Command ___SIU___   Date ___6/8/12___

FALSE STATEMENTS MADE HEREIN ARE
PUNISHABLE AS A CLASS "A" MISDEMEANOR
PURSUANT TO SECTION 210.45 OF THE
PENAL LAW OF NEW YORK STATE



STATE OF NEW YORK    ).
COUNTY OF SUFFOLK    )    SS:
TOWN OF SOUTHAMPTON)

_____ERICA SICLLES_____, being duly sworn, deposes and says:

THE SAME NIGHT WE SPOKE.
WE TALKED FOR ABOUT 28 MINUTES. I CRIED ON
EVERYTHING TO HIM. I TOLD HIM THAT ERIC
NEEDED HELP AND THAT HE WAS ON XANAX,
PAIN MEDICATION ( OXYCODONE) AND HAD SLEEP
APNEA. I TOLD HIM I WAS CONCERNED FOR
MY FAMILYS SAFETY AND THAT ERIC COULD NOT
STAY AWAKE SO I WOULDNT ALLOW HIM TO DRIVE A
CAR. I TOLD HIM ABOUT ERIC TAKING HIS GUN
HOME AND FALLING ASLEEP WITH IT ON THE TABLE.
    JIMMY TOLD ME THAT HE NOTICED IT TOO AND
ADMITTED ERIC WAS NOT HIMSELF. HE SAID HE
SAW THE CHANGE IN ERIC AND THAT HE NOTICED
HE WAS TIRED ALL THE TIME. I FELT BETTER AND
JIMMY TOLD ME HE WOULD TALK TO ERIC.
    THE NEXT DAY ERIC WENT INTO WORK FOR
AN EVENING SHIFT.
ERIC TOLD ME THAT JIMMY JUST TOLD HIM TO
GET A DOCTORS NOTE. JIMMY TOLD ERIC THAT
HE COULD STAY AT WORK BUT HE COULDNT DRIVE
OR HAVE A GUN, SO ERIC DECIDED TO COME HOME.
HE TOOK OFF 2 DAYS, GOT A DOCTORS NOTE
AND WENT BACK TO WORK.
    I REMBER THINKING ITS NOT RIGHT.
HOW COULD A NOTE BE ENOUGH TO GO BACK TO
WORK? I texted Jimmy a few times
over the next weeks asking about Eric
working & what were the guidelines. I did
tell him my concerns Thier the problem wasn't
fixed.
    OVER THE NEXT MONTH, I KEPT THINKING
HOW DOESNT ANYBODY SEE THE PROBLEM AT WORK.
I KNOW THAT JANE WAS ASSIGNED TO WORK WITH
ERIC AT WORK BUT THAT DIDNT FIX ANYTHING.

Reporting Officer  N. SOTOMNZO          Command    SHT    Date   6/6/13

FALSE STATEMENTS MADE HEREIN ARE
PUNISHABLE AS A CLASS "A" MISDEMEANOR
PURSUANT TO SECTION 210.45 OF THE
PENAL LAW OF NEW YORK STATE

STATE OF NEW YORK )
COUNTY OF SUFFOLK ) SS:
TOWN OF SOUTHAMPTON)

_____EMLA SICKLES_____, being duly sworn, deposes and says:

ALL I KEPT SAYING WAS HOW CAN I SEE THE
PROBLEM AND HIS BOSS WHO SEES HIM AT WORK
EVERY DAY (AND MORE THAN ME) (W) CANT ISNT
DOING ANYTHING ABOUT IT.
      I GIVE THIS A PAGE STATEMENT FREELY
AND TO THE BEST OF MY RECOLLECTION AND SWEAR IT
IS THE TRUTH.

Reporting Officer _____   Command __SH__   Date __6|8|13__

FALSE STATEMENTS MADE HEREIN ARE
PUNISHABLE AS A CLASS "A" MISDEMEANOR
PURSUANT TO SECTION 210.45 OF THE
PENAL LAW OF NEW YORK STATE





**SOUTHAMPTON TOWN POLICE DEPARTMENT**
**TOWN of SOUTHAMPTON**

*William Wilson Jr.*
*Chief of Police*

# Interoffice Memorandum

TO: Chief William Wilson
Subject: PO Sickles
Date: 2/13/12

On 2/10/12, I was directed by Chief of Police William Wilson to obtain a supplementary report from PO Sickles in reference to his substance abuse problem.

POS was hired as a police officer in 2000 and was assigned to the Street Crime Unit in January of 2003. While in this 3-4 person unit PO Sickles was under the direct supervision of Sgt. Kiernan from July 2006 and remained there after he was promoted to Lieutenant in October 2011.

On 2/10/12 the 2 page supp from PO Sickles was obtained in the presence of PBA representative Gwinn at a diner in Sayville. PO Sickles told me he was having a real bad day because he was having anxiety and depression. He was exhibiting withdrawal symptoms as he appeared shaky and was perspiring. He had just seen his counselor for his drug dependency which had made him feel a little better. I asked him to disclose the history of his drug abuse problem and he did so willingly.

PO Sickles disclosed that he was suffering from back pain for about the last 3 years. In the late months of 2010 his doctor had prescribed Oxycotin and Oxycodone IR (a stronger narcotic that was released directly into your system for faster results)to ease the pain and to assist him sleep. He stated that around feb 2011 a new doctor in riverhead prescribed him oxycodone IR, xanax for anxiety, zoloft for depression, and divan for his high blood pressure. He told me he was under the assumption that as long as he had a prescription for these medications and that as long as the dose was not exceeded he was ok to work. He stated that around 4 months later (summer 2011) he knew he had a problem and that he was addicted to the drugs.

PO Sickles told me that he was approached by his boss, Sgt Kiernan in early November 2011 (actual date was 10/26/11) who said Lt. Pearce noticed that there were problems with PO Sickles nodding off at work and odd behavior. At that time PO Sickles states he advised Lt Kiernan that he was on Oxycodone, zoloft, xanax, and diovan. He said that Lt Kiernan said that sometimes that blood pressure medication can make you drowsy and directed him see his doctor to address the issue. At that time he was directed by Lt Kiernan to lock his duty weapon in his Street Crime locker and not to drive his issued police department vehicle. He did same. PO Sickles took a Chart Day on 10/27/11, and 2 sick days on 10/29 and 10/30/11. He obtained notes from his personal doctor who took him of xanax and returned to full duty on 10/31/11 with the approval of Lt Pearce and Lt. Kiernan. PO Sickles stated that Lt K mentioned that LT. Pearce had seen POS and that he "looked as sharp as a tack".

On Sunday, February 12, 2012, I went to PO Sickles home to retrieve his duty weapon gun.

Respectfully,

Sgt. Lisa Costa #30

| CENTAL COMPLAINT NO. | DATE OF REPORT | POLICE DEPARTMENT | COMMAND REPORTING ☐UNIFORM ☐DETECTIVE | DATE OF OCC. |
|---|---|---|---|---|
| | 2/16/12 | | | |
| NCIDENT | | TOWN OF SOUTHAMPTON | | |
| | | SUPPLEMENTARY REPORT | | |
| COMPLAINANT – VICTIM – FIRM - BUSINESS | | ADDRESS | | |

IVE DETAILS (LIST ALL LOST, FOUND, STOLEN OR RECOVERED PROPERTY ON REVERSE SIDE)

On February 10th 2012 at about 1700 Hrs. the Following Supp. report was
quested at the Direction of Chief William Wilson.

About three years ago I sustained an injury to my lower back. I was see
a spine specialist and an M.R.I was done revealing a herniated disc. Around
e holiday times of 2010 I was prescribed Oxycontin by my general doctor to
lp me sleep. The medication helped with my back pain, but around two months
er my doctor prescribed me Oxycodone I.R. for the chronic pain. On about February
11 I changed general doctors and was also prescribed Oxycodone I.R. along with
nax for anxiety and Zoloft for depression. I was also prescribed Diovan for
h blood pressure. In that time I was also evaluated by a sleep specialist
diagnosed me with sleep apneia. In the summer of 2011 I attempted to
een off my pain medication when I realized I could not stop taking it in
short period of time due to physical dependency Issues. In early November 2011
Sgt. James Kieman approached me and told me that LT. Robert Pierce advised him
t it was noticed that I appeared very tired and nodding off at work. I advise
h Kremen that I was on several prescription drugs and advised him of what they
e. He then advised me to go to the Doctor to address the issue but in the
n time I would have to lock my weapon in my locker and not to drive my
ice issued vehicle. So my weapon was put in a Street Crime locker and
vehicle was not driven as ordered. I went to my general Doctor

| FOUNDED | ☐1 ACTIVE | ☐ - 3 CLEARED BY ARREST | TELETYPE MESA NO. | DATE |
|---|---|---|---|---|
| ☐YES NO☐ | ☐2 INACTIVE | ☐ - 4 EXCEPTIONALLY CLEARED | | 2/16/12 |
| REPORTING OFFICER  p. Eric Sickles | | | SUPERVISOR | |

yo th Saks 19/12

STATE OF NEW YORK )
COUNTY OF SUFFOLK ) SS:
TOWN OF SOUTHAMPTON)

_____, being duly sworn, deposes and says:

And advised him that I was very tired at work and needed my meds
adjusted so I could return to work. He wrote me a note stating
that the medication that was causing me to feel drowsy was discontinued and
that I can return back to full duty. I also got a note from my sleep
doctor noting my sleep condition. I returned to work several days later
and provided Sgt. Kiernan with the notes. He told me he had to
clear it with the LT. Pearce and he would let me know if I
could return to work. Shortly After Sgt. Kiernan advised me that the notes
were Sufficient and I could resume my regular duties. At that time
I was not asked to submit a urine test or any additional paperwork. If
it was requested I would have complied as I have on several other
occasions. I resumed my duties working with P.O. Jane Horrigan with no
additional incidents. In November of 2011 I was still prescribed oxycodone
along with my Zoloft and Diovan. During this time I was never advised that
I could not be taking legally prescribed drugs at work. At an about December
third I received a call from Sgt. Kiernan asking me if I could meet
him at his house the next day to speak about my condition at work. At
that time I had thought the problem with my drowsiness was resolved.
On the next day I met with Sgt. Kiernan at his house. PBA Rep Kevin Gwinn
was also present. At that time Kevin asked me if I was having issues
with my prescriptions. I told him what I was prescribed. Kevin Expressed
his concerns and after a lengthly conversation. I voluntarily accepted help
to address my issue with prescription drugs. Kevin advised he would
contact the Chief of Police and any other notifications that needed to be
made on my behalf. Kevin advised me that the P.B.A. would arrange any
treatment needed. Kevin Gwinn was at Sgt. Kiernan's house as a P.B.A representative.
I submit this supplementary report in the presence of Sgt. lisa Costa and P.B.A.
rep. Kevin Gwinn as per policy and to avoid disciplinary action.

Reporting Officer P.o. Eric Sickler   Command _____   Date 2/10/12

FALSE STATEMENTS MADE HEREIN ARE
PUNISHABLE AS A CLASS "A" MISDEMEANOR
PURSUANT TO SECTION 210.45 OF THE
PENAL LAW OF NEW YORK STATE



**William Wilson Jr.**
*Chief of Police*

**SOUTHAMPTON TOWN POLICE DEPARTMENT**
**TOWN of SOUTHAMPTON**

*110 Old Riverhead Road*
*Hampton Bays, New York  11946*

*Emergency: 911*
*Anonymous Tip Hotline: (631) 728-3451*
*General Business: (631) 728-5000*
*Police Reports: (631) 728-5007*
*(631) 728-5008*
*FAX: (631) 728-5440*

March 13, 2012

Police Officer Eric Sickles
Southampton Town Police Department
110 Old Riverhead Road
Hampton Bays, NY 11946

Police Officer Sickles,

You are directed to report to the Suffolk County Police Department Internal Affairs Bureau, located at 30 Yaphank Avenue, Yaphank, NY on Tuesday March 14, 2012 at 1300 hours, in reference to an interview.

Any and all questions posed to you will be answered honestly and without subterfuge.

William Wilson Jr.
William Wilson Jr.
Chief of Police

    Accredited by:
New York State Law Enforcement Accreditation Program    

**Interview notes:  PO Eric Sickles, Southampton Town PD**
**IAB Interview**

- Currently seeing Dr. *Satich*
- Sustained a lower back injury, not work related approximately 3 years ago.
- He was initially prescribed hydrocode.
- His doctor switched meds (first doctor was "Tanya Adams").
- She gave him a time release oxycotin so he could sleep.
- He had always been prescribed the diovan for high blood pressure and zoloft for depression (even before the back injury).  He is still taking that medication.
- His tolerance to the effect of the oxycodone built up (late 2010).
- Changed to Dr *Troian* in late 2010.  Sickles' prescription changed from 30mg twice a day to 15 mg 4 times a day.
- His wife said he looked tired at the end of 2010 (around when his child was born).
- He worked for Lt Kiernan until the end of November 2011.  Lt Kiernan was out injured at the end of the summer for 6 weeks or so.
- PO Sickles was never told he was supposed to be closing cases so that the Street Crime Unit could hand everything over to the East End Drug Task Force.  He believed he was supposed to give them his informants but he was never told to stop working.  Told by Sgt Kiernan to assist the East End Task Force.
- Lt Kiernan was aware of Sickles/ Harrigan's activities.
- PO Sickles would meet with CIs alone as he was preparing to turn them over to the task force.  The SCU stopped doing buys but continued to make warrant arrests and drug arrests.
- He heard a rumor he was left in the SCU to clean the cases but was never officially told so.
- He was told PO Harrigan was assigned because she was an active cop.
- In October 2011 Lt Kiernan told him that Lt Pearce said Sickles appeared drowsy.  No specific instances were cited.  Lt Kiernan ordered Sickles to leave his gun in a locker, not drive a dept vehicle and get a doctors note clearing him to work full duty.
- Sickles believed that order meant that he had to stay inside until he got a note.
- He got a note right away and took a couple more days off and when he came back on 10/31 Lt Kiernan told him to stay inside until further notice.  After lunch the lieutenant (Kiernan) told him he was cleared to work.  Sickles understood this to mean he was full duty with no restrictions.
- After the transfer order, transferring him to patrol, PO Sickles worked for a week clearing out his desk, getting uniforms, etc.
- The day before he was to start in patrol Lt Kiernan called him to meet, and told him that something else came up with his medical condition and he looked drowsy.
- PO Sickles assumed that someone from the pharmacy alerted the department about the mixture of medications.

- At the meeting PO Gwynn confronted Sickles with a list of Sickles meds (not sure how he got them, someone must have told him).  PO Gwynn told PO Sickles that he was not right.
- Lt Kiernan told Sickles to stop taking all of the medication.  PO Sickles told Kiernan he could not just stop taking the meds.  Lt Kiernan and PO Gwynn told PO Sickles to take some time off to get it resolved.
- PO Sickles told Lt Kiernan that he thought there was no longer an issue.  Kiernan agreed, he told Sickles that he thought Sickles was fine.
- PO Sickles had tried to wean himself off of the medications by taking less medication less often but was unable to get off of it because his body craved the medication.
- At some point after the October incident Sickles was prescribed Aderall (a stimulant) for his sleep apnea, he tried it once or twice some time in late November or December but was not happy with how he felt ( a little speed like having a red bull), so he stopped.
- PO Sickles was unaware of any conversations between his wife and anyone in the PD about his condition.
- PO Sickles always left his gun at work; never took it home.  Carried his weapon when he left the office (sometimes he would take one of the three smaller .380 cal. handguns assigned to the Street Crime Unit office).
- PO Harrigan was never ordered to drive Sickles, she drove when it was her turn or they took her vehicle.
- PO Harrigan picked Sickles up a couple of times when he had car trouble.  She did not pick him up every day.
- PO Sickles never felt like he should not drive because of drowsiness.
- PO Sickles never took the meds before coming to work.  He would take it the night before he worked a day tour and he would feel like he was hung over in the morning.
- PO Sickles believed he was fit enough to be assigned to patrol.
- PO Sickles had been drug tested several times in Street Crime but did not remember when.
- PO Sickles never took any other drugs (either prescription or illegal) in the past two years.

PAGE 1 of 2

| CC# | DATE OF REPORT 2/10/12 | POLICE DEPARTMENT TOWN OF SOUTHAMPTON | COMMAND Patrol | DATE OF OCCURRENCE 10-25-2011 |
|---|---|---|---|---|

INCIDENT
Confidential Investigation
2011-10

**SUPPLEMENTARY REPORT**

COMPLAINANT
Ericka Sickles

ADDRESS

This supplementary report is provided at the request of Chief William Wilson in regards to the events surrounding PO Eric Sickles fitness for duty in October of 2011. On October 26, 2011, Lt. Kiernan advised me that he had spoken to Erica Sickles, PO Eric Sickles spouse on the evening of October 25, 2011. Lt. Kiernan advised that Mrs. Sickles was concerned for Eric's well being due to a combination of medications he was taking and that he had fallen asleep at the kitchen table with his gun out after his 4-12 shift two nights prior. I inquired when PO Sickles was due to return to work and advised he was due in within a few hour on the 4-12 shift. I inquired if PO Sickles drove a department vehicle to and from work. I was advised he drove his personal vehicle. I advised Lt. Kiernan to meet PO Sickles when he reported to work and assess his condition and advise him that the Department has been made aware of his medication and sleep deprivation problem. PO Sickles was to be advised that he would be prohibited from operating a Department vehicle and was to secure his weapon at Headquarters until medical documentation was provided that he could perform full duty. I assigned an Internal Investigation number (2011-10) and advised Lt. Kiernan to submit a supplementary report with his findings.

Lt. Kiernan advised me that he spoke with PO Sickles and that he did not appear to have any loss of function or appear under the influence of a narcotic. On October 27, 2012, PO Sickles produced a physician's note stating he was fit for full duty and had upon advise of his doctor he had discontinued the use of his anxiety perscription which was determined to be interacting with his pain medication and contributing to his sleeplessness. Lt. Kiernan was advised to continue to monitor PO Sickles condition and advise the Chief of Police upon his return from out of town. A supplementary report was filed along with the original physcian's note and placed in the Internal Investigation file 2011-10.

| FOUNDED NO | CASE STATUS ACTIVE | | TELETYPE # | DATE |
|---|---|---|---|---|
| REPORTING OFFICER Lieutenant Robert Pearce | | SUPERVISOR | | |



**William Wilson Jr.**
*Chief of Police*

*SOUTHAMPTON TOWN POLICE DEPARTMENT*
*TOWN of SOUTHAMPTON*

*110 Old Riverhead Road*
*Hampton Bays, New York  11946*

*Emergency: 911*
*Anonymous Tip Hotline: (631) 728-3451*
*General Business: (631) 728-5000*
*Police Reports: (631) 728-5007*
*(631) 728-5008*
*FAX: (631) 728-5440*

March 28, 2012

Captain Robert Pearce
Southampton Town Police Department
110 Old Riverhead Road
Hampton Bays, NY 11946

Captain Pearce,

You are directed to report to the Suffolk County Police Department Internal Affairs Bureau, located at 30 Yaphank Avenue, Yaphank, NY on Thursday March 29, 2012 at 1300 hours, in reference to an interview.

Any and all questions posed to you will be answered honestly and without subterfuge.

William Wilson Jr.
Chief of Police

**Captain Robert Pearce, Southampton Town PD**
**IAB Interview**

- Captain Pearce prior assignment was Lt in charge of investigations division.
- Promoted to Lt in 1993. Recalled there was some type of dept order for promotion to Lt (not sure). In March 2012 there was no order for his promotion to Capt.
- Recalled an incident when an officer checked himself into Seafield for drug addiction.
- Also recalled suggesting an officer take advantage of employee assistance, never directed anyone there.
- Recalled an incident when he directed a supervisor to order a probationary officer to submit to a drug test.
- On 10/26 Lt Kiernan told him that he got a call from PO Sickles wife regarding PO Sickles falling asleep with his gun. She told Lt Kiernan about his insomnia problem.
- Capt Pearce told Lt Kiernan to meet PO Sickles at the door, make an assessment and get back to him. Lt Kiernan reported that PO Sickles had sleep apnea and a problem with medications.
- Capt Pearce told Lt Kiernan that PO Sickles would be "married to his desk and married to you" until he came back with a doctors note. PO Sickles got a note right away.
- Lt Kiernan was shadowing Capt Pearce at the time of the incident
- Capt Pearce "pulled an I number" because of the wife's complaint. He told Lt Kiernan to "pull an I number" and let the chief know.
- Pearce let the chief know that Thursday about the incident with PO Sickles. Capt Pearce recalled informing the chief on the phone about the incident the day after it happened (10/27).
- Capt Pearce told Lt Kiernan that even after he got a doctors note he was going to have to watch him.
- Capt Pearce spoke with PO Sickles a week later and did not observe anything that would lead him to believe he had a problem.
- Capt Pearce discussed that PO Sickles would secure his weapon with Lt Kiernan in the Street Crime office. Capt Pearce was not concerned about his driving because he was not assigned a department car.
- PO Sickles never came to work in a light duty/modified duty capacity. When PO Sickles came back with a note Capt Pearce told Lt Kiernan to watch him but he was assigned to regular duty.
- Capt Pearce recalled a similar situation when a PO was prescribed a controlled substance, but the county doctor told the PD that he could work.
- Capt Pearce considered a drug test because he was assigned to SCU but due to the fact that it was a sleep disorder and Lt Kiernan observed no problems he decided not to order a drug test.
- PO Sickles was one man in a defunct unit. It would be ok to let him come in and not do anything but administrative work while he waited to get a doctor's note.

- Once PO Sickles came in with a doctor's not he was assigned as a full duty police officer with no restrictions.
- Capt Pearce did not recall ever telling anyone that he had seen PO Sickles and he was "as sharp as a tack".
- PO Sickles was never ordered to see a county doctor or EAB. Capt Pearce concurred with the doctor's recommendation and LT Kiernan's observations of PO Sickles and allowed him back to work.
- Capt Pearce treated the situation as a guy with insomnia so he did not consider it a drastic issue (such as an officer was suicidal or anything along those lines).
- Capt Pearce was not familiar with the assignment of PO Harrigan to work with PO Sickles; he assumed that the chief would have made that assignment.
- No formal transfer order for PO Harrigan and PO Sickles to work together.
- Chief tends to go directly to a unit supervisor, past the higher level managers.
- Lt Kiernan still basically in charge of SCU, even though he wasn't always there, but he would adapt his schedule to meet whatever needs arose.
- PO Harrigan was assigned to CRU and answered to Sgt Briton.
- PO Sickles was assigned to SCU
- CRU and SCU had overlapping schedules (and flexible), so they could work whatever tour was necessary for the requirements of their jobs.
- Capt Pearce was not aware of what SCU was doing. SCU was not doing anything, PO Sickles was wrapping up cases to end and/or turn over to East End Task Force. There was not that much work going on.
- Capt Pearce recognized that PO Sickles was available for patrol, so he could be utilized to offset patrol overtime.
- Capt Pearce not sure if the chief knew that PO Sickles and PO Harrigan were working together.
- Capt Pearce never saw or heard anything that would lead him to believe that PO Sickles had a drug problem.
- Capt Pearce never heard that PO Sickles may have been drowsy.
- Capt Pearce had Lt Kiernan complete a supplementary report and file it in the captain's office. "I numbers" would not always be forwarded to the chief.
- Capt Pearce was not involved with the reassignment of PO Sickles to patrol.
- PO Harrigan currently works in CRU. Her job responsibilities never changed as far as I know.
- Capt Pearce was not familiar with any direction given to PO Harrigan while she was working with PO Sickles.
- Capt Pearce understood that the two were working together once in a while. He was not aware that they were working together on a steady basis.
- PO Sickles was full duty, no restrictions on his ability to drive a vehicle or carry a weapon.
- After a short break Capt Pearce clarified a question about PO Sickles assignment. Capt Pearce approached the chief and asked to assign PO Sickles to patrol in order to address the overtime situation.

PAGE 1 of 1

| CC# | DATE OF REPORT 2/10/12 | POLICE DEPARTMENT TOWN OF SOUTHAMPTON | COMMAND CRU | DATE OF OCCURRENCE |
|---|---|---|---|---|

INCIDENT

SUPPLEMENTARY REPORT

COMPLAINANT
Chief Wilson

ADDRESS

    I give this statement under the direction of Chief Wilson.  I worked with  Street Crime, actually just Eric Sickles, for roughly six weeks after being asked by Lieutenant Kiernan. While in the unit we would report to Lieutenant Kiernan. During my time in the unit Eric had been sick for several days and when he returned he stated that Lt. Pierce had wanted a doctor's note to return to work because he appeared to be not acting right. Eric was not allowed to drive and left his car at hq's and also locked his gun at hq's.  Eric had stated he was on prescription medication and he was having reaction to it leaving him tired or not feeling good.  Most days he seemed fine but some days he was tired and quiet.He stated he took some medication for aniexty and that he also had a sleeping disorder that was causing him problems.

| FOUNDED YES | CASE STATUS ACTIVE | | TELETYPE # | DATE |
|---|---|---|---|---|
| REPORTING OFFICER P.O. Jane Harrigan 2\5/cru | | | SUPERVISOR | |



**William Wilson Jr.**
Chief of Police

### SOUTHAMPTON TOWN POLICE DEPARTMENT
### TOWN of SOUTHAMPTON

*110 Old Riverhead Road*
*Hampton Bays, New York 11946*

Emergency: 911
Anonymous Tip Hotline: (631) 728-3451
General Business: (631) 728-5000
Police Reports: (631) 728-5007
(631) 728-5008
FAX: (631) 728-5440

March 12, 2012

Police Officer Jane Harrigan
Southampton Town Police Department
110 Old Riverhead Road
Hampton Bays, NY 11946

Police Officer Harrigan,

You are directed to report to the Suffolk County Police Department Internal Affairs Bureau, located at 30 Yaphank Avenue, Yaphank, NY on Tuesday March 13, 2012 at 1000 hours, in reference to an interview.

Any and all questions posed to you will be answered honestly and without subterfuge.

William Wilson Jr.
Chief of Police

 

Accredited by:
New York State Law Enforcement Accreditation Program

**PO Jane Harrigan, Southampton Town PD**
**IAB Interview notes**

- Assigned to CRU since 2005, supervised by Lt Kiernan or Sgt Scott. Sgt Britton at the end of 2011.
- She was approached by Sgt Kiernan at the end of august/ beginning of Sept. asked to work with Sickles because he was by himself as they were abandoning SCU.
- Work entailed undercover work, looking for drugs/street crime/ warrants
- Assigned for 2 months: October/November 2011 supervised by Sgt Kiernan and Sgt Britton.
- Sickles and Harrigan told Sgt Kiernan what work they intended to do for the upcoming tour.
- Sickles was supposedly finishing cases but Harrigan was assigned to do investigations.
- PO Harrigan wondered why she was assigned when everyone else in the unit was transferred out. She never questioned it but Sgt Kiernan told her it was because she was aggressive.
- PO Harrigan knew PO Sickles for a long time; she worked together with him when CRU assisted SCU in certain incidents.
- PO Harrigan knew his wife who had been a dispatcher.
- He was sick for a couple days, when he came back he told me that Lt Pearce told him he was not fit for duty and needed a medical note to be cleared for full duty. He said Pearce said he was acting weird not acting right. Sick days (Sat and Sun) that he took as sick days. .
- I tried calling him but he didn't call me back so I just went out on my own. He came back two days later. He said he was pissed off that Pearce told him he couldn't drive so he figured he would not come to work if he wasn't allowed to work. She then tried to tell him to get a PBA rep but he said don't worry I'll handle it.
- He told her he was on xanax and had sleep apnea. He never told her why he was taking the xanax.
- A lot of what was happening didn't make sense…he couldn't drive a car, left his gun in his locker.
- Never observed him nodding off or acting strangely.
- Started picking him up at his house in October some time picked him up and dropped him off.
- He would take his gun most of the time when we went out on the road, but he would take it most of the time I would watch to make sure he was armed. I saw him getting his gun in the locker and she saw him and asked and he said I leave it her but did not give any reason. As far as she knew he had his gun whenever he went on the road.
- No one else ever said anything about sickles behavior.
- No supervisor ever talked to her about sickles behavior. First time she knew about a problem was on 2/10/12.

- PO Sickles said it was "bullcrap" that he wasn't allowed to drive, he was on light duty and he was not allowed to go back to full duty until he got a medical note.
- She does not think that PO Sickles was not allowed on the road.
- She does not know exactly why she was assigned to SCU.  No written order only assigned verbally.  No one told her to drive sickles.  She drove because sickles told her to drive, because he wouldn't.  She started picking PO Sickles up because he asked her to.
- She was under the impression that if she did well they would keep her in SCU.
- Kier asked if I wanted to do it and I said yes, a couple of weeks later PO Sickles came up to me and said that kier got it cleared.  No transfer order which she believed was unusual.
- Would see Kiernan almost every day.  They would brief Sgt Kiernan on what they were doing that day, and on the weekend they would just do street crime stuff.
- Did not know about any weapons restriction.  Did not have to draw weapons while they were together.  Did not recall what PO Sickles was carrying (thought it was his dept weapon .40 cal).
- SCU had smaller gun, but sickles never used that it stayed in the office.
- Seemed odd but was not aware that he was ordered to keep gun locked up.
- Does not know where the weapon assigned to SCU is now.
- Never concerned about working together even with the odd things that were going on.  Knew something was going on but was never able to put my finger on it.
- Often discussions between Kiernan and sickles and left her out, she never questioned it.  Did not know if Kiernan and PO Sickles were friends.  Never complained about being left out of the loop.
- No cleaning up cases, just doing street crime work.
- Seemed odd that he was supposed to be cleaning up cases but they were creating more work.  Got the impression from Kiernan that they would be able to assist the east end Task Force.  Kiernan was aware of the work that they were doing.
- Some days PO Sickles was quiet but he said he had sleep apnea so she was not concerned.  She never observed any change in behavior in sickles.
- Went back to cru, found out after coming back from vacation for a couple of weeks in November and then he was going on vacation after he was notified of the change.
- Sgt Britton was not happy with her working in SCU.  Kiernan and Britt should have brought any disagreement to Lt Pearce.
- Made probably 10-15 arrests with sickle.
- Would jump in car if he was out sick and do some v&ts.
- Sickles not happy about going to patrol because he had been in SCU for 8 yrs.
- Didn't want people in SCU to go to East End Task Force probably because the SCU guys were too set in their ways, so the chief sent other people to the Task Force.
- Has not spoken to sickles since they were transferred (or his wife).
- Never told that she was going to SCU to drive PO Sickles
- Never discussed any drug addiction he told her he was taking prescriptions but I didn't know what.
- Never showed any indication of impairment.

- If I felt like he was wasted I would have acted on that, never thought he was not fit to drive.
- Lt Pearce never told me anything or spoke to me directly about anything.

| DATE OF REPORT<br>02/10/12 | POLICE DEPARTMENT<br>TOWN OF SOUTHAMPTON<br><br>SUPPLEMENTARY REPORT | COMMAND<br>Patrol<br>Division | DATE OF OCCURRENCE |
|---|---|---|---|
| INCIDENT | | | PAGE 1 OF 1 |
| COMPLAINANT | ADDRESS<br>110 Old Riverhead Rd. Hampton Bays, N.Y. 11946 | | |

This report is being submitted for administrative purposes only and under order of Chief William Wilson, Jr. I have not done so voluntarily and expressly decline to waive my right against self-incrimination and my right to counsel. In addition, this statement, and any part thereof, may not be used against me in any subsequent criminal and or civil proceeding and I submit this report to avoid disciplinary sanction.

In late November 2011, I was working a day tour as a patrol sergeant in squad 2. Lt. James Kiernan advised me that P.O. Eric Sickles, who worked in the Street Crime Unit, would be transferred to work in my squad within a couple of weeks. He then advised me that he needed to speak further to me about P.O. Sickles but would do so the following day.

The following morning Lt. Kiernan advised me that P.O Sickles has a pill problem. He said P.O. Sickles would be fine and he asked me to keep an eye on him. Lt. Kiernan stated that while he was a Sergeant assigned to the Street Crime Unit he had noticed P.O. Sickles nod-out while at work and lose his train of thought during conversations. Lt. Kiernan stated that he had P.O. Jane Harrigan, who was assigned to the Community Response Unit, drive P.O. Sickles around during his tour of duty because he was not allowed to drive.

P.O. Sickles was placed on sick leave during December, 2011, having never worked a day in squad 2. In January, 2012 I was told by P.O Don Metcalf, who is assigned to my squad and who previously worked in the Street Crime Unit, that P.O. Sickles was feeling depressed about his absence from work.

I spoke to Lt. Kiernan and told him that I was very concerned for P.O. Sickles well-being. Lt. Kiernan advised me that he will check on him. Lt. Kiernan then stated that other officers assigned to the Street Crime Unit had also noticed P.O. Sickles nod-out while on-duty. Lt. Kiernan stated P.O. Sickles has a pill problem for quite some time, and felt it began sometime around the time after P.O. Todd Spencer was promoted to Sergeant and left the Street Crime Unit, which was in January of 2010.

| CASE STATUS | TELETYPE # | DATE |
|---|---|---|
| REPORTING OFFICER<br>Sergeant Susan C. Ralph, #30   #32 | SUPERVISOR | |



**William Wilson Jr.**
*Chief of Police*

*SOUTHAMPTON TOWN POLICE DEPARTMENT*
*TOWN of SOUTHAMPTON*

*110 Old Riverhead Road*
*Hampton Bays, New York  11946*

*Emergent*
*Anonymous Tip Hotline:* (631) 72
*General Business:* (631) 72
*Police Reports:* (631) 72
(631) 72.
*FAX:* (631) 72.

March 13, 2012

Sergeant Susan Ralph
Southampton Town Police Department
110 Old Riverhead Road
Hampton Bays, NY 11946

Sergeant Ralph,

You are directed to report to the Suffolk County Police Department Internal Affairs Bureau, located at 30 Yaphanl Avenue, Yaphank, NY on Tuesday March 14, 2012 at 0900 hours, in reference to an interview.

Any and all questions posed to you will be answered honestly and without subterfuge.

William Wilson Jr.
Chief of Police




She knew PO Sickles was going to come to her squad.  She observed him
gas pump; he was driving a department Impala at the end of November,
had been disbanded.  PO Sickles was picking up his equipment.

He was sweating, ashen gray and talking extremely fast, I thought he wa
didn't do anything because I knew he was going inside.  I knew there wa
problem so I had asked to speak with the chief.

Lt Kiernan told her PO Sickles was coming to her squad but he need to s
her.  Lt. told me he would talk to me the next day.  I sought him out and
into the sergeant's room where he told her that Sickles had a pill problem
would not elaborate, she didn't ask him to.  Lt K asked her to keep an ey
Sickles.  I know I'm getting an officer with a problem.

She had spoken to Sickles on the phone and knew he wanted a slow sect
sounded odd to her.

She would never question Lt Kiernan due to prior experience when she v
detective

Worked with PO Sickles in SCU for a brief time.  Knew him as a hard w
Ralph wondered why PO Sickles was doing car stops with PO Harrigan
was supposed to be "cleaning up cases".

Other officers were saying PO Sickles did not look right.  Based on their
interactions with him on car stops.

Never heard PO Gwynn or PO Harrigan make comments regarding PO S
behavior.

Lt Kiernan told Sgt Ralph that he had seen PO Sickles nodding off and st
conversations.

Sgt Ralph had a second conversation with PO Sickles told her he was cor
because Sickles was not at work.  She texted him to ask how he was doin
Sickles told her he was depressed, she asked him if he needed help, he sa
back pain and did not need to talk to anyone.  Asked Lt Kiernan if PO Si
his weapon because she thought he was depressed.  Lt Kiernan told her h
suboxone.  Lt Kiernan talked as if PO Sickles was coming back to work a
Lt Kiernan told Sgt Ralph that he would check on him.

Lt Kiernan first told her about the transfer to patrol the day before the per

- No one approached her to complain about Sickles or warn her that he had a problem.
- She believed that PO Sickles would show up for work unfit for duty. She expected to drive him home on the first day, because she could not go to Lt Kiernan, Lt Pearce and the chief was away.
- Lt Kiernan told Sgt Ralph that PO Sickles was suspended where he was relegated to the office and was not allowed to leave, but he obviously did.
- Sgt Ralph stated that PO Sickles was not supposed to have a gun. Lt Kiernan told Sgt Ralph that PO Sickles was not supposed to have a weapon. A supervisor would have taken the weapon and invoiced it. Should have been vouchered to property. If suspended badge and gun should be taken.
- Only observed PO Sickles once in the condition not fit for duty.
- Lt Kiernan told Sgt Ralph that the problem began when PO Spencer of SCU was promoted to Sergeant in 2010.
- Lt Kiernan targeted Neptune's bar for enforcement.
- Sgt Ralph discussed other complaints about Lt Kiernan's supervision of the Street Crime Unit that she had experienced. Specifically she was concerned about Lt Kiernan's handling of undercover drug operations.



**William Wilson Jr.**
*Chief of Police*

### SOUTHAMPTON TOWN POLICE DEPARTMENT
### TOWN of SOUTHAMPTON

*110 Old Riverhead Road*
*Hampton Bays, New York  11946*

*Emergency: 911*
*Anonymous Tip Hotline: (631) 728-3451*
*General Business: (631) 728-5000*
*Police Reports: (631) 728-5007*
*(631) 728-5008*
*FAX: (631) 728-5440*

March 12, 2012

Police Officer Kevin Gwinn
Southampton Town Police Department
110 Old Riverhead Road
Hampton Bays, NY 11946

Police Officer Gwinn,

You are directed to report to the Suffolk County Police Department Internal Affairs Bureau, located at 30 Yaphank Avenue, Yaphank, NY on Tuesday March 13, 2012 at 1300 hours, in reference to an interview.

Any and all questions posed to you will be answered honestly and without subterfuge.

William Wilson Jr.
Chief of Police

   

Accredited by:
New York State Law Enforcement Accreditation Program

**PO Kevin Gwynn, Southampton Town PD**
**IAB interview 3/14/12**

- PO Gwynn currently assigned to the Detective Division.  Worked with PO Sickles in patrol prior to PO Sickle's assignment to Street Crime Unit.
- Recently worked together occasionally when the detectives worked with the Street Crime Unit.
- PO Gwynn saw PO Sickles between August and November.  In mid-late November PO Gwynn observed a change in PO Sickles' behavior.  Drowsy all the time couldn't focus his speech was slurred at times.  PO Gwynn had not observed the condition earlier.
- On one occasion the detectives were investigating a grand larceny and there were power tools on the ground in the squad room.  PO Gwynn observed PO Sickles come into the office to say hello.  PO Sickles just stood by the tools staring at the ground almost as if he forgot anyone else was in the room, then he kind of woke up.  Just the way he was talking I knew something was wrong.  PO Gwynn asked him if he was ok and he just said he was drowsy.  Then he went home for the evening.
- Some time in November, PO Sickles came into the office with PO Harrigan (at that time she was with him all the time), they were going out on a detail.  PO Sickles appeared to be pale as a ghost.  PO Gwynn did not confront him in front of anyone.  PO Gwynn was worried about him so he contacted his immediate supervisor, Lt Kiernan.  Lt Kiernan told PO Gwynn that it was pain medication and he had been suspended, but then got a doctor's note.
- PO Harrigan spoke to PO Gwynn about PO Sickles shortly after December.  PO Harrigan told him that she knew something was wrong, so she asked him to reach out to one of the PBA board members.
- PO Gwynn contacted Lt Kiernan on his cell phone and told him that he suspects that PO Sickles had a substance abuse problem.  Lt Kiernan told him that he had handled it; PO Sickles had been suspended and came back with a medical note.
- PO Gwynn told Lt Kiernan that PO Sickles was back and needed to be dealt with.
- PO Gwynn told PO Sickles he was concerned.
- PO Gwynn believed that PO Sickles should not have been driving a car (or functioning as a police officer).
- PO Gwynn was concerned that if PO Sickles was ordered not to drive while at work, how was he able to drive to work.  PO Gwynn learned later that PO Harrigan had been picking him up and driving him to work.  PO Gwynn assumed that those instructions came from Lt. Pearce.
- Lt Kiernan called PO Sickles and told him to come to Kiernan's house.  PO Gwynn told Sickles that he had known him for a long time and wanted to get him help.
- After some back and forth PO Sickles broke down and accepted the help offered by PO Gwynn.  Lt Kiernan was genuinely concerned.
- PO Gwynn called the Chief who assisted in getting PO Sickles help immediately.
- PO Gwynn believes that PO Sickles is currently in treatment and doing well.

- PO Gwynn never observed any indication of a substance abuse problem prior to the end of 2011.
- PO Gwynn never spoke to Lt Pearce about PO Sickles.
- PO Gwynn did not see PO Sickles between the two incidents he described initially.  When asked about when he saw PO Sickles last, PO Gwynn recalled possibly seeing him in between the two instances stated above.
- PO Sickles told Lt Kiernan that Sickles looked stoned.
- PO Gwynn never had a conversation with PO Sickle's wife, he was aware of the conversation between Erica Sickles and Lt Kiernan.
- On the two occasions mentioned above PO Gwynn believed that PO Sickles was in no condition to drive or act as a police officer.
- No record of any suspension as stated by Lt Kiernan.  The PBA would normally be notified.
- Lt Kiernan was told by Lt Pearce to suspend PO Sickles.
- PO Gwynn was aware that PO Sickles was taking oxycodone and xanax, and currently suboxone.

## STIPULATION OF SETTLEMENT AND GENERAL RELEASE

Stipulation of settlement by and between the Town of Southampton (the "Town") and James Kiernan ("Kiernan") dated this ____ day of October, 2012.

WHEREAS, Kiernan is employed by the Town as a Lieutenant in the Police Department; and

WHEREAS, disciplinary charges were preferred against Kiernan on or about May 4, 2012; and

WHEREAS, by answer dated May 9, 2012, Kiernan, by his counsel, Perini & Hoerger, denied the charges and requested a hearing; and

WHEREAS, Kiernan was suspended on May 4, 2012; and

WHEREAS, during his suspension from service, Kiernan was permitted to remain on the payroll while utilizing accumulated leave time, and

WHEREAS, Roger Maher was appointed hearing officer by Town Board resolution dated June 12, 2012; and

WHEREAS, disciplinary hearings were scheduled before Hearing Officer Maher; and

WHEREAS, the Town and Kiernan are mutually desirous of resolving this disciplinary proceeding without the time, expense and uncertainty of litigation;

NOW THEREFORE, it is hereby stipulated and agreed as follows:

1. In full satisfaction of the disciplinary charges against him, Kiernan pleads guilty to Charge 4 (Incompetency or Inefficiency in Performance of Duty), Charge 10 (Incompetency or Inefficiency in Performance of Duty), Charge 11 (Incompetency or Inefficiency in Performance of a Duty), Charge 25 (Conduct Which Brings Discredit Upon The Department) in that he failed to document by Personnel Order or otherwise changes of assignments for Police Officers Harrigan and Sickles. The remaining charges as set forth in the May 4, 2012 disciplinary charges are dismissed based upon the above plea.

2. Kiernan accepts as a penalty, a loss of 60 sick days, 11 vacation days and 2 personal leave days for a total forfeiture of 73 days.

3. Any remaining leave days in excess of the agreed-upon penalty, including sick, vacation and personal leave, which Kiernan utilized between May 4, 2012 and November 1, 2012 to remain on the payroll during his suspension shall be re credited to Kiernan.

4.   Kiernan shall be reinstated to the position of Lieutenant effective November 1, 2012 and shall be entitled to payment for longevity and holiday pay in accordance with the SOA contract for 2012.

5.   This Stipulation shall be binding upon Kiernan and the Town and may not be released, discharged, abandoned, supplemented, amended, changed or modified in any manner, orally or otherwise, except by an instrument in writing of concurrent or subsequent date signed by a duly authorized representative of each of the parties hereto.

6.   This Stipulation contains and constitutes the entire understanding and agreement between Kiernan and the Town with respect to the matters that are the subject of this Stipulation, and it supersedes and cancels all prior negotiations, agreements, commitments, communications and understandings, written or oral, between Kiernan and the Town.

7.   This Stipulation shall be binding upon the affiliates, successors, heirs and assigns of the parties.

8.   This Stipulation may be executed in separate counterparts, each of which shall constitute an original.

9.   Kiernan acknowledges and agrees that he was entitled to a hearing on the disciplinary charges pursuant to section 155 of the Town Law and that he is knowingly and voluntarily waiving any right to a hearing based upon his plea and settlement of this case. Kiernan further acknowledges that he has read this agreement in its entirety, that he had an opportunity to consult with his counsel, that he has been given sufficient time to consider this Stipulation, that he understands all of its terms, and that he knowingly and voluntarily assents to all terms and conditions contained in this Stipulation. Kiernan acknowledges that he is satisfied with the representation provided to him by the SOA and SOA-appointed counsel.

10.  This Stipulation is subject to ratification by the Southampton Town Board.

FOR THE TOWN

FOR THE EMPLOYEE

_____
William Wilson, Jr
Police Chief, Town of Southampton

_____
Lieutenant James Kiernan

FAX NO. : 631 452 2344

6317170095

FROM :Permit and license gr

DEC. 18 2012 04:03PM

NAM-25-2013 12:21 From:RIVERHEADBUREAU

COUNTY OF SUFFOLK
DISTRICT ATTORNEY'S OFFICE



THOMAS SPOTA
DISTRICT ATTORNEY

Address Reply To:
Governmental Corruption Bureau

April 26, 2012

Ms. Tiffany Scarlato, Town Attorney
Office of the Town Attorney
116 Hampton Road
Southampton, N.Y. 11968

Police Chief William Wilson
Southampton Town Police Department
110 Old Riverhead Road
Hampton Bays, N.Y. 11946

Town Attorney Scarlato and Chief Wilson,

The purpose of this letter is to memorialize my phone conversations with both of you yesterday.

This office has received allegations that for some period of time a Town of Southampton police officer with a known drug addiction was permitted to function on active duty. I called both of you to ascertain the identity of the officer, whether the allegations are true and what official actions the officer took in the condition alleged.

Ms. Scarlato denied knowledge of the details of the situation and Chief Wilson offered to provide this office with his findings of facts.

The Suffolk County District Attorney's Office is obligated by the United States Constitution and other legal requirements to provide exculpatory evidence and information in its possession to defendants charged with crimes. This office takes this obligation very seriously.

I request that the Town of Southampton provide the District Attorney's Office with all information it has regarding this officer's conduct and any related officers or supervisors who were aware of said conduct including, but not limited to, a list of individuals arrested by the officer in question during the time of his alleged addiction. As the liberty

and rights of any such arrestees may be at stake, this information must be provided immediately.

I respectfully ask that any information or statements garnered from compelled interviews of police staff be segregated and clearly marked as such.

Should you have any questions or are uncertain about any aspect of this request, please contact me immediately.

Respectfully,

Christopher A. McPartland
Division Chief of Investigations

CAM:mk



**TOWN OF SOUTHAMPTON**

Office of the Town Attorney
116 HAMPTON ROAD
SOUTHAMPTON, NY 11968

Phone: (631) 287-3065
Fax: (631) 287-3662

TIFFANY SCARLATO
TOWN ATTORNEY
KATHLEEN MURRAY
DEPUTY TOWN ATTORNEY

KARA BAK
KATHRYN V. GARVIN
MICHAEL SENDLENSKI
ELIZABETH E. VAIL
ASSISTANT TOWN ATTORNEYS

ANNA THRONE-HOLST
TOWN SUPERVISOR

June 4, 2012

ADA Christopher A. McPartland
Division Chief of Investigations
Suffolk County District Attorney's Office
North County Complex, Building # 77
Veterans Memorial Highway
Hauppauge, New York 11787-4311

Dear ADA McPartland:

In light of the recent dismissal of two cases and release of those defendants with respect to your ongoing investigation and review of the arrests made by the Southampton Town Police Department, I am obligated to begin to assess and measure the potential loss the Town of Southampton may be facing. To that end, I am likewise obligated to put the Town's insurance carrier on notice of said potential loss, and hope to explain to the Town's insurance carrier why these cases are being dismissed and how much exposure the Town may be looking at.

As we have discussed in the past, the Police Commissioners are lacking any particular information as it relates to the officers involved in these ongoing issues, and while we appreciate and respect your responsibility as a prosecutor, we also ask that you appreciate that the Town may face substantial liability as it relates to defendants and/or arrestees who may make claims against the Town based upon the determinations made by your office.

Thus, I am writing to request any information that you are able to give to the Town including copies of any orders, minutes and/or legal instruments dismissing the cases of Mohammed Proctor and Bernard T. Cooks; a list of any other cases you will be dismissing or have reason to believe you will be dismissing or defendants that will be re-sentenced as a result of this investigation; and the official basis upon which your office has or will ask the Court to dismiss or re-open cases arising out of the Southampton Town Police Department, whether in writing or in personal consultation.

The Board of Police Commissioners is very mindful of their obligation to the taxpayers of the Town of Southampton and the future fiscal stability of the Town and the

information sought herein is intended solely to gauge and minimize the risk to their constituency.   Please contact me as soon as possible so that we may come to an amicable solution on how to proceed forward in cooperation with your office, while at the same time ensuring that the Town of Southampton is able to deal with the liability issues associated with these ongoing investigations.

Very truly yours,

Tiffany S. Scarlato
Town Attorney

cc:     Southampton Town Board
        Vincent Toomey, Esq.
        NYMIR

TOWN OF SOUTHAMPTON



Office of the Town Attorney
116 HAMPTON ROAD
SOUTHAMPTON, NY 11968

Phone: (631) 287-3065
Fax: (631) 287-3662

ANNA THRONE-HOLST
TOWN SUPERVISOR

TIFFANY SCARLATO
TOWN ATTORNEY
KATHLEEN MURRAY
DEPUTY TOWN ATTORNEY

KARA BAK
KATHRYN V. GARVIN
MICHAEL SENDLENSKI
ELIZABETH E. VAIL
ASSISTANT TOWN ATTORNEYS

June 4, 2012

ADA Christopher A. McPartland
Division Chief of Investigations
Suffolk County District Attorney's Office
North County Complex, Building # 77
Veterans Memorial Highway
Hauppauge, New York 11787-4311

Re:   People v. John Doe,  CC# 12-991147
       Grand Jury Number 1201858

Dear ADA McPartland:

I am writing in response to your May 24, 2012, correspondence, and as it relates to the copying of those certain files obtained by Grand Jury subpoena dated May 7, 2012. Since the files are the property of the Town of Southampton, we anticipate that the original files will be returned to the Town when the investigation is completed.   Kindly advise if you have a different understanding.   However, in the interim, the Board of Police Commissioners would like a copy of the files.

As extended in your letter, I would like to make arrangements to have the files copied.  May I suggest, rather than the Town providing the equipment to duplicate the files, which could be overly time-consuming and cumbersome, that a representative of the District Attorney's Office, perhaps a Detective Investigator, and a representative of the Town, supervise the copying of these files at an off-site professional copying facility, such as Kinkos, which can accomplish this task in a fraction of the time, thereby ensuring that this task be completed as quickly as possible and without unnecessary interruption as it relates to your purposes.  Of course, the Town would pay for the cost of the copying.

Please let me know if this is an acceptable arrangement and, if it is not, what accommodations may be made to have these files duplicated without further delay.

Very truly yours,

Tiffany S. Scarlato
Town Attorney

.cc:    Southampton Town Board of Police Commissioners
        Vincent Toomey, Esq.
        Chief William Wilson



# RICHARD D. HAMBURG, M.D., D.D.S., F.A.C.S.

Diplomate American Board of Otolaryngology
Facial Plastic Surgery • Otolaryngology • Head and Neck Surgery
**John Ricciardelli, M.D.**

257 Middle Country Road • Smithtown, New York 11787 • Tel: 631-724-4664 • Fax: 631-360-7880

10/28/2011

To Whom It May Concern:

I am writing on behalf of my patient, ERIC SICKLES, he has been diagnosed with Obstructive Sleep Apnea (OSA) and has been under my care since. OSA is a serious medical condition which includes symptoms of fatigue, headaches, restless sleep and snoring.

If I can assist you with additional information regarding my patients medical condition, please call 631 724-4664 ext 200.

Sincerely,

Richard D. Hamburg, M.D.

SW CNYRxPadMR355230 P Pad 2 of 20 8/14/2011 N

## OFFICIAL NEW YORK STATE PRESCRIPTION

### DR. BELLAMY BROOK DO PC

BELLAMY BROOK MD
LIC 215053
NPI 1947251749

MICHAEL A. TROYAN PA
LIC 010097

1272 E. MAIN ST. RIVERHEAD, NY 11901 (631) 284-3793
32645 MAIN RD CUTCHOGUE, NY 11935 (631) 734-8550

PRACTITIONER DEA NUMBER

Patient Name _SICKLES ERIC_                     Date _10/27/11_

Address _____

City _____ State ____ Zip ____ Age ___ | Sex M/F

℞ _The patient is under my_
_care, has had pain to his back/neck_
_and pain and in case patient_
_a medication to control this and_
_should always this HT_
_has been at full duty_

Prescriber Signature X _____

MAXIMUM DAY DOSE
(Medicaid Patients only)

THIS PRESCRIPTION WILL BE FILLED GENERICALLY UNLESS PRESCRIBER WRITES 'daw' IN THE BOX BELOW

REFILLS  ☐ None      [daw]
         Refills __

0P20JL 52

PHARMACIST
TEST AREA

Dispense As Written

Report Summary

| Program | SHARR512 | | Printer Name | HP LaserJet P2050 Series PCL6 |
| User ID | 000103 | WILSON, WILLIAM | Document ID | Print Officer Arrest Activity |
| Started | 02/22/2012 | 13:37:12 | Orientation | p |
| Ended | 02/22/2012 | 13:37:26 | No. of Copies | 01 |
| Message | Report completed. | | Pages | 001 |

**Report Parameters**

Date/Time Range  09/01/2011  Thru  11/30/2011

**Qualifiers**

Officer  001190  Thru  001190  SICKLES, ERIC  W

Arrest Type  [  ]  Thru  [  ]

Law Type  [  ]

Statute  [  ]  Thru  [  ]

Agency  SH

 Southampton Town P.D.

OFFICER ARREST ACTIVITY
09/01/2011 to 11/30/2011

02/22/2012   13:36
Page   1

| Officer | Statute | Description | Total | Percent |
|---------|---------|-------------|-------|---------|
| 1190   SICKLES, ERIC  W | 220.03 | CRIM POSS CONTROL SUBST 7TH | 2 | 33.3 |
| | 221.05 | UNLAW POSSESSION MARIJUANA | 1 | 16.6 |
| | 420.10 | FAIL TO PAY FINE - BENCH WARRANT | 2 | 33.3 |
| | 550.10 | FAILED TO APPEAR - BENCH WARRANT | 1 | 16.6 |
| | | Officer Total: | 6 | 100.0 |
| | | Report Total: | 6 | |



**SOUTHAMPTON TOWN POLICE DEPARTMENT**
**TOWN of SOUTHAMPTON**

NUMBER:2011-09
ISSUE DATE:11-21-2011
EFFECTIVE DATE:12-3-2011

**William Wilson Jr.**
*Chief of Police*

# Personnel Order

TO:        *All Personnel*
FROM:      *Lieutenant James Kiernan*
SUBJECT:   *Personnel Order 2011-09*
Date:      *November 21, 2011*

**Effective December 3, 2011,**  *PO Eric Sickles is transferred from The Street Crime Unit to Squad 2.*

BY DIRECTION OF THE CHIEF OF POLICE



**Southampton Town Board**
116 Hampton Road
Southampton, NY 11968

**ADOPTED**

**RESOLUTION 2011-975**

Meeting: 10/11/11 01:00 PM
Department: Personnel
Category: Personnel
Prepared By: Janeen Cevasco
Initiator: Russell Kratoviil
Sponsors: Throne-Holst, Graboski, Nuzzi, Fleming, Malone
DOC ID: 13713

# Promote Sergeant James Kiernan to Rank of Lieutenant in Southampton Town Police Department

WHEREAS, as a result of the mandatory retirement of two Southampton Town Police Department Superior Officers in 2012, a need exists to appoint a new Lieutenant in advance of the officers' retirement in order to ensure a smooth transition of responsibilities and duties; and

WHEREAS, the Chief of Police recommends the promotion of a current Town of Southampton Police Sergeant to the new Police Lieutenant position; therefore be it

RESOLVED, the position of Lieutenant be and hereby is created in the Southampton Town Police Department, at an annual salary of $135,081.40, effective October 12, 2011; and be it further

RESOLVED, based on the recommendation of the Chief of Police, Sergeant James Kiernan be and hereby is promoted to the rank of Lieutenant from the Suffolk County Department of Civil Service Promotional Certification of Eligible?s No.11EL300 , at an annual salary of $135,081.40, effective October 12, 2011; and be it further

RESOLVED, this position will be funded through the Police Department Cost Center #3120.

### Financial Impact

To be determined by Comptroller.

| RESULT: | ADOPTED [UNANIMOUS] |
|---|---|
| MOVER: | Anna Throne-Holst, Supervisor |
| SECONDER: | James Malone, Councilman |
| AYES: | Throne-Holst, Malone, Graboski, Fleming, Nuzzi |



**William Wilson Jr.**
*Chief of Police*

### SOUTHAMPTON TOWN POLICE DEPARTMENT
### TOWN of SOUTHAMPTON

*110 Old Riverhead Road*
*Hampton Bays, New York 11946*

*Emergency: :*
Anonymous Tip Hotline: (631) 728-3·
General Business: (631) 728-5(
Police Reports: (631) 728-5(
(631) 728-5(
FAX: (631) 728-5·

April 19, 2012

To:       Hon. Supervisor Anna Throne-Holst
          Councilwoman Christine Scalera
          Councilwoman Bridget Fleming
          Councilman James W. Malone
          Councilman Christopher R. Nuzzi

From:    Chief William Wilson Jr.

Subject:   James Kiernan, Probationary Lieutenant Status

James Kiernan is currently serving in the title of Police Lieutenant (Probationary).  Upon review of Lieutenant Kiernan's performance during his probationary period my recommendation is that James Kiernan's probationary period as Lieutenant is terminated and he be returned to the rank of Sergeant in accordance with New York State and Suffolk County Civil Service guidelines.

Respectfully submitted,

William Wilson Jr.
Chief of Police

    



**SOUTHAMPTON TOWN POLICE DEPARTMENT**
**TOWN of SOUTHAMPTON**

*110 Old Riverhead Road*
*Hampton Bays, New York  11946*

*Emergency: :*
*Anonymous Tip Hotline: (631) 728-3-*
*General Business: (631) 728-5(*
*Police Reports: (631) 728-5(*
*(631) 728-5(*
*FAX: (631) 728-5•*

**William Wilson Jr.**
*Chief of Police*

Date:        April 26, 2012

To:          Lieutenant James Kiernan

From:        Chief William Wilson Jr.

Subject:     Administrative Leave

Lieutenant Kiernan,

You are hereby placed on paid administrative leave, effective immediately, pending the results of an investigation.

Your access to the PD facility, department vehicle and computer system is rescinded until further notice. Otherwise, any and all provisions of the Southampton Town Police Department's Rules of Conduct and General Orders Manual are still applicable to your employment.

By authority of,

William Wilson Jr.
Chief of Police



Accredited by:
New York State Law Enforcement Accreditation Program



RECEIVED

May 13, 2014

2013 MAY 14  AM 9: 08

Sundy Schermeyer

Southampton Town Clerk



116 Hampton Road Southampton N.Y. 11968

**Reference: Public Hearing To Consider Amending Southampton Town Code Section 23-4 of Chapter 23 to prohibit police officers from serving as political party committee members**

As a citizen of the United States of America I have certain rights that are protected by the constitution. One of my rights is to affiliate myself with any political activities that I see fit in accordance with election law.

As well as being a US citizen I have the privilege of serving the town as a police officer and thereby I recognize the importance of respecting certain rules and regulations that are put in place for police officers to maintain discipline in the department.

I am not contending that this topic may not be a legitimate concern for discussion, however the timing of this proposed law change by Ms. Fleming is part of continued harassment that my family and I have endured since the board made the mistake of hiring Mr. Wilson as Chief of police. I am the only individual that is affected by this proposed law change.

My affiliation with the Republican Party began at the age of 14 when I attended a government class in high school. It became a community service and a hobby for me on and off since that time. I was president of the Teenage Republicans (TARs) and when I was old enough to register to vote I became a committee person. Life took me in different directions with collage and other interests, but I never lost my desire in participating in government. In fact, I found it to be, not only a right, but also a duty. When I settled in Southampton with my wife and after my undercover service to our police department I began my community service with the committee once again.

Let me make this perfectly clear, I have never asked for, hinted at, or even suggested to any political leader that I receive any type of benefit from my position in the Republican Party. I earned every promotion by being the number one candidate on the civil service list, holding an MBA in General Management, graduating from the FBI Academy and making many high profile arrests. Ironically, my position of one of over eighty committee persons is considered a very minor one and certainly not one of with much influence. Secondly and contrary to what some PBA officials and Wilson have suggested in the media, I had absolutely nothing to do with Mr. Wilson's leaving the department. In fact it is my understanding that the Town Supervisor ordered him to return to work during Hurricane Sandy or

submit his resignation.  He decided to resign rather than give up his vacation in the face of one of the worst storms in Southampton history.

If there were any type of political influence being abused in the Southampton Police Department, it was Wilson who asked that I use my political position to get things he wanted from the board. Coincidently, that request was a violation of both the Election Law and the Civil Service Law.  It was my refusal to help him in this way that caused him to lie about me and create bogus evidence to support those lies.

Ms. Fleming is quoted in the press as saying that while there may well not have been any political influence at play ... the potential for these sorts of accusations by Wilson and the PBA officials would have been muted had I not been a member of the committee.

Wilson, and others not acting with integrity, shouldn't be cause to propose new legislation.  I believe that the timing of this proposal, itself, reeks of political grandstanding. Is the board going to enact new laws every time someone makes an unsubstantiated claim? Let me again state emphatically that I take no position either way in your discussions regarding this new proposed law. I merely resent its timing in the wake of so many outright lies and falsehoods that my family and myself have had to endure.

I wholeheartedly respect whatever decision is made by this Town Board and, as always, you can expect my full cooperation.


Respectfully submitted,

*James Kiernan* (signature)

James Kiernan

Citizen, Town of Southampton

# Patrolman's Benevolent Association
### OF SOUTHAMPTON TOWN, INC.
P.O. Box 591 · Speonk, New York 11972
631-325-1620 Tel./Fax

TIMOTHY O'FLAHERTY, President
KEVIN GWINN, Vice President
TONY VECCHIO, Secretary
ERIK BREITWIESER, Treasurer
STEVE DeMARCO, SCPC-Director
NICK BADAGLIACCA, Director
MIKE FOOS, Director
DAVE PETERS, Director
ROB WICKLUND, Director
RYAN HUGHES, Sergeant At Arms

June 8th, 2012

Town Of Southampton
Southampton Town Hall
116 hampton Road
Southampton, New York 11968

    I want to take this time to direct your attention to various Federal Laws that protect employees in Southampton Town, which prohibit employment discrimination against individuals with disabilities. As you know the term "Disabilities" is quite broad and pertains to many, as well as employees who have voluntarily engaged in and/or completed a supervised drug rehabilitation program to address a drug addiction. An addiction to a drug or drugs that were prescribed legally by a licensed health care professional. The Rehabilitation Act of 1973 and all its amendments address the protections for an employee with such a disability to include sections 501 and 505 just to name a couple. I refer you to volume 29 of the United States Code beginning at section 791 for further clarification.

    I would also like to bring to your attention the Americans with Disabilities Act and all its amendments, to include the ADA amendments of 2008, which further describes the definition of "individuals with a disability". Section 512 of the Americans with Disabilities Act as well as later amendments connected to the Rehabilitation Act of 1990, further outlines the protection for employees with the aforementioned disability.

    The Civil Rights Act of 1991 offers many remedies to employees with disabilities against a respondent or employer who engages in unlawful intentional discrimination of any kind. The Civil Rights Act offers remedies to such a situation to include, the complaining party being able to recover compensatory and punitive damages as allowed by law, as well as additional relief as authorized by various sections of the Civil Rights Act of 1964.

    I remind you of this on behalf of Police Officer Eric Sickles who has been voluntarily recovering from such a disability. I have proudly worked with Officer Sickles for the past ten years and can not say enough about the character of the man. Officer Sickles is a highly decorated officer who continually exceeds department standards. Police Officer Sickles has been nominated numerous times and has received the "Police Officer of the Year" award, as well as Suffolk Counties "Top Cop" award. These awards and the aforementioned department standard evaluations have been sponsored and have been given to Officer Sickles by his immediate supervisors. Officer Sickles possesses an unblemished police record. Officer Sickles has answered the call in protecting our community, in voluntarily choosing an assignment (Street Crime), that many officers have declined. The many hazards accompanied with such a detail and the dangers to each undercover officer is a 24 hour-a-day reality. The personal sacrifices given-up by Officer Sickles and his family, so that the residents of Southampton Town can sleep easy at night, are far to many to list. Police Officer Sickles has given of himself and is now in need of time to recover. Officer Sickles has been failed once and we will not allow that to happen again. We will not hesitate to act quickly on his behalf should any one individual violate his rights. Thank you for your time and attention.

Kevin Gwinn, Vice President
Southampton Town P.B.A.

PBA Official Document 12-1620-7-W

§ 155. Discipline and charges. Except as otherwise provided by law, a member of such police department shall continue in office unless suspended or dismissed in the manner hereinafter provided. The town board shall have the power and authority to adopt and make rules and regulations for the examination, hearing, investigation and determination of charges, made or preferred against any member or members of such police department. Except as otherwise provided by law, no member or members of such police department shall be fined, reprimanded, removed or dismissed until written charges shall have been examined, heard and investigated in such manner or by such procedure, practice, examination and investigation as the board, by rules and regulations from time to time, may prescribe. Such charges shall not be brought more than sixty days after the time when the facts upon which such charges are based are known to the town board. Any member of such police department at the time of the hearing or trial of such charges shall have the right to a public hearing and trial and to be represented by counsel; no person who shall have preferred such charges or any part of the same shall sit as judge upon such hearing or trial. Witnesses upon the trial of such charges shall testify thereto under oath. No member of such department who shall have been dismissed shall be reinstated unless he shall, within twelve months of his dismissal, file with such board a written application for a rehearing of the charges upon which he was dismissed. Such board shall have the power to rehear such charges and, in its discretion, may reinstate a member of the force after he has filed such written application therefor.

Any member of such department found guilty upon charges, after five days' notice and an opportunity to be heard in his defense, of neglect or dereliction in the performance of official duty, or of violation of rules or regulations or disobedience, or of incompetency to perform official duty, or of an act of delinquency seriously affecting his general character or fitness for office, may be punished by the town board having jurisdiction, by reprimand, by forfeiture and withholding of salary or compensation for a specified time not exceeding twenty days, by extra tours or hours of duty during a specified period not exceeding twenty days, by suspension from duty for a specified time not exceeding twenty days and the withholding of salary or compensation during such suspension, or by dismissal from the department. Such board shall have the power to suspend, without pay, pending the trial of charges, any member of such police department. If any member of such police department so suspended shall not be convicted of the charges so preferred, he shall be entitled to full pay from the date of suspension. The conviction of a member of such police department by the town board shall be subject to review by the supreme court in the judicial district in which such town is located in the manner provided by article seventy-eight of the civil practice law and rules, provided that the proceeding is commenced within thirty days from the determination of such conviction by the town board.

§ 154. Administration. The town board may make, adopt and enforce rules, orders and regulations for the government, discipline, administration and disposition of the police department and of the members thereof. Such rules and regulations and all amendments thereto shall be in writing and shall be posted in a conspicuous place in the police headquarters. Each member of the department shall receive a copy thereof and of all amendments thereto.

**Southampton Town Police Superior Officers Association, Inc. (SHTSOA)**
**Post Office Box 528 Hampton Bays, New York, 11946**
**631-317-0788**

April 5, 2012

To:        Chief William Wilson Jr.

From:      President Robert Pearce – SHTSOA

Subject:   SHTSOA Grievance 2012-1 Violation of the Collective Bargaining
           Agreement's **Bill of Rights, Article VIII, Sections 1-C & D**

Chief William Wilson Jr. issued a letter dated March 28, 2012 and addressed to
"Captain Robert Pearce" on departmental stationary.

This letter (attached) directed Captain Robert Pearce to respond to Suffolk County
Internal Affairs Bureau, Yaphank, NY on Thursday, March 29, 2012 at 1300hrs *"in
reference to an interview."*

Captain Robert Pearce arrived at Suffolk County Internal Affairs as directed and was
not interviewed, but in fact interrogated by two Suffolk County Police lieutenants
concerning an internal departmental matter

Chief Wilson did not inform Captain Pearce of the nature of the investigation before
the commencement of the interrogation including the name of the complainant
**(Article VIII, Section 1-D)**.

Chief Wilson did not provide Captain Pearce with sufficient information to reasonably
apprise him of the allegations **(Article VIII, Section 1-D)**.

Chief Wilson did not inform Captain Pearce if he was a witness or a "target" of this
investigation **(Article VIII, Section 1-D)**.

The actions of Chief Wilson were in direct violation of the Collective Bargaining
Agreement's Bill of Rights, **Article VIII, Sections 1-C&D**.

**Remedy:**

Chief Wilson is to provide Captain Robert Pearce with the above information as
required by the Contractual Bill of Rights, **Article VIII, Sections 1-C&D**.

Chief Wilson is to acknowledge that he violated **Article III, Section 1-C&D** of the
Collective Bargaining Agreement by not conforming to the explicit requirements
contained in this section.

Grievance submitted directly to Chief William Wilson Jr. by Captain Robert Pearce.

**Southampton Town Police Superior Officers Association, Inc. (SHTSOA)**
**Post Office Box 528 Hampton Bays, New York, 11946**
**631-317-0788**

April 5, 2012

To:    Chief William Wilson Jr.

From:    Lieutenant James Kiernan

Subject:    SHTSOA Grievance 2012-2 Violation of the Collective Bargaining
Agreement's Bill of Rights, *Article VIII, Sections 1-C & D*

Chief William Wilson Jr. issued a letter dated March 28, 2012 and addressed to
"Captain Robert Pearce" on departmental stationary.

This letter (attached) directed Captain Robert Pearce to respond to Suffolk County
Internal Affairs Bureau, Yaphank, NY on Thursday March 29, 2012 at 1300hrs "in
reference to an interview."

Chief Wilson also directed Captain Pearce to contact Lieutenant Kiernan (verbally) to
also respond to Suffolk County Internal Affairs Bureau, Yaphank, NY on Thursday,
March 29, 2012 at 1100hrs to be "interviewed."

Lieutenant William Kiernan arrived at Suffolk County Internal Affairs as directed and
was not interviewed, but in fact interrogated by two Suffolk County Police lieutenants
concerning an internal departmental matter

Chief Wilson did not inform Lieutenant Kiernan of the nature of the investigation
before the commencement of the interrogation including the name of the complainant
**(Article VIII, Section 1-D)**.

Chief Wilson did not provide Lieutenant Kiernan with sufficient information to
reasonably apprise him of the allegations **(Article VIII, Section 1-D)**.

Chief Wilson did not inform Lieutenant Kiernan if he was a witness or a "target" of this
investigation **(Article VIII, Section 1-D)**.

The actions of Chief Wilson were in direct violation of the Collective Bargaining
Agreement's Bill of Rights, **Article VIII, Sections 1-C&D**.

<u>**Remedy:**</u>

Chief Wilson is to provide Lieutenant William Kiernan with the above information as
required by the Contractual Bill of Rights, **Article VIII, Sections 1-C&D**.

{1 of 2}

Chief Wilson is to acknowledge that he violated **Article III, Section 1-C&D** of the Collective Bargaining Agreement by not conforming to the explicit requirements contained in this section.

Grievance submitted directly to Chief William Wilson Jr. by Lieutenant James Kiernan.

(2 of 2)

Case 2:13-cv-00940-ADS-GRB   Document 31   Filed 08/20/14   Page 72 of 78 PageID #: 194

§ 155. Discipline and charges. Except as otherwise provided by law, a member of such police department shall continue in office unless suspended or dismissed in the manner hereinafter provided. The town board shall have the power and authority to adopt and make rules and regulations for the examination, hearing, investigation and determination of charges, made or preferred against any member or members of such police department. Except as otherwise provided by law, no member or members of such police department shall be fined, reprimanded, removed or dismissed until written charges shall have been examined, heard and investigated in such manner or by such procedure, practice, examination and investigation as the board, by rules and regulations from time to time, may prescribe. Such charges shall not be brought more than sixty days after the time when the facts upon which such charges are based are known to the town board. Any member of such police department at the time of the hearing or trial of such charges shall have the right to a public hearing and trial and to be represented by counsel; no person who shall have preferred such charges or any part of the same shall sit as judge upon such hearing or trial. Witnesses upon the trial of such charges shall testify thereto under oath. No member of such department who shall have been dismissed shall be reinstated unless he shall, within twelve months of his dismissal, file with such board a written application for a rehearing of the charges upon which he was dismissed. Such board shall have the power to rehear such charges and, in its discretion, may reinstate a member of the force after he has filed such written application therefor.

Any member of such department found guilty upon charges, after five days' notice and an opportunity to be heard in his defense, of neglect or dereliction in the performance of official duty, or of violation of rules or regulations or disobedience, or of incompetency to perform official duty, or of an act of delinquency seriously affecting his general character or fitness for office, may be punished by the town board having jurisdiction, by reprimand, by forfeiture and withholding of salary or compensation for a specified time not exceeding twenty days, by extra tours or hours of duty during a specified period not exceeding twenty days, by suspension from duty for a specified time not exceeding twenty days and the withholding of salary or compensation during such suspension, or by dismissal from the department. Such board shall have the power to suspend, without pay, pending the trial of charges, any member of such police department. If any member of such police department so suspended shall not be convicted of the charges so preferred, he shall be entitled to full pay from the date of suspension. The conviction of a member of such police department by the town board shall be subject to review by the supreme court in the judicial district in which such town is located in the manner provided by article seventy-eight of the civil practice law and rules, provided that the proceeding is commenced within thirty days from the determination of such conviction by the town board.



**Patrolman's Benevolent Association**

### OF SOUTHAMPTON TOWN, INC.

P.O. Box 591 • Speonk, New York 11972
631-325-1620 Tel./Fax

TIMOTHY O'FLAHERTY, President
KEVIN GWINN, Vice President
TONY VECCHIO, Secretary
ERIK BREITWIESER, Treasurer
STEVE DeMARCO, SCPC-Director
NICK BADAGLIACCA, Director
MIKE FOOS, Director
DAVE PETERS, Director
ROB WICKLUND, Director
RYAN HUGHES, Sergeant At Arms

*January 2nd, 2012*

Superior Officer's Association
of Southampton Town Inc.
Attn: Robert Pearce, President
110 Old Riverhead Road
Hampton Bays, New York 11946

President Robert Pearce:

I am writing this correspondence to inform you that numerous members of the Patrolman's Benevolent Association have been approached by a representative of your organization in an effort to solicit their presence at the office of S.O.A. council. Recent efforts made by Sergeant Todd Spencer, was done so to inquire about their personal knowledge in reference to a current investigation being conducted by the Southampton Town Police Department, in conjunction with the Suffolk County District Attorney's Office.

The Town of Southampton, the Suffolk County District Attorney's Office, as well as Southampton Town Police Department's Chief William Wilson, have been advised that our members who may be of interest in connection with said investigation have invoked their right to counsel. Please advise your board as well as Association Counsel and any organization representative, to include Sergeant Todd Spencer of same.

Our organization will not allow any Superior Office to impose the misuse of authority to pressure, or to imply the requirement or obligation upon any of our members to speak outside of P.B.A. counsel. The previously addressed efforts are a clear attempt to influence possible witnesses and possibly people of interest to the agencies investigating same. The P.B.A. will continue to adhere to Department Policy and Procedure and respect the process surrounding the aforementioned investigation. If you have any questions regarding this correspondence, feel free to contact me at any time, or Vice President Kevin Gwinn. I anticipate your immediate cooperation in this matter.

Cc: Southampton Town Attorney's Office
    Suffolk County District Attorney's Office
    P.B.A. Counsel
    Chief William Wilson
    Southampton Town Supervisor

_____
Timothy O'Flaherty, President

_____
Kevin Gwinn, Vice President

# SOUTHAMPTON TOWN POLICE DEPARTMENT
## SUPPLEMENTARY REPORT

06/08/2012                                                        PAGE 1 OF 1

On June 6th, 2012, the undersigned was directed to provide a Supplementary Report at the direction of Chief William Wilson, in reference to any contact I may have had concerning an ongoing internal Department investigation. I do not provide this report voluntarily and only do so to avoid disciplinary action.

On May 31st, 2012, at about 8:00 P.M, I was contacted by Sergeant Todd Spencer. Sergeant Spencer requested my appearance with him at the attorney's office for Lieutenant Kiernan. He stated that we should go to the attorney's office on June 1st, 2012, to help Lieutenant Kiernan concerning the aforementioned investigation. I told him that I had to watch the kids during that time and didn't think I would be able to attend. Sergeant Spencer replied, "No Pressure, I understand if you can't make it". On June 1st, at about 9:00 A.M, I spoke with Police Officer Vincent Cagno, who advised me that he was contacted by Sergeant Spencer as well, with the same request. We both agreed to decline his requests, at which time Police Officer Cagno sent a text message to Sergeant Spencer advising him of same.

On June 5th, 2012, at about 2:00 P.M, I received a text message from Sergeant Spencer stating the following, " Don, sorry to involve you in this mess. I just want you to be comfortable telling the truth. I have no problem with my name being in your supp report, so no worries". I did not know what Sergeant Spencer was referring to, concerning a "supp report".

On June 6th, 2012 at about 7:00 P.M, I received a phone call from Sergeant Spencer which I did not answer. He left a voice message stating, in substance, that he wanted to know how I made out with my supp-report and if I could call him when I get a chance. I did not call him back and have had no further contact with him.

Respectfully Submitted,

Police Officer Donald A. Metcalf, shield 255

PAGE 1 of 1

| DATE OF REPORT 06/05/2012 | POLICE DEPARTMENT TOWN OF SOUTHAMPTON | COMMAND Patrol | |
|---|---|---|---|
| | SUPPLEMENTARY REPORT | | |
| COMPLAINANT P.O. Vincent Cagno #205/1 | | | |

On Monday, June 4th, 2012, was directed by Chief William Wilson to provide a Supplementary Report in regards to any recent contact I may have had with a member of service in reference to an ongoing investigation involving Lt. James Kiernan. I prepare and provide this Supplementary Report at the direction of Chief William Wilson and do not do so voluntarily. I do so to avoid disciplinary action.

On May 31st, 2012, at about 8:06 P.M., I received a phone call from Sergeant Todd Spencer. Sergeant Spencer advised me that he was going to Lt. Kiernan's lawyer's office the following day and requested that I go. Sergeant Spencer stated that we should go to help out Lt. Kiernan. I am aware of the current ongoing investigation and did want to get involved or interfere in any way. I did not want to be pressured to get involved. I told Sergeant Spencer that I would call him back and ended the phone conversation. On June 1st, 2012, I had contact with Police Officer Metcalf and he advised me he also had contact with Sergeant Spencer on May 31st, 2012. Police Officer Metcalf stated he did not wish to get involved as well. We were uncomfortable in calling Sergeant Spencer to advise him that Police Officer Metcalf and I would not be going with him to Lt. Kiernan's lawyer's office, so I sent him a text message stating same at approximately 9:22A.M.

On June 1st, 2012, I also had contact with P.B.A. Vice President Kevin Gwinn and advised him of my contact with Sergeant Spencer.

Respectfully Submitted,

*PO V.t Giraorh*

Police Officer Vincent Cagno, shield #205

| REPORTING OFFICER | | |
|---|---|---|
| *Po V.t Giraorh* | | |



**SOUTHAMPTON TOWN POLICE DEPARTMENT**
**TOWN of SOUTHAMPTON**

*110 Old Riverhead Road*
*Hampton Bays, New York 11946*

*Emergency:*
*Anonymous Tip Hotline: (631) 728-*
*General Business: (631) 728-*
*Police Reports: (631) 728-*
*(631) 728-*
*FAX: (631) 728-*

**William Wilson Jr.**
*Chief of Police*

Date:       June 4, 2012

To:         Police Officer Berini #1242

From:       Chief William Wilson Jr.

Subject:    Supplementary Report

Police Officer Berini,

You are hereby directed to prepare a supplementary report detailing the following;

- Have you, at any time, been contacted by any member of service, or individual, concerning Lt. Kiernan's disciplinary matter? If so, provide the identity of the person, the date and time you wer contacted and the detailed nature of any and all conversations relating to Lt. Kiernan and/or you assignment with the Street Crime Unit. Also include actions taken by you, if any, as a result of sa contact.

The supplementary report shall be completed immediately upon receipt of this correspondence and forwarde to my office.

William Wilson Jr
William Wilson Jr.
Chief of Police




Accredited by:
New York State Law Enforcement Accreditation Program

PAGE 1 of 1

| CC# | DATE OF REPORT 6/5/12 | POLICE DEPARTMENT TOWN OF SOUTHAMPTON | COMMAND Patrol | DATE OF OCCURRENCE 6/5/12 |
|---|---|---|---|---|

| INCIDENT Request for Supp Report | SUPPLEMENTARY REPORT |
|---|---|

| COMPLAINANT P.O. John T Berini #242/5 | ADDRESS The Southampton Town Police Dept. |
|---|---|

I, P.O. John T. Berini #242/5, provide this supplementary report, not voluntarily, but at the direction of the chief of police, William Wilson Jr, and do so solely to avoid disciplinary action.

On Tuesday, June 5th, 2012, I received a typed letter, signed by Police Chief William Wilson Jr, directing me to provide a supp. report answering the following question:

Have you, at any time, been contacted by any member of service, or individual, concerning Lt. Kiernan's disciplinary matter? If so, provide the identity of the person, the date and time you were contacted and the detailed nature of any and all conversations relating to Lt. Kiernan and/ or your assignment with the Street Crime Unit. Also include any actions taken by you, if any, as a result of said contact.

In response to the above noted question; on Friday June 1st, 2012, at about 0300 hrs, while working a midnight shift, undersigned met with Sgt. Todd Spencer, as is normal practice, to have my memo book reviewed and signed. During a brief conversation, Sgt. Spencer advised undersigned that he, Sgt Spencer, planned to meet with Lt. Kiernan's lawyer, later in the day. Sgt. Spencer asked if undersigned would accompany him to the meeting. Undersigned declined the offer and informed Sgt. Spencer that, under the advice of counsel and the P.B.A., I could not discuss, or relay, information pertaining to the investigation into Lt. Kiernan, the Street Crime Unit or persons involved in same.

I, P.O. John T. Berini #242/5, have not, since that time, received any further inquiries or requests for information, with regards to the investigation of Lt. Kiernan, the Street Crime Unit or any of the persons involved in same.

| FOUNDED YES | CASE STATUS ACTIVE | | TELETYPE # | DATE |
|---|---|---|---|---|
| REPORTING OFFICER P.O. John T. Berini #242/5 | | | SUPERVISOR | |

Day _____ Date _6/1/13_ Tour _842_ Sqd _5_ Weather _OR_
Road _DM_ Sector _821_ Unit _427_ Dic _23-5_ Sgt _24-5_
Start Miles _11392_ End Miles _11489_ Flares _✓_
Shotgun # _____ Alert # _____ Radar # _____ Fire Ext _✓_
02 Reading _1400_ Life Ring _✓_ First Aid Kit _✓_
Oil Check _____ REMARKS, missing gear, etc; _AED OK_
                                    _seh seasonal_

| 2330 | 27 10 November 28 |
| | Resp to 413 Utilities Ref |
| | Metro dial alarm - |
| | 38 CC#2 - Cancelled |
| | Verbal Only |
| 0048 | Resp to 324A Education ave |
| | ref adult Male Stephen |
| | Hansen 11/11/08 Migraine |
| 0109 | 38 CC#2-10756 Cesonic |
| 0320 | Chill to take 1 #515 |
| 0543 | Resp to 46 Bay ave N Ref |
| | Lift assist William Hess 5/20/53 |
| 0605 | 38 CC#12 - 10761 |
| 0608 | 10-18 |
| 0700 | 27 |
| 0730 | 28 PO Bogan 27 |
| | MC Fee Mc 240/8 |

**SOUTHAMPTON TOWN POLICE**