1

2   UNITED STATES DISTRICT COURT
    EASTERN DISTRICT OF NEW YORK
3   ------------------------------------X
    BERNARD COOKS,
4
                        Plaintiff,
5

6       -against-          Civil Action No.:
                           13 3460 (LDW)(AKT)
7
    THE COUNTY OF SUFFOLK, THE SUFFOLK
8   COUNTY POLICE DEPARTMENT, THE TOWN
    OF SOUTHAMPTON, THE SOUTHAMPTON TOWN
9   POLICE DEPARTMENT, THE SUFFOLK
    COUNTY DISTRICT ATTORNEY'S OFFICE and
10  "JOHN DOE," a person or official
    whose name is currently unknown,
11
                        Defendants.
12  ------------------------------------X

13                      June 27, 2014

14                      9:41 a.m.

15                      H. Lee Dennison Building

16                      Hauppauge, New York

17          DEPOSITION of THE SUFFOLK COUNTY

18  DISTRICT ATTORNEY'S OFFICE, a Defendant herein,

19  by ASSISTANT DISTRICT ATTORNEY CHRISTOPHER

20  MCPARTLAND, taken by the Plaintiff and

21  Co-Defendants, pursuant to Federal Rules of

22  Civil Procedure, and Order, held at the

23  above-mentioned time and place, before Lori Anne

24  Curtis, a Notary Public of the State of New

25  York.

```
 1

 2    A P P E A R A N C E S:

 3

 4

 5         BRACKEN, MARGOLIN & BESUNDER, LLP
                Attorneys for Plaintiff
 6              1050 Old Nichols Road
                Suite 200
 7              Islandia, New York  11749
           BY:  WILLIAM T. FERRIS, III, ESQ.
 8                   -and-
                PATRICIA MEISENHEIMER, ESQ.
 9

10

11         SUFFOLK COUNTY DEPARTMENT OF LAW
                Attorneys for Defendants
12              THE COUNTY OF SUFFOLK, THE SUFFOLK
                COUNTY POLICE DEPARTMENT and THE
13              SUFFOLK COUNTY DISTRICT ATTORNEY'S
                OFFICE
14              H. Lee Dennison Building; Sixth Floor
                100 Veterans Memorial Highway
15              Hauppauge, New York  11788
           BY:  ARLENE S. ZWILLING,
16              Assistant County Attorney

17

18         DEVITT SPELLMAN BARRETT, LLP
                Attorneys for Defendants
19              THE TOWN OF SOUTHAMPTON and THE
                SOUTHAMPTON TOWN POLICE DEPARTMENT
20              50 Route 111
                Suite 314
21              Smithtown, New York  11787
           BY:  KELLY E. WRIGHT, ESQ.
22

23

24

25
```

1

2                    FEDERAL STIPULATIONS

3            IT IS HEREBY STIPULATED AND AGREED by

4      and between the parties hereto, through their

5      respective counsel, that the certification,

6      sealing and filing of the within examination

7      will be and the same are hereby waived;

8            IT IS FURTHER STIPULATED AND AGREED

9      that all objections, except as to the form of

10     the question, will be reserved to the time of

11     the trial;

12           IT IS FURTHER STIPULATED AND AGREED that

13     the within examination may be signed before any

14     Notary Public with the same force and effect as

15     if signed and sworn to before this Court.

16

17

18

19

20

21

22

23

24

25

1

2    A. D. A.    C H R I S T O P H E R

3    M C P A R T L A N D, the Witness herein, having

4         been first duly sworn by a Notary Public

5         in and of the State of New York, was

6         examined and testified as follows:

7    EXAMINATION BY

8    MR. FERRIS:

9         Q    Would you please state your full

10   name for the record.

11        A    Christopher McPartland.

12        Q    What is your current business

13   address?

14        A    Building 77, North County Complex,

15   Veterans Memorial Highway, Hauppauge, New York

16   11788.

17             MR. FERRIS:  Good morning.

18             Mr. McPartland.

19             THE WITNESS:  Good morning.

20             MR. FERRIS:  Thank you for

21             being here.

22             Let me just say, if I ask

23             you something and you don't

24             understand it, if it's not clear,

25             please ask me and I'll certainly

1               ADA C. McPartland

2               be happy to clarify it; okay?

3                    THE WITNESS:  Okay.

4                    MR. FERRIS:  Also, just let

5               me finish the question before you

6               may answer it.

7                    THE WITNESS:  Sure.

8          Q       Okay, who do you presently work

9     for?

10         A       The Suffolk County District

11    Attorney's Office.

12         Q       That's Thomas Spota?

13         A       Yes.

14         Q       How long have you been an

15    Assistant District Attorney?

16         A       Since 1991.

17         Q       And you were hired by James

18    Catterson?

19         A       Correct.

20         Q       Take me through, if you will, some

21    of the bureaus that you were in up to the

22    present time.

23         A       I started in the District Court

24    Bureau.  I was there a couple years.  I then

25    went to the Civil Forfeiture Unit for

1                    ADA C. McPartland

2    approximately a year.  I then went to the Major

3    Crime Bureau for a couple of years.  I then was

4    transferred to a special project for a couple --

5    for a year or two, and ultimately wound up in

6    the Rackets Bureau, the Organized Crime Bureau.

7    I stayed there for probably close to ten years,

8    where I was promoted to Deputy Bureau Chief.

9                    Thereafter, I was assigned to a

10   political corruption task force for a year or

11   two, and ultimately a new bureau was formed, a

12   Government Corruption Bureau, where I was

13   promoted to bureau chief.  That was in 2005.

14                   Thereafter, I was promoted to

15   Division Chief of Investigations, which is my

16   current assignment.

17        Q      Let me just take you back a little

18   bit.

19                   When you were in the Major Crimes

20   Bureau, you conducted some investigations, if I

21   recall correctly, or maybe it was after that

22   that you were assigned a special unit for

23   investigations?

24        A      Right.

25        Q      What were the investigations

1                    ADA C. McPartland

2    about?

3           A       They were about primarily

4    government contracting.

5           Q       Okay.

6                   And later on in the Racket Bureau,

7    at that time, you handled criminal corruption

8    cases?

9           A       In the Racket Bureau I handled

10   organized crime.

11          Q       Organized crime?

12          A       Right.

13          Q       Part of that was dealing with

14   police officers; am I correct?

15          A       Yes.

16          Q       And police agencies?

17          A       Sure.

18          Q       You also did some trials, am I

19   correct, in addition to some investigations?

20          A       Yes.

21          Q       What were some of the trials that

22   you did?

23          A       I did assault trials, DWI

24   trials -- you are talking felony trials, I

25   assume?

1              ADA C. McPartland

2      Q      Felony trials.

3      A      Yeah, theft trials, gang trials,

4   those types of things.

5      Q      Okay.

6              And, of course, you are well aware

7   of certain issues, legal issues in terms of the

8   prosecution's responsibility; such as Brady,

9   exculpatory materials and so forth?

10      A      Yes.

11              MS. ZWILLING:  Objection.

12              You can answer.

13              THE WITNESS:  Yes.

14      Q      Your present assignment is

15   Division Chief; am I correct?

16      A      Yes.

17      Q      Now, is that -- how many Division

18   Chiefs are there?

19      A      Two.

20      Q      You have one of the positions.

21   Who has the other?

22      A      Ed Heilig.

23      Q      What is he the Division Chief of?

24      A      Administrative matters and the

25   Economic Crime Bureau and our Labor and Tax

```
 1                   ADA C. McPartland

 2   Bureau.

 3         Q       In your present assignment,

 4   Mr. McPartland, who do you report to directly in

 5   the chain of command?

 6         A       I report to Emily Constant.

 7         Q       Are there times that you also

 8   report directly to Mr. Spota?

 9         A       Um --

10         Q       Let me put it this way --

11                      MR. FERRIS:  Let me

12                 rephrase it.

13         Q       For lack of a better term,

14   operational issues, such as cases,

15   investigations, decisions in terms of how to

16   handle an investigation or an indictment, would

17   that be -- would you report both to Ms. Constant

18   as well as Mr. Spota?

19         A       Primarily to Ms. Constant.

20         Q       Okay.

21                 Are there occasions, however, that

22   you consult directly with Mr. Spota on your

23   cases?

24         A       There are times, yes.

25         Q       Okay.
```

1                    ADA C. McPartland

2                    In the -- as a Division Chief do

3        you have an Assistant District Attorney that

4        works with you, assigned directly to you?

5            A      Well, it's a little bit of a

6        hybrid position.

7            Q      Okay.

8            A      I'm responsible for the daily

9        operations of the Government Corruption Bureau,

10       so in effect I am a Bureau Chief of that bureau.

11       Currently I have three assistants who work for

12       me in that bureau.

13                   In terms of my responsibilities as

14       Chief of Investigations, the Bureau Chiefs that

15       I supervise report to me.  So that would be for

16       Narcotics, Bob Ewald; Special Investigations,

17       Joe Carroll; Civil Forfeiture Unit, Craig

18       Pavlik.

19           Q      Can you give me a definition or a

20       description of what you mean by Government

21       Corruption Division or Bureau?

22           A      It's a bureau that investigates

23       corruption in the county.

24           Q      And that would include political

25       entities?

1                    ADA C. McPartland

2          A        Correct.

3          Q        That would include police

4    departments?

5          A        Correct.

6          Q        What are the kinds of entities you

7    would be investigating other than police

8    departments and municipal bureaus and divisions?

9          A        Potential -- we've prosecuted over

10   time county officials, town officials, village

11   officials who engage in criminal conduct.

12         Q        In those cases, Mr. McPartland,

13   when you do the investigation, which may lead

14   either to a plea of a person or an indictment,

15   do you consult with either Ms. Constant or

16   Mr. Spota in terms of the decision to go

17   forward?

18                   MS. ZWILLING:  Objection.

19                   You may answer it.

20         A        Yes.

21         Q        Are there certain circumstances,

22   situations, where a decision in terms of a case,

23   whether it be going forward with a case for

24   prosecution, whether there be an indictment or a

25   decision to take a plea, are there any cases

1                    ADA C. McPartland

2      where you alone make the decision, where you

3      wouldn't have to go to Ms. Constant or

4      Mr. Spota?

5              A      Yes.

6              Q      What -- give me a couple of

7      examples on that.

8              A      I mean, recently we had a

9      complaint against the clerk of the court in

10     Southold who was stealing funds.  We've

11     consulted with, you know, the village officials,

12     obtained some documents, and I made a decision

13     that there was enough to charge that person.

14     That was sort of very clear, cut-and-dry, no

15     need to consult with anyone else.

16             Q      Okay.

17             A      You know, a lot of misconduct in

18     fire departments and ambulance units and things

19     like that, that, you know, tend to be

20     straight-out theft cases, so they are fairly

21     cut-and-dry.

22             Q      Okay.

23                    During your tenure as Division

24     Chief of Investigations, can you recall

25     approximately how many indictments that you have

ADA C. McPartland

2  dismissed on behalf of the District Attorney?

3      A      As far as I can recall, only the

4  ones in this Southampton matter, which I believe

5  there were approximately eight.

6      Q      And would it be fair to say that

7  certainly in those circumstances, that you would

8  consult both with Ms. Constant and Mr. Spota who

9  are dismissing those indictments?

10      A      Yeah, I reviewed the matters, I

11  made a determination that I felt they should be

12  dismissed, I explained my decision to both of

13  them and they accepted my recommendation.

14      Q      Okay.

15              Let me turn now to the case we're

16  here today on, Bernard Cooks; okay?

17              When was it that you were first

18  alerted or informed that there might be an issue

19  in connection with Mr. Cooks' case?

20      A      Well, I believe it was sometime

21  around April of last year --

22      Q      April of 2013?

23      A      Yeah, the dismissal occurred last

24  year, right, or was it '12?  I'm sorry, forgive

25  me.

1                    ADA C. McPartland

2          Q      Well, let me see if I could show

3    you something that would refresh your

4    recollection.

5          A      Okay.

6          Q      Actually, let's do it this way --

7          A      No, I'm sorry, it had to be 2012.

8    Now I'm remembering the time span of the issue,

9    yes, 2012.  Somewhere in April of 2012 we

10   received some intelligence information that

11   there was an officer, unknown who, who had some

12   sort of a drug dependency issue.  Towards the

13   end of April of that year, I reached out to the

14   Town Attorney and the then chief to find out if

15   there was such a person.

16         Q      You said that you received some

17   sort of intelligence or information.

18         A      Uh-hum.

19         Q      Do you recall where that

20   information came from?  Did it come from a

21   police officer, did it come from someone in the

22   Southampton Police Department, was it something

23   someone said to you, was there some paperwork or

24   documentation that you looked at?

25         A      It's --

1                    ADA C. McPartland

2          Q       It's a compound question, but I'm

3     just trying to --

4          A       No, I understand.

5                  There was no documentation to

6     support the allegation at that time, and I don't

7     recall the source of the information.  It was

8     sort of rumor.  We had other matters that we

9     were investigating in the Town, and just with

10    our presence there, somehow or another, this

11    information came to us.  I simply don't recall

12    the exact source of it.

13         Q       Just in terms of background, you

14    just said you had been involved in other matters

15    with the Town of Southampton.  I'm assuming the

16    police department; would that be fair to say?

17         A       There was a person who was I

18    believe a public safety officer named Tumbarello

19    that we had arrested and charged with cocaine

20    sales, so we were working matters in that area.

21         Q       Had you, during the course of your

22    involvement with the Southampton Police

23    Department leading up to this information that

24    you received in April of 2012, had you met with

25    or talked to the police chief at that time,

         1                    ADA C. McPartland

         2    William Wilson?

         3         A      Ultimately after I sent -- I sent

         4    a letter in April to both the Town Attorney and

         5    to the chief.  They both responded to that

         6    letter, and thereafter I met with the chief

         7    about the person that was ultimately identified

         8    as Eric Sickles.

         9         Q      Let me show you this, which has

        10    already been marked (handing).

        11                This has already been marked as

        12    Plaintiff's Exhibit 22.  Do you recognize that?

        13         A      (Witness peruses document.)

        14                    MS. ZWILLING:  (Perusing

        15                    document.)

        16                    Okay, I just wanted to see

        17                    it.

        18         A      Yes, I do.

        19         Q      Is that the letter that you just

        20    referred to?

        21         A      Yes, it is.

        22         Q      By the way, prior to coming here

        23    today, what files, documents, did you review in

        24    preparation for your testimony?

        25         A      Two days ago I reviewed some

1                    ADA C. McPartland

2    materials that we -- that I have in a file on

3    this and other Southampton matters.

4         Q      Okay.

5                Was this a file that you

6    maintained as part of your duties and

7    responsibilities as Division Chief concerning

8    this matter?

9         A      Yes.

10        Q      Does that file also include some

11   handwritten notes or entries that you may have

12   made based on conversations that you may have

13   had with certain people?

14                    MS. ZWILLING:  You can

15                    answer "yes" or "no."

16        A      Yes.

17        Q      Okay.

18                And would it be fair to say that

19   you certainly reviewed those notes before coming

20   here today?

21        A      Yes.

22        Q      Again, we're talking more than two

23   years.

24        A      Yes.

25        Q      Other than notes that you may have

1                    ADA C. McPartland

2    had yourself written, was there other

3    correspondence or letters or memos that you

4    reviewed in preparation for today?

5        A      There is a small correspondence

6    file, but, yes, my notes about preparing this

7    letter and other notes, and I'm not sure exactly

8    what else is in that file, but I think there's

9    another -- there's another couple of letters

10   about other issues.  There were other things

11   going on with respect to the Town of

12   Southampton, so I sort of kept these things

13   together, so that's what I reviewed.

14       Q      By the way, in the events leading

15   up to being in court with Judge Weber and Susan

16   Menu on the date this case was dismissed, did

17   you prepare any sort of memo, a written memo to

18   either Ms. Constant or Mr. Spota in connection

19   with your recommendation in this case?

20       A      No.

21       Q      So that any recommendation that

22   you made to either one or both of them was

23   strictly verbal?

24       A      Correct.

25       Q      Did you make an entry in the file

1          ADA C. McPartland

2     in terms of notes or a memo indicating what you

3     were going to do in connection with this case?

4     In other words --

5          A     Yes.

6          Q     Okay.

7                Did you review that memo or

8     document, whatever that might be?

9          A     Yes.

10         Q     After this case, the indictment

11    was vacated and the sentence was vacated, did

12    you make any other sort of memo or piece of

13    paper or note to the file indicating what

14    happened and the reasons why it happened?

15         A     What happened, not necessarily the

16    reasons why it happened.

17         Q     Okay.

18               Mr. Murray was with you on the

19    date that the case was -- the indictment was

20    vacated; am I correct?

21         A     I believe he was.

22         Q     To your knowledge, did he make any

23    notes in the file in terms of your investigation

24    and observations about this case?

25         A     I don't recall.  I believe I made

1                    ADA C. McPartland

2    a memo to the file explaining the process.

3            Q       Okay, let me clarify a couple

4    things.

5            A       Uh-hum.

6            Q       The District Attorney's Office had

7    a file which was certainly maintained at the

8    time by the Narcotics Bureau in terms of the

9    prosecution, the indictment, discovery, so on

10   and so forth.  All those documents would be kept

11   in what we would normally call the DA file,

12   probably in Narcotics, would that be fair to

13   say?

14           A       Yes.

15           Q       The file you are talking about is

16   an entirely separate file from that particular

17   file; would that be fair to say?

18           A       Correct.

19           Q       And the information in your file

20   would more than likely be separate and apart

21   from anything that would be in the other

22   District Attorney's file --

23           A       Exactly.

24           Q       -- would that be fair to say?

25           A       Yes.

1                    ADA C. McPartland

2          Q        So, again, my question to you is

3     that with Mr. Murray with you on that date --

4                    MR. FERRIS:  Withdrawn.

5          Q        Did he assist you at all in terms

6     of the handling of this case, the prosecution

7     and the investigation?

8          A        Yes, he did.

9          Q        I mean, I'm assuming with your

10    position you have a lot of different things

11    going on.

12         A        A few.

13         Q        A few.  So it seems to me you

14    would certainly need someone else to assist you

15    to follow through on certain things; such as

16    phone calls, talking to people, getting

17    information.  Would that be fair to say?

18         A        Yes.

19         Q        Now, in this case, did he -- I

20    know you sort of answered before, but let me ask

21    you again based on what we just talked about:

22    Were there any notes, to your knowledge, that he

23    made in the file in connection with

24    conversations with people as part of the

25    investigation, memos to you, notes to you, maybe

1                    ADA C. McPartland

2       indicating dates he may have met with someone,

3       even though it doesn't include information, but

4       the conversation.

5              A       Okay --

6              Q       I gave you a lot.

7              A       Right.

8                     So, if I may, just to sort of

9       clarify what happened and what I believe to be

10      in the file.

11                     THE WITNESS:  May I?

12                     MS. ZWILLING:  Yes.

13             A       Okay.

14                     Ultimately, the Town provided us

15      with a list of cases that Eric Sickles had been

16      involved in.  We endeavored to pull those files

17      and review them to determine what Eric Sickles'

18      role was, whether it was significant or de

19      minimus or whatever his role was, to assess what

20      we should do with those cases.  Myself, Bob

21      Ewald and Mark Murray reviewed those cases, as

22      we were moving quickly and wanted to accurately

23      assess the value of Sickles' role in those

24      matters.

25                     I believe that Mark Murray may

ADA C. McPartland

1

2      have made notes about his review, as did I.

3           Q      Okay.

4           A      But I do not believe that there

5      are notes about contacting witnesses or having

6      discussions with people.  Once we had a belief

7      that Mr. Sickles had issues about his fitness

8      for duty, we went right to the files.

9           Q      Let me clarify something.  When

10     you said you requested files of all the cases

11     that Officer Sickles may have been involved with

12     during a certain period of time, let me ask you,

13     what was the period of time that you were

14     looking at in connection with Officer Sickles?

15     Let me take it piece by piece.

16          A      Uh-hum.  I believe it dated back

17     to -- my best recollection, as I sit here, is

18     that it dated back to 2010.

19          Q      And these were files that you

20     obtained from Southampton Police Department?

21          A      It was a list of matters that Eric

22     Sickles worked on.  We then went to our

23     archives -- we first determined who was in

24     custody, and reviewed those cases first, in

25     order, and then began a process of reviewing the

1                    ADA C. McPartland

2    out-of-custody cases, both felonies and

3    misdemeanors.

4          Q      Okay, so you looked at your files

5    first; am I correct?

6          A      No.  The police department gave us

7    a list of matters that Mr. Sickles was involved

8    in.

9          Q      Sorry, right.

10         A      We then went to our archives and

11   pulled those files, obviously the in-custody

12   defendants first.

13         Q      And with respect to Mr. Cooks, you

14   found out that Officer Sickles was involved in

15   this particular case?

16         A      Yes.

17         Q      At that point in time did you then

18   request further files from Southampton, either

19   the Town or the police department, as a result

20   of your own internal review?

21         A      No.

22         Q      Let me ask you, the archived files

23   that you said you looked at from your office,

24   did that include documents or paperwork or field

25   reports, Sup reports, evidence reports, chain of

1                    ADA C. McPartland

2    evidence, so on and so forth?  Did your files

3    include all those documents?

4         A      Yeah, they had the Southampton

5    Police Department offense report and other

6    materials that related to that incident.  It was

7    all in the DA file.

8         Q      Okay.

9                The letter here that I showed you,

10   which is Exhibit Number 22, in terms of the

11   timing, Mr. McPartland, did you conduct a

12   review -- the review that you conducted as a

13   result of getting a list of cases from the

14   Southampton Town Police Department, you

15   conducted a review of your own cases.  Did that

16   review precede the letter dated April 26th to

17   the Town?

18        A      No.  If I may?

19        Q      Please.

20        A      As of the date of this letter, I

21   didn't know the name of the officer who had the

22   issue.  That's why I'm asking the Town in this

23   letter, do you know -- is there an officer that

24   you believe to be impaired in some way by drugs.

25        Q      Okay.

1                    ADA C. McPartland

2          A       If I may read from the letter --

3          Q       Yeah, actually maybe I

4    misunderstood, and at the risk of asking you

5    again, when you got the list of cases from

6    Southampton Police Department, did that list

7    include the name of Officer Sickles?

8          A       No.  If I may --

9          Q       Please clarify for me; okay?

10         A       On this date, April 26th, the

11   letter -- and if I may read just the first two

12   paragraphs?

13         Q       Go ahead.

14         A       It says, "The purpose of this

15   letter is to memorialize my phone conversations

16   with both of you yesterday" -- and it is

17   addressed to the Town Attorney and the Chief of

18   Police -- "This office has received allegations

19   that for some period of time a Town of

20   Southampton Police Officer with a known drug

21   addiction was permitted to function on active

22   duty.  I called both of you to ascertain the

23   identity of the officer, whether these

24   allegations are true and what official actions

25   the officer took in the condition alleged."

1          ADA C. McPartland

2          So, as of the writing of this

3    letter, I didn't know who that person was.

4          Q     Okay.

5          A     Okay, so ultimately thereafter,

6    his identity is made clear to me.  When I am

7    told that it is Eric Sickles, I asked that I be

8    provided with a list of cases that he was

9    involved in.  I was then provided a list of

10   cases that he was involved in.

11         I then took that list, went to our

12   archives, pulled the files first for in-custody

13   defendants, and began the review process with

14   Mr. Murray and Mr. Ewald.

15         Q     Thank you, I got confused on the

16   timing of that.

17              COURT REPORTER:  How do you

18              spell Mr. Ewald?

19              THE WITNESS:  E-w-a-l-d,

20              and Murray is with two "R"s.

21         Q     And you also indicate, actually on

22   the bottom of the first page -- well, the last

23   two paragraphs, you, of course, remind them that

24   you have an obligation to provide exculpatory

25   material at any time it becomes available to

1                    ADA C. McPartland

2    you; is that correct?

3          A      Correct.

4          Q      And that's imbibed in the letter

5    to the Town; correct?

6          A      It is.

7          Q      All right.

8                 Now that I've got the times a

9    little better, when did you get the name of

10   Officer Sickles and the list of those cases?

11         A      Somewhere between April 26th and

12   May 16th.

13         Q      During that period of time, was

14   there a Grand Jury subpoena issued to the Town

15   for the records, if you know?

16         A      I don't believe so.

17         Q      Okay.

18         A      I just asked for them, and they

19   gave it to me.

20         Q      All right.

21                Just, the basis for that, there

22   was a lot of information from the press in terms

23   of Grand Jury subpoena and getting records and

24   so forth.  That's the reason for my question,

25   just to clarify how you got those records to

                    ADA C. McPartland

 2    your knowledge.  That's what I'm asking.

 3         A      I asked the Town for them and they

 4    provided them to me.

 5         Q      Did you get them from the police

 6    department or from the Town?  Did you actually

 7    go to their -- because there's some

 8    correspondence in terms of making copies of the

 9    documents.

10         A      No, that's different.

11         Q      Different?

12         A      That's different material,

13    different issue.

14         Q      Fine, okay.

15         A      So, in this case I reached out to

16    the Town Attorney, who, I believe, was privy to

17    some general allegations, but not specifics.

18    She referred me to the Chief of Police, who was

19    conducting some form of investigation about the

20    matter.  Ultimately he responded in those days,

21    in that window that I discussed between the 26th

22    and the 16th, he provided us with a list of

23    cases that Mr. Sickles was involved in, and then

24    we, in turn, started the process that I've

25    described.

1               ADA C. McPartland

2          Q     Okay.

3          A     But they were accommodating and

4     responsive and provided it in short order.

5          Q     The date May 16th, what happened

6     on that date, Mr. McPartland?

7          A     The 16th I believe was the day

8     that we asked archives to pull the files in

9     question.

10         Q     Your archives?

11         A     Correct.

12         Q     After May -- after April 26th did

13    you have occasion to meet with Chief Wilson?

14         A     I believe I did in that period of

15    time.

16         Q     Do you remember the approximate

17    date?

18         A     I do not.

19         Q     Where did you meet with him?

20         A     I believe he came to our office --

21    actually, I take that back.  I believe I met

22    with him in that period of time.  I don't have a

23    recollection of when.  I know that certain

24    materials were delivered, were handed over to

25    one of my detectives who picked up information.

1                    ADA C. McPartland

2    I think, although I don't recall clearly having

3    met with him.  I certainly spoke to him.

4                    MS. WRIGHT:  Before we move

5                    on, could I just get the dates for

6                    the last question, or the last

7                    couple of questions.

8                    COURT REPORTER:  "QUESTION:

9                    After May -- after April 26th did

10                   you have occasion to meet with

11                   Chief Wilson?"

12                   MS. WRIGHT:  Thank you.

13        Q    When you met with him, who from

14   your office, if any, were present at the time?

15        A    I'm not positive that I met with

16   him, so I can't answer your question.  I know

17   that I spoke to him about getting the list and,

18   you know, that it was very important, and, you

19   know, it was going to be a challenge for him to

20   search his own records to find out exactly which

21   cases Sickles was involved in.  He endeavored

22   quickly to do a search, and did a search.  I

23   don't know if I spoke to him on the phone about

24   that or in person.

25        Q    I'm not going to pursue this very

1              ADA C. McPartland

2    far, but I just -- in terms of the Cooks case,

3    you said before that you had other issues going

4    on in the Southampton Police Department that you

5    were looking at.  Is that a fair statement?

6         A    Yes.

7         Q    So other than Mr. Cooks' case,

8    were you speaking with either Chief Wilson or

9    the members of the department in connection with

10   other investigations, other than Mr. Cooks?

11        A    Yes.

12        Q    Now, I know you said that you

13   didn't have a specific recollection actually

14   where, if you met Chief Wilson at all, but do

15   you remember at all if you did meet with him any

16   information that you obtained from Chief Wilson?

17        A    It was asking him for the list,

18   what was the list of cases that he was involved

19   in and did he have some basis to believe that

20   Sickles had been impaired by his drug use, and

21   for how long.

22        Q    Who gave you the name of Officer

23   Sickles in the first instance?  Who was it that

24   told you Officer Sickles may have had a problem?

25        A    No one told me Officer Sickles

1                    ADA C. McPartland

2     might have had a problem.

3          Q     That's what I'm trying to find

4     out.

5          A     So, in April, prior to this

6     letter, I have vague intelligence information,

7     the source of which I don't recall what it is,

8     but it was enough for me write this letter.

9     Ultimately, after this letter is written, it is

10    Chief Wilson who identifies the person as

11    Officer Sickles.

12         Q     Mr. Murray, to your knowledge, did

13    he have conversations with Chief Wilson in

14    addition to yourself, if you know?

15         A     I don't believe so.

16         Q     Do you recall what else Chief

17    Wilson may have told you about Officer Sickles

18    in connection with Mr. Cooks or in connection

19    with his substance issues, anything else?

20         A     I never spoke to Chief Wilson

21    about Eric Sickles' role with respect to

22    Mr. Cooks.  He was not the chief at the time of

23    the incident, and I don't believe he had

24    anything to offer.  I don't believe he even

25    worked for the department at the time.  So he

1              ADA C. McPartland

2    had nothing to offer.  Our basis for action came

3    from the Cooks file, the District Attorney's

4    Cooks file.

5         Q     Okay.

6              When you reviewed the file,

7    Mr. McPartland, would it be fair to say that you

8    reviewed the file from when Mr. Cooks was

9    initially arrested pursuant to a search warrant

10   on January 19th, 2011?

11        A     Yes.

12        Q     And that your review also

13   encompassed leading up to his indictment on

14   June 22, 2011?

15        A     Yes.

16        Q     Okay, you may not know the dates

17   of the actual indictment --

18        A     I don't.

19        Q     Okay, but it included the period

20   of time leading up to the indictment; am I

21   correct?

22        A     Correct.

23        Q     And as part of that review, did

24   you also review up to the time that Mr. Cooks

25   entered a plea of guilty before Judge Weber in

1                   ADA C. McPartland

2      May of 2011?

3           A      I noted that in the file.  It was

4      in the file, yes.

5           Q      And as part of your review was

6      also in terms of Mr. Cooks' sentence, which was

7      in June of 2011, part of your review was the

8      case?

9           A      Yes.

10          Q      And then on --

11                       MR. FERRIS:  Could we have

12                  this marked as Plaintiff's 26 and

13                  have this marked also as 27.

14                       (Plaintiff's Exhibit 26,

15                  Court transcript for the date of

16                  May 23, 2012, consisting of four

17                  pages, was marked for

18                  identification, as of this date.)

19                       (Plaintiff's Exhibit 27,

20                  Court document consisting of five

21                  pages, was marked for

22                  identification, as of this date.)

23          Q      Okay, so this is 27 (handing).

24     Mr. McPartland, take a look at Number 27.  Do

25     you recognize that?

1                    ADA C. McPartland

2          A       (Witness peruses document.)

3                   It appears to be a copy of the

4     indictment involving Bernard Cooks and others.

5          Q       Okay.

6                   Would it be fair to say that that

7     is the indictment upon which he was indicted,

8     and it was that indictment that was subsequently

9     vacated in May of 2012?

10         A       I believe so.

11         Q       Do you want to double check that

12    that is correct?

13                         MS. ZWILLING:  I don't know

14                         if he has any way of doing that.

15                         MR. FERRIS:  Well, there is

16                         one way.  He can take a look at

17                         Number 26 (handing).

18         Q       Okay, so let me ask you about 26.

19    Have you seen that document before?

20         A       (Witness peruses document.)

21                 I have not.

22         Q       The transcript?

23         A       I don't think I've seen the

24    transcript before.

25         Q       Would you take a minute to read

1                    ADA C. McPartland

2      it, please.

3            A      I did.

4            Q      You just did?

5            A      Yeah, when you handed it to me.

6            Q      Okay.

7            A      And this transcript of the

8      proceeding on May the 23rd before Judge Weber

9      relates to applications for indictment 218-C of

10     2011, which is what you provided me in

11     Exhibit 27.

12           Q      Okay.

13                  And the letter "C," would that be

14     fair to say it reflects on Bernard Cooks?

15           A      Correct.  He is the third

16     defendant.

17           Q      Okay.

18                  Now, before you went on the record

19     that morning on May 23rd, did you have a

20     conversation with Judge Weber and Sue Menu and

21     Tom Moore, his law secretary, before coming out?

22           A      Yes.

23           Q      And did you inform the Court and

24     Ms. Menu what you planned to do with respect to

25     this indictment?

2          A       Yes.

3          Q       In this case, Mr. McPartland, you

4    had made the request -- correct me if I'm

5    mistaken -- you had made the request to Sue Menu

6    to appear in court for purposes of dismissing

7    her client's case; am I correct?

8          A       That's correct.

9          Q       The reason I say that is as

10   opposed to the defense attorney calling you and

11   asking you to come in, "I want to make a motion

12   to dismiss" or "vacate," whatever that might be.

13               In this case, it was your office

14   that initiated the contact with Ms. Menu and the

15   Court to place this on the calendar to vacate

16   the conviction; am I correct?

17         A       Correct.

18         Q       And would it be fair to say that

19   it was agreed in chambers that Ms. Menu would

20   actually make the application to dismiss, to

21   conform with the actual statute?

22         A       My recollection is that Ms. -- we

23   asked Ms. Menu to make a motion under 440 to

24   vacate the conviction.  I then, I believe, made

25   an application to dismiss the then-standing

1           ADA C. McPartland

2    indictment to be dismissed in the interest of

3    justice.

4           Q      Okay.

5           A      (Witness peruses document.)

6                  Correct, I made an application

7    pursuant to Penal Law 170.30(1)(f).

8           Q      Okay.

9                  What I did -- just for

10   clarification, I photocopied the CPL Section

11   440; okay?

12                    MR. FERRIS:  I'd like to

13                    have this marked Number 28.

14          Q      But I also have with me the actual

15   book so you can confirm, in fact, that I copied

16   the correct section, if you want to do that.

17          A      I don't think we need to do that.

18          Q      I didn't want you to think I was

19   being presumptuous in not letting you check it.

20          A      Okay.

21          Q      And I also copied the section that

22   was applicable at that time, because since that

23   time, the section has been amended.

24          A      Okay.

25                    MR. FERRIS:  So, if we

1              ADA C. McPartland

2              could have that marked, please.

3                   (Plaintiff's Exhibit 28,

4              photocopy of CPL Section 440,

5              entitled "Post-Judgment Motions,"

6              consisting of two legal-sized

7              sheets of paper, was marked for

8              identification, as of this date.)

9         Q    Okay, do you want to take a look

10   at the actual marked exhibit (handing)?

11        A    Yes.

12             (Witness peruses document.)

13        Q    Just for the record,

14   Mr. McPartland, could you read Section 440.

15   Start with Subdivision 1, and then move down to

16   Subdivision (h).

17        A    "440.10(1):  At any time after the

18   entry of a judgment, the court in which it was

19   entered may, upon motion of the defendant,

20   vacate such judgment upon the ground that: (h)

21   the judgment was obtained in violation of a

22   right of the defendant under the Constitution of

23   this state or of the United States."

24        Q    And would it be fair to say,

25   again, prior to coming on the record that you

1                    ADA C. McPartland

2    discussed the section with Ms. Menu in terms of

3    moving towards -- or vacating the judgment of

4    the conviction?

5          A      Yes.

6          Q      I'm just going to jump ahead and

7    then I'll come back.

8                 I also have with me -- actually,

9    it's Section 170.30.  I'm not sure that was the

10   section the record reflects, but I think that's

11   the section you cited in the transcript.

12         A      No.

13         Q      You want to take a look at the --

14         A      No, it's "170.31(f)" is what's in

15   transcript, but I thought it was 170.40 -- no.

16   Let me just see.

17                (Witness peruses documents.)

18                Okay, yes, this is the section.  I

19   take it back, I'm sorry.  The way it is reported

20   in the transcript is inaccurate.  The transcript

21   says "Section 170.31(f)," when it should read

22   "170.30" Subdivision "(1)" Subdivision "(f)."

23                    MR. FERRIS:  Okay, let me

24                mark this as an exhibit.

25                    (Plaintiff's Exhibit 29,

1          ADA C. McPartland

2          Photocopy of CPL Section 170.30,

3          consisting of one legal-sized

4          sheet, was marked for

5          identification, as of this date.)

6     Q     Aside from the transcription

7   error, can I just ask you to read the section

8   that you were referring to when you were on the

9   record.

10    A     It says "After arraignment and

11  upon an information, a simplified information, a

12  prosecutor's information or a misdemeanor

13  complaint, the local criminal court may, upon

14  motion of the defendant, dismiss such instrument

15  or any count thereof upon the grounds that:

16          "(f) There exists some other

17  jurisdictional or legal impediment to conviction

18  of the defendant for the offense charged."

19    Q     Thank you.

20          Okay, now, going back to Exhibit

21  Number 27, which I believe is the transcript --

22    A     No, 26.

23    Q     26, okay.

24          On the top of the next page,

25  Page 2, which is what I'm looking at, on the

1                    ADA C. McPartland

2      bottom photograph, starting at Line 19, and I

3      quote from you, Mr. McPartland, "Your Honor,

4      certain matters have recently come to the

5      District Attorney's attention regarding a police

6      officer that participated in the investigation

7      in this matter, those facts related to defense

8      counsel and the Court in chambers.  Based on

9      that information, People consent to the

10     application."

11                    Would that be fair and accurate

12     what you said in the transcript?

13          A      I believe so.

14          Q      Just moving on, the Court granted

15     the application, and he asked if there's a

16     further application, and on Page 3,

17     Mr. McPartland, on Line 7, you state, "Your

18     Honor, respectfully, the People make application

19     pursuant to Criminal Procedure Law Section

20     170.31(f) [sic] to dismiss the case in the

21     interest of justice, based on what the People

22     believe to be an impediment to the conviction of

23     the defendant for the offense charged."

24                    Did I quote that correctly?

25          A      You read it correctly from this

1          ADA C. McPartland

2    transcript.

3          Q     From the transcript, yes, aside

4    from the issue of the 170 --

5          A     Yeah.  Actually, I believe the

6    proper vehicle for the dismissal was 170.40, I

7    believe.  I'm not -- there's an interest of

8    justice dismissal for an indictment.  That's

9    what I thought I was moving under, so there is

10   some discrepancy.

11         Q     Well, the main issue here that I

12   really want to come to is that your request to

13   the Court was to dismiss the case on what you

14   believed to be an impediment to the convection

15   of the defendant.

16         A     That is correct.

17         Q     Okay.

18               Now, as you know, and not to

19   belabor what we said before, you understand that

20   Mr. Cooks was indicted, and he had actually pled

21   guilty and was sentenced, and in a minute I'll

22   just ask if you recognize that he also waived

23   his right to appeal as part of that.

24               So, I'm going to ask you:  What

25   was the specific reason that you had in

1           ADA C. McPartland

2    representing the District Attorney's Office that

3    there was an impediment to the conviction of the

4    defendant for the offense charged?

5           A      After the defendant's plea and

6    sentence, our office became aware of the fact

7    that Officer Sickles was taking significant

8    quantities of a narcotic drug while he was on

9    duty.  We had reason to believe that he was

10   taking those drugs at the time of the offense

11   that Mr. Cooks was charged with.  It posed a

12   credibility issue with respect to Mr. Sickles'

13   complete and accurate answers to which we could

14   not answer.

15          Q      Let me follow up on your last

16   statement, and I know you chose your words

17   wisely and carefully.  What did you mean by that

18   last statement?

19          A      Well, if we were to go to trial --

20   if we were to consent to the dismissal -- to the

21   vacating of the conviction, we then had a

22   standing indictment again.  We had to make a

23   determination whether we could go forward to

24   trial on that matter.

25                 In contemplation of such a trial,

1          ADA C. McPartland

2    we had to assess what information we would have

3    to provide about Mr. Sickles' conduct and his

4    condition, and more specifically, we would have

5    to be prepared at trial to have him or us answer

6    questions about his condition at the time of his

7    actions in that investigation.

8              There was virtually no way for me

9    or Mr. Sickles to recall whether he had taken

10   narcotics that day, and if he had, how it may

11   have impaired his judgment or thinking on that

12   day at the time he signed complaints in the

13   matter and later when he testified in the Grand

14   Jury.  Under those circumstances, I made the

15   determination that we should dismiss the case.

16        Q      Okay.

17              Just to clarify this -- and I was

18   going to come to it, but you raised it -- in the

19   District Attorney's Office and in the Criminal

20   Procedure Law, there's a two-step process

21   normally in terms of dismissing -- or releasing

22   the defendant from custody and dismissing the

23   indictment.  To vacate the conviction leaves the

24   indictment standing.  And at that point in

25   time -- and correct me if I'm mistaken -- what

1                    ADA C. McPartland

2   happens then is that the District Attorney makes

3   the determination to either dismiss the

4   indictment in its entirety or take the case to

5   go to trial.  Is that a fair statement?

6          A     Correct.

7          Q     And what you did was to make a

8   decision to dismiss the indictment in its

9   entirety and not go to trial; am I correct?

10         A     Correct.

11         Q     Okay.

12               And the basis for that is your

13  review of the case going back to when Mr. Cooks

14  was actually initially arrested back on

15  January 19th of 2011; would that be fair to say?

16         A     Yes.

17         Q     And it carried through to, as you

18  said, filing the criminal complaint in

19  Southampton with criminal possession of a

20  controlled substance?

21               In other words, when the complaint

22  was signed initially against Mr. Cooks, you had

23  an issue in terms of the complaint itself?  I

24  just want to make sure I understood what you

25  said.

1                    ADA C. McPartland

2          A      No.  No, I believe the complaint

3    was properly filed based on probable cause.

4          Q      But there was an issue in terms of

5    Officer Sickles' ability to testify and recall

6    the circumstances concerning the arrest and the

7    processing of the paperwork; am I correct on

8    that -- let me take it one step at a time.

9          A      Yeah.

10         Q      There was an issue of the actual

11   arrest of Mr. Cooks, the execution of the search

12   warrant, what Officer Sickles was doing in

13   connection with Mr. Cooks; is that fair to say?

14                    MS. WRIGHT:  Objection to

15                    the form.

16         A      If I may clarify.

17         Q      Sure.

18         A      The sole basis on which this

19   matter was dismissed was a post-Brady

20   disclosure -- excuse me, a post-conviction Brady

21   disclosure, which is rooted in the Constitution,

22   that was information that we felt we had to

23   provide to the magistrate and the defendant

24   immediately, which is what we did.  The --

25         Q      That's not my issue.  I have no

1          ADA C. McPartland

2     problem with that.  That's not what I'm getting

3     at --

4          A     Okay, but the issue here is -- is

5     that Mr. Sickles -- we had reason to believe

6     that during the period of time of this case, the

7     Cooks arrest, Mr. Sickles was taking narcotic

8     drugs.  We could not answer, nor can I answer

9     today, whether he was under the influence of

10     those drugs when he acted in this matter.

11               It should be noted that there was

12     never an allegation that Mr. Sickles engaged in

13     any type of misconduct with respect to the

14     seizure of those drugs, the signing of that

15     complaint, his testimony before the Grand Jury.

16               The basis of the dismissal is the

17     depth of our obligation under Brady, and that we

18     simply could not identify what it was that was

19     wrong with Mr. Sickles, if anything, at the time

20     of this event.

21          Q     However, you made the decision not

22     to go forward with the trial on this matter,

23     which would have allowed Officer Sickles to

24     testify, and, of course, be subject to

25     cross-examination.  You made a decision not to

1                    ADA C. McPartland

2      do that; am I correct?

3             A      Correct.

4             Q      And your decision, then, was to

5      actually dismiss the indictment in its entirety?

6             A      Correct.

7             Q      Therefore, obviating the need for

8      Officer Sickles to come to court and testify; am

9      I correct?

10            A      That's correct.

11                   Our obligation being different

12     than Mr. Sickles'.

13            Q      I understand that.  That's not --

14            A      Okay.

15            Q      I'm trying to get underneath that

16     obligation, as you just said, because your

17     obligation, of course, is to make sure that --

18     in prosecuting cases, is to make sure that a

19     person's Constitutional rights are not violated

20     as part of the process; am I correct?

21            A      Correct.

22            Q      So in this case you made a

23     determination, based upon what you just told me,

24     if I'm not mistaken, that, in your opinion,

25     Officer Sickles would not be able to testify --

1                    ADA C. McPartland

2    you put it in your words, rather than mine.

3                    You made a decision that you did

4    not want him to testify in this case; would that

5    be fair to say?

6          A      No.

7          Q      What was the determination --

8    aside from the Brady issue, practically, what

9    was your decision with respect to Officer

10   Sickles?

11         A      The basis for the dismissal is the

12   Brady issue.

13         Q      But Brady requires something that

14   was done or not done affecting a defendant's

15   Constitutional rights, and in this case

16   something certainly that may be favorable to the

17   defendant; would that be fair to say?

18         A      Yes.

19         Q      What was the information that was

20   favorable to the defendant which was not

21   previously afforded to him during the pendency

22   of this case?

23         A      That Officer Sickles was taking

24   narcotics during the time period of the offense

25   charged.

1                    ADA C. McPartland

2        Q       On the Brady issue, as you said,

3    this was a post-judgment Brady awareness, if you

4    will, which certainly, setting aside the

5    judgment and conviction, did not necessarily

6    require the actual indictment to be dismissed;

7    am I correct?

8        A       It's a matter of discretion.

9        Q       To be sure, but my question is:

10   As a matter of Brady, it was not necessary for

11   you to have to make the determination to

12   actually dismiss the case in its entirety.  In

13   other words, the issue of Brady would have been

14   satisfied, if you will, if you had notified

15   defense counsel about what happened and just set

16   aside the judgment and conviction and let the

17   indictment stand and go to trial?

18       A       I disagree with you.

19       Q       Okay, how so?

20       A       Because part of the Brady

21   obligation is to provide that information to the

22   defendant in a time period where they can make

23   use of the information.  Mr. Cooks was in

24   prison.  He was never afforded the opportunity

25   to have a meaningful use of the Brady material,

1                    ADA C. McPartland

2    Mr. Ferris.

3         Q      Fair enough.

4                That really wasn't my question.

5    Maybe I didn't phrase my question, properly.

6    Understood.  No issue.

7         A      But your question, if I may --

8         Q      Yes.

9         A      -- was would we satisfy our Brady

10   obligation simply by providing the information

11   about Mr. Sickles' conduct.  I don't believe

12   that did satisfy our Brady obligation, because

13   Mr. Cooks never had the benefit of that

14   information when he took his plea.

15               So, I think it is responsive to

16   your question, respectfully.

17        Q      So let me rephrase the question.

18        A      Uh-hum.

19        Q      And I don't disagree with what you

20   just said; okay?

21        A      Okay.

22        Q      The issue is this:  Looking at in

23   terms of how a judgment conviction is vacated

24   under Brady -- and by the way, let me -- for the

25   record, I'm not disagreeing with your decision

ADA C. McPartland

1

2     what you did.  I'm not doing that; okay?

3              A     Okay.

4              Q     I'm asking you strictly in terms

5     of procedural, and you certainly know the

6     procedure as well as I do, and probably even

7     better at this point in time.

8                    But what I am asking right now is

9     in terms of procedure, to satisfy the Brady

10    claim -- and I realize that the defendant was

11    already in custody, he had been in jail, but the

12    right to have him face his accusers in court

13    with now the information about Sickles and his

14    drug use, that still could have been --

15    procedurally it still could have happened,

16    procedurally.  You did not have -- and again,

17    I'm not questioning your decision, I'm only

18    questioning procedurally, you did not have to

19    dismiss the indictment.  That's my question.

20                    Do you understand what I said?

21             A     I do.

22             Q     Okay.

23             A     But therein is the substance of

24    the decision, and our -- the role of a

25    prosecutor is to do justice.  And so what is

1          ADA C. McPartland

2     justice (indicating) and what is Brady

3     (indicating)?  When you combine those two things

4     together, is it fair to Mr. Cooks, who sat in

5     jail and didn't have the benefit of those

6     disclosures even though he could have started

7     over with a new process with that information.

8              Now, you combine that with the

9     fact that I could not explain to the world what

10    Mr. Sickles' condition was on the day that that

11    arrest was made, and ultimately, those three

12    legs to the stool formed the basis upon which I

13    felt the just thing to do was to dismiss the

14    case.

15        Q     Okay.

16              I also think in your answer, you

17    sort of answered my question, because we both

18    know there are three prongs, of course, to

19    Brady.

20              Okay, I think you have answered my

21    question within your explanation.

22        A     Okay.

23        Q     During the course of your

24    investigation of this and Officer Sickles, were

25    you able to ascertain when it was that the Town

1                ADA C. McPartland

2     of Southampton or the Southampton Police

3     Department was aware of Officer Sickles'

4     condition in terms of his substance abuse and

5     using narcotics?

6          A     That is a matter of great

7     controversy and inconclusive facts.  I don't

8     know how to answer that.  It's -- it's unclear

9     to me.

10         Q     But certainly during your

11    investigation of this and your review and your

12    determination, am I incorrect by saying it was

13    certainly clear to you that he had an issue of

14    abuse of narcotics back on January 19, 2011 when

15    he was involved in the Cooks case?

16         A     Well, I don't know what you mean

17    by "an issue" with narcotics.  I knew that

18    during this period of time, that Officer Sickles

19    was taking narcotic drugs.

20         Q     And again, not to beat a dead

21    horse, but that also included January 19th of

22    2011 which -- because what you said, that's the

23    date of the execution of the search warrant and

24    the arrest?

25         A     Yes.

1                    ADA C. McPartland

2          Q      Okay.

3                 Mr. McPartland, just so I am

4     clear, it was not only Mr. Cooks' case that was

5     dismissed; it was all four defendants on that

6     indictment.  Am I correct on that, if you know?

7          A      I know Mr. Opoku and Mr. Cooper's

8     were.  As I sit here, I'm not sure whether

9     Mr. Whidbee's was.  I just don't recall right

10    now.  It's very possible that it was, but the

11    name is just not striking me as I sit here.

12         Q      In the event that I didn't ask

13    you, would it be fair to say that you discussed

14    your recommendation with both Mr. Spota and

15    Ms. Constant on this cases?

16         A      I did.

17         Q      And I'm assuming that they

18    approved your decision?

19         A      Yes.

20         Q      When you reviewed the files in

21    your office and Officer Sickles' name was known

22    to you and you identified the cases that he was

23    involved with, did you review your own District

24    Attorney's file that was previously part of

25    narcotics?  I'm sure at that time it was closed

            1                    ADA C. McPartland

            2        out and put someplace else, but did you review,

            3        let's say, the trial folder?

            4              A      Yes.

            5                          MR. FERRIS:  Can we have

            6                    this marked Plaintiff's 30.

            7                          (Plaintiff's Exhibit 30,

            8                    Document entitled "Request for

            9                    Bill of Particulars and Demand to

           10                    Produce," consisting of five

           11                    pages, was marked for

           12                    identification, as of this date.)

           13              Q      Mr. McPartland, I ask you to take

           14        a look at this (handing).  Let me tell you where

           15        it came from.  It actually came from your office

           16        as part of your trial folder, just so you know

           17        where it came from.

           18                          I'll ask you if you remember

           19        seeing that document in the file.

           20              A      (Witness peruses document.)

           21                          MS. WRIGHT:  Do you have a

           22                    copy of that, Bill?

           23                          MR. FERRIS:  I don't have a

           24                    copy, but I'll tell you what it

           25                    is.  Just for the record, it's a

1                    ADA C. McPartland

2                    demand for discovery and

3                    inspection by the defense attorney

4                    at the time representing

5                    Bernard Cooks, as well as it asks

6                    for any Brady material.

7          A     I don't have a specific

8     recollection of reviewing it, but it would

9     certainly have been in the file, and in

10    reviewing it, I'm sure I probably would have

11    noted it.

12                    MS. WRIGHT:  Can you just

13                    tell me the date on that document?

14                    MR. FERRIS:  Sure.  In

15                    fact, I could -- for the record,

16                    it is March 11th of 2011.

17                    MS. WRIGHT:  Did that also

18                    have Bates stamps on it?  Sorry.

19                    I think on the bottom of that.

20                    MR. FERRIS:  No, just the

21                    Exhibit Number -- oh, I'm sorry,

22                    yes.

23                    MS. WRIGHT:  Thank you.

24         Q     Let me just go back,

25    Mr. McPartland, if I can, to Section

1                    ADA C. McPartland

2       440.10 (1)(h).

3                    What it does in that statute is

4       that it says, "The judgement was obtained in

5       violation of a right of the defendant under the

6       Constitution of this state or the United

7       States."

8                    The dismissal that you made in

9       this case was made under -- or can you specify

10      the violation that was violated in this case to

11      deny Mr. Cooks?

12           A      It is the post-conviction Brady

13      disclosure.  So, for example, in my letter dated

14      April 26, 2012, in Paragraph 4 I say, "The

15      Suffolk County District Attorney's Office is

16      obligated by the United States Constitution and

17      other legal requirements to provide exculpatory

18      evidence of information in its possession to

19      defend its charge with crimes."

20                   When we came in possession of that

21      information, we provided it immediately, but it

22      was after the defendant's plea; and so

23      therefore, the obligation of Brady is rooted in

24      the Constitution, and that is the basis upon

25      which we consented under Subdivision (h).

1                    ADA C. McPartland

2         Q      I mentioned before, and went over

3    it kind of quickly, but Brady, if you agree with

4    me, really consists of, one, material

5    information; two, beneficial to the defendant;

6    and material to the case.  Would you agree with

7    that?  If you want to change or modify it, feel

8    free to do so.

9         A      Well, I agree that is included in

10   Brady, yes.

11        Q      So when you dismissed or moved to

12   dismiss this case pursuant to Brady, it would

13   include the definition or explanation of Brady

14   as I just described to you?

15                    MS. ZWILLING:  Objection.

16                    MR. FERRIS:  Well --

17                    MS. ZWILLING:  I think the

18                    question is a little bit unclear,

19                    but...

20        Q      If you don't understand,

21   Mr. McPartland, I'll rephrase it.

22        A      I am a little unclear.

23        Q      Fine.

24                    When you say you moved to dismiss

25   this case under Brady, the Brady umbrella, if

1                        ADA C. McPartland

2       you will, in this case includes those three

3       qualities, if you will -- material information,

4       benefit to the defendant, and material to the

5       case.

6              A       Well, you have two materials.

7              Q       I'm sorry.  It's information

8       favorable to the defendant and material to the

9       case.

10             A       Correct.

11             Q       Okay.

12                     And what you are saying, when you

13      moved for dismissal under Brady, he was not

14      afforded information that, one, is either

15      helpful to him, that's to him, and material to

16      the case.  Would that be fair to say?

17             A       That's correct.  Sadly, because

18      unclear whether the Town was aware of that or

19      not, but our office certainly was not at the

20      time of the entering of the plea.

21             Q       Let me just say this, and then we

22      can -- you said before that you couldn't

23      determine when the Town became aware, and I'll

24      leave it at that.

25             A       Right.

1                    ADA C. McPartland

2          Q       And if it's okay with you, I'll

3     leave it at that.  Certainly, I'm not

4     challenging your office and when you found out

5     about it, that's not my issue.

6          A       Okay.

7                   Can I just clarify something, if I

8     may?

9          Q       Sure.

10         A       Because we're saying "dismissed,"

11    and I think we're fumbling things together.  So,

12    in the interest of being very precise here, the

13    first action was that we consented to an

14    application under 440.10(1)(h), we consented to

15    the vacating of the plea and sentence.

16         Q       And by the way, excuse me, that

17    application has to be made by the defendant; am

18    I correct?

19         A       The statute requires that it be

20    made by the defendant, which is why I asked

21    Ms. Menu to make it.

22         Q       Precisely.

23         A       And the basis for that was that

24    "the judgment was obtained in violation of a

25    right of the defendant under the Constitution of

1                    ADA C. McPartland

2    this state or of the United States."  So

3    specifically with respect to that, the

4    post-conviction Brady is rooted in the

5    Constitution and we felt it was appropriate to

6    consent to that application, because he had not

7    been afforded that information before he took

8    his plea.

9                    The next procedural step is

10   dismissing the indictment, which was dismissed

11   under, let's just say Article 170 of the CPL,

12   but the basis was that it be dismissed in the

13   interest of justice.  That was a determination,

14   that based upon the fact that he had not been

15   afforded the information prior to his plea, and

16   because of the fact that we could not clearly

17   answer the questions that would have to be

18   answered about Officer Sickles' fitness for duty

19   on the day in question, and the fact that

20   Mr. Cooks had spent time in prison, I felt it

21   was the just thing to do; and therefore, moved

22   to dismiss the indictment in the interest of

23   justice.

24        Q       Okay, I am just going to go back

25   under CPL 170.30(1)(f).  I believe in the

1              ADA C. McPartland

2    transcript that's the section that you referred

3    to; am I correct?

4         A    Uh-hum.

5         Q    So I understand that you just said

6    it was dismissed in the interest of justice, but

7    also in Subdivision (f), it also states, and I

8    quote "There exists some other jurisdictional or

9    legal impediment to the conviction of the

10   defendant for the offense charged."

11             Am I correct?

12        A    Uh-hum, yes.

13        Q    And again not to beat a dead

14   horse, that was the section you referred to for

15   the dismissal?

16        A    Uh-hum.

17        Q    Is that a "yes"?

18        A    Yes.

19             MR. FERRIS:  May I have

20             these two separate exhibits

21             marked, please.

22             (Plaintiff's Exhibit 31,

23             Letter dated June 4, 2012,

24             consisting of two pages, was

25             marked for identification, as of