UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------------------------x
KWAME OPOKU,

                    Plaintiff,

      -against-

THE TOWN OF SOUTHAMPTON, THE SOUTHAMPTON
TOWN POLICE DEPARTMENT, JAMES OVERTON,
LIEUTENANT JAMES KIERNAN, POLICE OFFICER ERIC
SICKES AND UNKNOWN JOHN DOE SUPERVISORS,
DETECTIVES AND POLICE OFFICERS EMPLOYED BY THE
TOWN OF SOUTHAMPTON,

                    Defendants.
--------------------------------------------------------------------------------x

**FILED**
**CLERK**
10/17/2016 10:51 am

**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**LONG ISLAND OFFICE**

**Memorandum of**
**Decision & Order**
13-cv-0940 (ADS)(GRB)

APPEARANCES:

**John J. Nonnenmacher, Esq.**
*Attorney for the Plaintiff*
744 Fairmount Avenue
Chatham, NJ 07928

**Devitt Spellman Barrett LLP**
*Attorneys for the Defendants*
50 Route 11
Smithtown, NY 11787
        By:   Jeltje DeJong, Esq.
              David H. Arnsten, Esq.
              Kelly E. Wright, Esq., Of Counsel

SPATT, District Judge:

On February 21, 2013, the Plaintiff Kwame Opoku ("Opoku" or the "Plaintiff") commenced this civil rights action under 42 U.S.C. §§ 1983 & 1985, alleging that his constitutional rights were violated by the Town of Southampton (the "Town"); the Southampton Police Department ("SHPD"); and several members of SHPD personnel, including the former Chief of Police James Overton ("Chief Overton"); Lt. James Kiernan ("Lt. Kiernan"); Officer Eric Sickes ("Officer Sickes"); and an unspecified number of "John Doe" Defendants, whose identifies are unknown to the Plaintiff, but who are believed to be supervisors, detectives, and/or police officers employed by the SHPD.

Presently before the Court is motion by the Defendants, pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 56 for summary judgment dismissing the complaint. For the reasons that follow, the Court grants the Defendants' motion for summary judgment as to the federal claims over which the Court has original jurisdiction, and declines to exercise supplemental jurisdiction over the remaining state law causes of action.

## I.  Background

Unless otherwise noted, the following salient facts are not in dispute.

### A.  The Arrest

From late-2010 to early-2011, the Plaintiff, then 29 years old, rented a multi-bedroom home located at 599 Noyac Road in Southampton (the "Residence").

Apparently, for several months leading up to January 2011, the SHPD had been investigating drug activity at the Residence, including the use of confidential informants to conduct controlled purchases of illicit drugs. It is undisputed that, prior to the events at issue in this case, the Plaintiff had been arrested between five and seven times, and was twice convicted for drug offenses.

On January 14, 2011, based upon an affidavit of probable cause sworn to by Police Officer Donald Metcalf, the Southampton Town Justice issued a warrant to search the Residence for drugs – specifically, crack cocaine – as well as drug paraphernalia and currency representing the proceeds of drug dealing.

At the times relevant to this action, Officer Sickles was a member of SHPD's Street Crimes Unit, a four-member plainclothes narcotics task force. Although he had previously investigated the Plaintiff's role in certain drug-related activity, including by conducting surveillance on some of the controlled purchases at the Residence, Sickles testified that he had no involvement in obtaining the search warrant referenced above; he did not assist in preparing the supporting affidavit; and he was not a lead investigator on the case.

On the evening of January 18, 2011, the Plaintiff was present at the Residence with three friends, namely, Karron Whidbee; Bernard Cooks; and Nathaniel Cooper. All four men stayed at the house overnight.

At approximately 3:50 A.M. on the morning of January 19, 2011, police personnel executed the search warrant. Lt. Kiernan, then a sergeant and the supervising officer of the Street Crimes Unit, testified that he and approximately 15 police personnel arrived at the premises in three or four vehicles. In addition to Kiernan, this group consisted of all four police officers then in the Street Crimes Unit, namely, Officers Sickles, Metcalf, Vincent Cagno, and John Berini. The remaining personnel, which included officers, sergeants, and detectives, were members of a special group known as the Emergency Services Unit ("ESU").

According to testimony by Officer Sickles, on the date in question, and in the ordinary course of police business, the ESU was responsible for executing search warrants. This specialized unit, which he characterized as being "like a SWAT team," was comprised of between 15 and 17 officers, some of whom were also on the Street Crimes Unit. During a usual search, the ESU would make an initial entry and secure the scene – that is, restrain or otherwise account for any subjects and ensure that the location is safe. Then, the remaining police personnel would enter and perform their various functions.

On the date in question, Lt. Kiernan testified that ESU officers used a battering ram to enter the Residence through the front door. He was one of several officers on the "entry team." Additional officers were stationed in the rear of the house to prevent anyone from attempting to flee.

He also testified that a "distraction device," namely, a device producing light and/or loud noises, was deployed simultaneously with the officers' entry. This is consistent with the Plaintiff's recollection of being awoken by an object he described similar to a flare being thrown through the window of the bathroom adjoining his first-floor bedroom.

Lt. Kiernan, whose role in these events was supervisory, testified that, upon entry, he generally observed members of the police department conducting a search for drugs and paraphernalia in the Residence. Eventually, all four occupants, namely, Opoku, Whidbee, Cooks, and Cooper, were arrested at the scene. The Court notes that, on the date in question, there was an outstanding warrant for Cooks' arrest.

Relevant here, Officer Cagno, who was a member of both the Street Crimes Unit and the ESU, was also a part of initial entry team. Upon entering the Residence, he testified that he immediately proceeded to a first-floor bedroom, which, based on his prior investigation, he understood to be the Plaintiff's bedroom. Inside the bedroom, he encountered Opoku. He claims to have announced himself as a police officer and indicated that he possessed a warrant to search the premises. According to Officer Cagno, the Plaintiff cooperated with officers' instructions and was eventually handcuffed; patted down; and escorted to the adjoining living room.

This statement of events by Officer Cagno is mostly consistent with the Plaintiff's own version of events. He testified that, after being awoken by the object breaking through his bathroom window, he arose from his bed; positioned himself in the doorway between the bedroom and the living room; and directed his attention to a sliding glass door at the rear of the house, where he viewed multiple police officers in tactical gear.

Upon the officers' entry, the Plaintiff testified that that two or three of the officers "tackled" him; "slammed [him] to the ground"; and placed him in handcuffs. However, the Court notes that, despite references to being "tackled" and "slammed," during his deposition in this case, the Plaintiff specifically denied being physically abused or subjected to excessive force or police brutality. He also denied making any complaints about the manner in which he was handcuffed, and stated that, although he experienced some stiffness and soreness from being forced to the ground – which he treated with ice and a topical pain reliever – he suffered no injuries. He described the extent of any

physical interaction as "a little shove"; "a little pop"; and being "lightly roughed up." He also denied being verbally abused by police personnel.

With his hands cuffed behind his back, the Plaintiff testified that he was patted down by one or two police officers and seated in a chair in the living room.

Officer Cagno explained that, after Opoku left the bedroom in handcuffs, he searched that part of the house, including all the cabinets and containers, for contraband. According to Cagno, this search led to his discovery of two grams of crack cocaine wrapped in a tissue inside the pocket of a black winter jacket hanging on the wall of the bedroom. Officer Cagno also discovered four prescription Xanax pills on the sink in the adjoining bathroom, which was accessible only through the Plaintiff's bedroom. These items were photographed and placed in police property bags at the scene.

At his deposition in this case, the Plaintiff denied that the jacket or the crack cocaine belonged to him, and denied any knowledge of there being drugs in the Residence.

Cagno also searched the kitchen of the Residence, where he discovered a digital scale.

During these events, Officer Sickles testified that he was responsible for processing the scene – that is, to catalog evidence and take photographs. However, Lt. Kiernan testified that Sickles was actively involved in the search and reportedly found drugs on the person of Bernard Cooks. A Supplementary Report chronicling these events also identifies Officer Sickles as one of several officers who conducted a search of the Residence and inventoried recovered contraband. Further, it is undisputed that Sickles was the arresting officer for Nathaniel Cooper.

Of importance, it is also undisputed that Officer Cagno – not Officer Sickles – was the arresting officer for the Plaintiff. *See* Pl. 56.1 Counterstatement ¶ 39. In this regard, Officer Cagno testified that he was designated as the arresting officer for the Plaintiff because he recovered the relevant contraband which formed the basis for the charges against Opoku, including offenses relating to his possession of the crack cocaine; the Xanax pills; and the digital scale.

According to the Plaintiff, he and the other men were eventually led to a squad car and transported to the SHPD precinct, where they were processed, fingerprinted, photographed, and placed in jail cells.

The Plaintiff was held at the precinct overnight and was arraigned the next morning on one felony count of Criminal Possession of a Controlled Substance in the 3rd Degree; one felony count of Criminal Possession of a Controlled Substance in the 5th Degree; one misdemeanor count of Criminal Possession of a Controlled Substance in the 7th Degree; and one misdemeanor count of Criminally Using Drug Paraphernalia in the 2nd Degree. He was taken to the Suffolk County Jail in Riverhead.

Officer Cagno swore to the criminal complaint on which the Plaintiff was arraigned, and later testified before the Grand Jury convened with regard to Opoku's arrest.

It is undisputed that neither Officer Sickles nor Lt. Kiernan testified before the Grand Jury or otherwise participated in the subsequent prosecution of the charges against the Plaintiff.

On May 12, 2011, Opoku appeared with counsel in the Suffolk County Court and pled guilty to one felony count of Attempted Criminal Possession of a Controlled Substance in the 3rd Degree. During his allocution, the Plaintiff affirmatively stated that, on the date in question, he knowingly possessed and intended to sell a quantity of crack cocaine. He was sentenced to a term of imprisonment of nine months and waived his right to an appeal.

**B.      The Facts Relating to Officer Sickles**

In May or June of 2010, Officer Sickles injured his back participating in a sporting event. At about that same time, he received a prescription for Oxycodone, a highly-addictive narcotic pain reliever, from a physician affiliated with Long Island Spine Specialists in Commack. He took this medication continuously through at least the fall of 2011. Of importance, Officer Sickles conceded at his deposition that he was taking Oxycodone in accordance with his doctor's prescription during the events outlined above, namely, the execution of the search warrant at the Residence and the arrest of the Plaintiff on January 19, 2011.

In or about late-October 2011, Lt. Kiernan and others in the SHPD received information suggesting that Officer Sickles may have developed a physical dependency on Oxycodone and, worse, he may have been under the influence of this medication while on duty.

In late-November or early-December 2011, a meeting between Lt. Kiernan, Police Officer Kevin Gwinn, and Officer Sickles was held at Kiernan's home. Recalling this meeting, Sickles testified that Kiernan and Gwinn asked him whether he believed he could stop taking Oxycodone. When Sickles answered this question in the negative, citing a physical dependency as the reason, Kiernan and Gwinn suggested he seek help for his problem.

Following this meeting – and, indeed, as a result of it – Officer Sickles took a leave of absence, during which he received treatment for his dependency.

In June of 2012, while still on a leave of absence, the SHPD filed formal charges against Officer Sickles, including: (1) one count each of (a) incompetence and (b) conduct which brings discredit upon the department, both based on conduct that took place on various dates between January 2010 and December 2011; (2) one count of lounging or sleeping on duty, based on an incident that took place in the summer of 2011; and (3) two counts of failure to be fit for duty, based on incidents that took place on in the summer and fall of 2011.

Based on these charges, Officer Sickles was suspended from the force for eight months.

The Court also notes that, on an unspecified date, the SHPD filed 32 formal charges against Lt. Kiernan, including counts based his failure to train, direct, supervise and/or evaluate Officer Sickles, and counts based on his failure to properly safeguard and catalog drugs confiscated by the Street Crimes Unit.

## C.    The Legal Implications

According to testimony given by Suffolk County Assistant District Attorney Christopher McPartland in a related federal case commenced by Bernard Cooks, in or about April 2012, the Suffolk County District Attorney's Office (the "DA") received information that a certain police

officer had a drug dependency issue and may have been permitted to function on active duty in an impaired state. This prompted McPartland to send letters to both Chief Wilson and the Suffolk County Attorney inquiring as to the truth of these allegations. He reminded them that the DA's office has a continuing obligation in criminal matters to disclose exculpatory material at any time it becomes available. These letters, in turn, led to a meeting between McPartland and Wilson, during which time the identity of the individual in question was revealed to be Officer Sickles.

Subsequently, at the request of the DA's office, the SHPD provided a list of cases dating back to 2010 in which Officer Sickles may have been involved. In mid-May 2012, the respective case files in the DA's office were then examined to determine whether and to what extent Officer Sickles was, in fact, involved in the events underlying the criminal prosecutions.

After conducting this review, the DA's office reached the conclusion that Officer Sickles, who they learned had been taking "significant quantities of a narcotic drug while he was on duty," may have consumed this drug at the time of the Plaintiff's arrest on January 19, 2011. Simply stated, McPartland testified that the DA's office was unable to determine whether Sickles was under the influence of narcotics when he participated in the relevant events in this case.

According to McPartland, with respect to the cases against the Plaintiff and the other arrestees, this information posed a problem because, even if the original convictions were vacated on this ground, the DA's office would still have to decide whether to proceed with a new trial:

> In contemplation of such a trial, we had to assess what information [*i.e.*, *Brady* material] we would have to provide about Mr. Sickles' conduct and his condition, and more specifically, we would have to be prepared at trial to have him or us answer questions about his condition at the time of his actions in that investigation.
>
> There was virtually no way for me or Mr. Sickles to recall whether he had taken narcotics that day, and if he had, how it may have impaired his judgment or thinking on that day at the time he signed complaints in the matter and later when he testified in the Grand Jury. Under those circumstances, I made the determination that we should dismiss the case.

*See* June 27, 2014 Deposition of Christopher McPartland, annexed as Exhibit "K" to the Dec. 16, 2015 Declaration of Kelly E. Wright, Esq., DE [51-14], at 45:25-46:15.

However, notwithstanding these events, McPartland clarified that, in the opinion of the DA's office, the complaint against Cooks had been properly filed based on probable cause. In this regard, he stated that there was no allegation of misconduct with respect to seizing the drugs from the Residence; signing the complaint; or testifying before the Grand Jury. Nor did his review of the search warrant executed by the SHPD on the date in question reveal any irregularities. Further, McPartland testified that there was nothing improper about the actual arrest of Cooks or his guilty plea.

Rather, according to McPartland, the only issue that existed concerned Officer Sickles' ability – at a trial or otherwise – to recall the circumstances surrounding the execution of the search warrant; the arrest; the processing of paperwork underlying the charges, which, in the case of Cooks, included a criminal complaint; and any testimony given before the Grand Jury. In this regard, McPartland testified that he ultimately decided to dismiss the indictment against Cooks based on the concern on the part of the DA's office that, after disclosing the fact of Officer Sickles' drug dependency pursuant to *Brady*, his credibility would be impeached on cross-examination, which would damage the People's case to an unknown degree.

Thus, with respect to the indictment and conviction of Bernard Cooks, McPartland testified that his office initiated contact with defense counsel for the purpose of informing her that the DA's office intended to dismiss the case against Cooks.

During a May 23, 2012 court appearance, defense counsel moved to vacate the judgment of conviction against Cooks under New York Criminal Procedure Law § 440.10(1)(h), which provides for dismissal where "[t]he judgment was obtained in violation of a right of the defendant under the constitution of this state or of the United States." In this case, the constitutional violation arose from a conviction without the benefit of *Brady* material. This motion was granted, with the consent of the DA's office.

Also, at that time, defense counsel moved to dismiss the underlying indictment against Cooks under New York Criminal Procedure Law § 210.40(1)(j), which provides for the dismissal of an indictment when doing so is warranted in the interest of justice. This motion was also granted, again with the consent of the DA's office.

Following a similar procedure, on July 12, 2012, several months after completing his sentence, the DA's office requested a court conference in the Plaintiff's criminal case. At this conference, Assistant District Attorney Mark Murray advised the court that, following the Plaintiff's conviction, "the People became aware of a significant *Brady* issue . . . which concerned one of the involved officers' fitness for duty during the time and circumstances of these offenses."

Based on this information, Opoku's defense counsel made oral motions to set aside the conviction and to dismiss the underlying indictment. On the consent of the DA's office, the court granted both applications.

**D.      Relevant Procedural History**

Based on these events, on February 21, 2013, the Plaintiff commenced this federal lawsuit asserting numerous causes of action arising under federal and state law.

The federal claims, purportedly asserted under 42 U.S.C. §§ 1983 and 1985, allege that the Plaintiff was deprived of his Fourth Amendment rights in the following ways: (1) Officer Sickles falsified documents in order to secure a search warrant for the Residence; (2) the Plaintiff was falsely arrested and imprisoned without a valid warrant or probable cause; (3) he was assaulted, battered, and subjected to excessive force by Officer Sickles; and (4) Other police personnel witnessed the assault and battery by Officer Sickles but failed to intervene.

The Plaintiff also claims that these alleged violations occurred as a result of various policies and/or procedures of the Town of Southampton and SHPD, giving rise to § 1983 municipal liability consistent with *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978).

By way of pendent state law claims, the Plaintiff alleges that the complained-of conduct gave rise to liability under theories of: (1) failure to properly train, supervise, or discipline; (2) negligence; (3) negligent retention and/or hiring; and (4) intentional infliction of emotional distress.

Further, the Plaintiff claims that the alleged violations of his federal constitutional rights also constitute violations of his analogous rights under Article 1 of the New York State Constitution.

Finally, the Plaintiff alleges that the Town and SHPD are vicariously liable for the conduct of the individual Defendants under common law principles of *respondeat superior*.

For these alleged wrongs, the Plaintiff seeks to recover compensatory and punitive damages, together with an award of attorneys' fees and costs under 42 U.S.C. § 1988.

Following discovery, on March 9, 2016, the Defendants filed a motion under FED. R. CIV. P. 56, seeking to dismiss the complaint in its entirety.

## II.    DISCUSSION

### A.    The Standard of Review

Under FED. R. CIV. P. 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "The Court 'must draw all reasonable inferences and resolve all ambiguities in favor of the non-moving party.' " *Castle Rock Entm't, Inc. v. Carol Publ'g Grp., Inc.*, 150 F.3d 132, 137 (2d Cir. 1998) (quoting *Garza v. Marine Transp. Lines, Inc.*, 861 F.2d 23, 26 (2d Cir. 1998)).

" '[A]t the summary judgment stage the judge's function is not himself [or herself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.' " *Redd v. N.Y. State Div. of Parole*, 678 F.3d 166, 173-74 (2d Cir. 2012) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)).

B.    **As to the Plaintiff's Federal Claims**

The Court's analysis begins with a review of the Plaintiff's federal claims, which, as noted above, essentially fall into two broad categories: (1) Fourth Amendment violations; and (2) *Monell* liability.

1.    **The Fourth Amendment Claims**

Within the broader category of alleged Fourth Amendment violations, the Plaintiff articulates the following specific bases for relief under the federal civil rights statutes: (i) an irregularity affecting the search warrant; (ii) false arrest and false imprisonment; and (iii) excessive force. The Court will discuss each of these contentions in greater detail below.

a.    **As to the Claim Challenging the Validity of the Search Warrant**

The Plaintiff's first cause of action alleges that Officer Sickles falsified documents in order to obtain the search warrant that was executed at the Residence on the night in question.

As an initial matter, the Court notes that the Plaintiff failed to respond to the argument in the Defendants' opening brief, which specifically sought to dismiss his Fourth Amendment claims based on an allegedly unlawful search of the Residence. Accordingly, the Plaintiff may be deemed to have abandoned this claim. *See Sanders v. City of New York*, No. 12-cv-113, 2015 U.S. Dist. LEXIS 42698, at *65-*66 (Jan. 7, 2015) (Report and Recommendation) (collecting cases for the proposition that a court may deem a plaintiff's claims abandoned where the opposition papers do not specifically address arguments raised in summary judgment motion), *adopted*, 2015 U.S. Dist. LEXIS 40972 (E.D.N.Y. Mar. 30, 2015).

However, even assuming that this claim had not been abandoned, in the Court's view, it would lack sufficient support in the factual record to survive summary judgment.

Contrary to the Plaintiff's allegations, there is no evidence that Officer Sickles played any role in obtaining the search warrant that is at issue in this case, let alone evidence that he falsified documents in furtherance of that objective. On the contrary, Sickles testified that, although he had

previously investigated the Plaintiff's role in certain drug-related activity and was present in his capacity as a member of the Street Crimes Unit for the events in question, he had no involvement in the preparation of the search warrant or the supporting affidavit. The Plaintiff has produced no evidence to the contrary.

Further, the undisputed evidence in the record establishes that Officer Metcalf prepared the affidavit of probable cause upon which Southampton Town Justice Barbara L. Wilson relied in issuing a warrant to search the Residence. According to the uncontroverted testimony of ADA McPartland, an official review of the search warrant by the DA's office failed to uncover any irregularities.

Accordingly, with respect to the Plaintiff's Fourth Amendment claim based on Officer Sickles' alleged procurement of a search warrant through false pretenses, the Court discerns no genuine issue of material fact and concludes that summary judgment dismissing the first cause of action is appropriate.

b.  **As to the Claims Based on False Arrest and False Imprisonment**

The Plaintiff's second and fourth causes of action allege claims based on false arrest and false imprisonment, respectively. In this regard, the Plaintiff contends that his arrest and subsequent detention were unlawful insofar as the SHPD lacked probable cause to suspect that he had committed the crimes for which he was charged.

i.  **The Applicable Law**

In general, "[t]he common law tort of false arrest is a species of false imprisonment," *Singer v. Fulton County Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995), and the essential elements of a claim based on either theory are substantially the same, *see Andersen v. United States*, No. 98-cv-4782, 2001 U.S. Dist. LEXIS 24469, at *32-*33 (E.D.N.Y. July 20, 2001) (Spatt, J.) ("Whether the terms be referred to as false arrest or false imprisonment . . . the elements are the same"), *aff'd*, 2002 U.S. App. LEXIS 14530

(2d Cir. July 17, 2002); *see also Polanco v. United States*, No. 10-cv-1705, 2014 U.S. Dist. LEXIS 25502, at *9 (E.D.N.Y. Feb. 27, 2014) (noting that "the tort of false arrest is synonymous with that of false imprisonment").

In this regard, it is well-settled that the legal standards governing § 1983 claims for false arrest and imprisonment in federal court are guided by state tort law. *See Yanez v. City of New York*, 29 F. Supp. 2d 100, 106 (E.D.N.Y. 1998). In particular, under New York law, "[t]he four elements of a false arrest and imprisonment claim are (1) the defendant had intended to confine the plaintiff; (2) the plaintiff was conscious of the confinement; (3) the plaintiff did not consent to the confinement; [and] (4) the confinement was not otherwise privileged." *Id.* at 106 (citing *Broughton v. State*, 37 N.Y.2d 451, 456, 373 N.Y.S.2d 87, 93, 335 N.E.2d 310, *cert. denied*, 423 U.S. 929, 96 S. Ct. 277, 46 L. Ed. 2d 257 (1975)).

In this context, the question of whether an arrest was "privileged" "turn[s] on whether the arresting officers had the requisite legal justification [*i.e.*, probable cause] for making the arrest." *Polanco*, 2014 U.S. Dist. LEXIS 25502, at *10. Stated otherwise, "[t]o succeed in a false arrest or false imprisonment claim, a plaintiff must demonstrate an absence of probable cause." *Yanez*, 29 F. Supp. 2d at 106 (citing *Zanghi v. Village of Old Brookville*, 752 F.2d 42, 45 (2d Cir. 1985)); *see Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1998) (recognizing that "[t]he existence of probable cause to arrest constitutes justification and 'is a complete defense to an action for false arrest,' whether that action is brought under state law or under § 1983").

"Probable cause to arrest exists when law enforcement officials have knowledge of, or reasonably trustworthy information about facts and circumstances sufficient to warrant a person of reasonable caution to believe than an offense has been committed by the person arrested." *Yanez*, 29 F. Supp. 2d at 106-07 (citing *Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991), *cert. denied*, 505 U.S. 1221, 112 S. Ct. 3032, 120 L. Ed. 2d 902 (1992)).

As one district court has explained:

> In determining whether an officer had probable cause, "courts must consider those facts available to the officer at the time of the arrest and immediately before it." [*Panetta v. Crowley*, 460 F.3d 288, 395 (2d Cir. 2006)] (citing *Caldarola v. Calabrese*, 298 F.3d 156, 162 (2d Cir. 2002)). This requires a court to "look to the 'totality of the circumstances' and . . . [realize] that probable cause is a fluid concept – turning on the assessment of probabilities in particular factual contexts – not readily, or even usefully, reduced to a neat set of legal rules." *Id.* (citing *Caldarola*, 298 F.3d at 162). The probable cause standard 'is a practical, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *United States v. Steppello*, 664 F.3d 359, 364 (2d Cir. 2011).

*Polanco*, 2014 U.S. Dist. LEXIS 25502, at *10-*11.

Of relevance here, "[i]f, following the arrest, the plaintiff was convicted of the charges against him, that conviction normally 'would be conclusive evidence of probable cause.' " *Weyant*, 101 F.3d at 852 (quoting *Broughton*, 37 N.Y.2d at 458). "The same is true if the conviction is obtained through a guilty plea." *Croft v. Greenhope Servs. for Women*, No. 13-cv-2996, 2013 U.S. Dist. LEXIS 176841, at *13 (S.D.N.Y. Dec. 17, 2013) (citing *Maietta v. Artuz*, 84 F.3d 100, 102 n.1 (2d Cir. 1996)); *see Piñero v. Casey*, No. 10-cv-4803, 2012 U.S. Dist. LEXIS 33825, at *21 (S.D.N.Y. Mar. 13, 2012) (noting that "since a guilty plea is the equivalent of a conviction, a guilty plea will also bar a § 1983 false imprisonment claim" (internal citation and quotation marks omitted)). Nonetheless, " 'evidence of a subsequent dismissal, acquittal or reversal on appeal would . . . be admissible to refute . . . justification.' " *Weyant*, 101 F.3d at 852 (quoting *Broughton*, 37 N.Y.2d at 458).

Consistent with general principles of summary judgment, the existence of probable cause "may be determinable as a matter of law if there is no dispute as to the pertinent events and knowledge of the officers." *Yanez*, 29 F. Supp. 2d at 107.

### ii. Application to the Facts of this Case

In this case, the Defendants contend that summary judgment dismissing the Plaintiff's false arrest and imprisonment claims is warranted in light of the Plaintiff's guilty plea, pursuant to which

he admitted to the drug offense for which he was ultimately imprisoned and consented to a nine-month term of imprisonment. The Defendants contend that this plea is legally equivalent to a conviction, which is conclusive evidence of probable cause.

Further, assuming the guilty plea alone is insufficient to preclude the Plaintiff's claim, the Defendants contend that the uncontroverted evidence in the record nevertheless establishes that probable cause to arrest the Plaintiff existed, as a matter of law. The Court agrees.

Initially, the caselaw outlined above seems to require that a criminal defendant, who is represented by counsel, and who knowingly and voluntarily pleads guilty to a charged offense, assents to a term of imprisonment, and waives his right to an appeal, is thereafter barred, as a matter of law, from claiming that his arrest and/or detention were unlawful for purposes of a § 1983 false arrest or imprisonment claim.

However, notwithstanding the preclusive effect of the guilty plea, in the Court's view, the overall record plainly establishes that probable cause existed for the Plaintiff's arrest.

The uncontroverted evidence demonstrates that, for several months leading up to January 2011, the SHPD had been investigating drug activity at the Residence, including by using confidential informants to conduct controlled purchases of illicit drugs at the house. As noted above, the Plaintiff does not dispute that, prior to the events at issue in this case, he had been arrested between five and seven times, and was twice convicted for drug offenses.

Further, the undisputed evidence reveals that four days prior to the date in question, Officer Metcalf prepared a detailed affidavit stating, in relevant part, that he possessed information – obtained through conversations with other police officers, civilian complaints, and controlled purchases of crack cocaine at the Residence – that the Plaintiff was actively involved in illegal drug trafficking from that location. The affidavit specifically incorporated by reference a sworn statement by a confidential police informant who personally participated in two of the controlled purchases. Officer Metcalf's affidavit concluded that, based on these facts, as well as the Plaintiff's known

criminal history, and his own experience as a narcotics officer with the Street Crimes Unit, probable cause existed to believe that a search of the Residence would result in the discovery of crack cocaine and related money and paraphernalia.

Evidently the Southampton Town Justice agreed and signed the warrant authorizing the search.

Further, the record is clear that, on the date in question, upon entering the Residence, Officer Cagno and other ESU personnel proceeded to the Plaintiff's bedroom, where they handcuffed the Plaintiff; patted him down; and escorted him to another room.

Cagno conducted a search of the Plaintiff's bedroom and adjoining bathroom. He testified, and an inventory of items recovered during the search corroborates, that this search led to the discovery of two grams of crack cocaine in the pocket of a jacket in the Plaintiff's bedroom and four prescription Xanax pills in the bathroom that was accessible only through the Plaintiff's room. Cagno also searched the kitchen, where he discovered a digital scale.

In the Court's view, the Plaintiff's self-serving testimony in this lawsuit that neither the jacket, the drugs, nor the scale belonged to him, is insufficient to raise a genuine issue of fact on the question of probable cause. Rather, in light of all the facts available to the Defendants at the time of the arrest and immediately before it, the Court finds that there was an objectively reasonable basis to believe that the Plaintiff was in criminal possession of the drugs recovered during the search.

To be sure, though not necessarily dispositive in this case, it is also important and relevant that the Plaintiff pled guilty to attempted criminal possession of a controlled substance; assented to a term of imprisonment of nine months; and waived his right to an appeal. While it is true that the conviction was later vacated, the uncontroverted testimony of ADA McPartland makes clear that the decision by the DA's office to abandon the charges was not based on any perceived lack of probable cause.

Thus, under these circumstances, the Court finds, as a matter of law, that there was probable cause for the Plaintiff's arrest, precluding his right to recover for false arrest and/or false imprisonment under § 1983.

In reaching this conclusion, the Court is unpersuaded by the Plaintiff's contention that questions surrounding Officer Sickles' fitness for duty somehow vitiated the probable cause that otherwise existed for his arrest. In this regard, the record is abundantly clear that Officer Sickles was not materially involved in any of the relevant events as they pertained to the Plaintiff.

First, as discussed above, there is no evidence that Officer Sickles was materially involved in actually obtaining the search warrant; preparing the supporting affidavit; or meaningfully participating in the underlying police operations upon which Officer Metcalf's affidavit was premised. The Plaintiff has presented no evidence to the contrary.

Second, there is no evidence that Officer Sickles was involved in any way in apprehending or handcuffing the Plaintiff. On the contrary, the Plaintiff admits that two or three ESU officers whom he was unable to identify entered the Residence; placed him on the ground; and arrested him. *See* 56.1 Counterstatement ¶ 24. He further admits that, only after all of the occupants were secured did non-ESU personnel, including Officer Sickles, enter the Residence. *See id.* ¶ 25. In fact, the Plaintiff admits that, by the time he first encountered Officer Sickles, he was already handcuffed in the living room. *See id.* ¶ 35.

Nor is there any evidence that Officer Sickles participated in the search of the Plaintiff's bedroom or recovered any of the contraband which formed the basis for the charges against him.

Finally, the record is clear that Officer Cagno swore to the criminal complaint upon which Opoku was arraigned, and later testified before the Grand Jury convened with regard to his arrest. The Plaintiff admits that Officer Sickles did not testify before the Grand Jury that ultimately returned his indictment. *See id.* ¶ 94.

Therefore, the Court finds that the questions which arose after-the-fact concerning Officer Sickles' fitness for duty do not suffice to create a triable issue of fact on the question of probable cause for the Plaintiff's arrest.

Similarly, the Court's reasoning is not altered by the Plaintiff's reliance upon the disciplinary charges filed against Lt. Kiernan. The Court's review of the charging document reveals that, not only do the counts of misconduct not relate to the events at issue in this case, but they also do not arise from conduct that occurred on or reasonably close in proximity to the date in question. Moreover, aside from simply stating that these charges were filed, the Plaintiff fails to explain in his legal memorandum how, if at all, they bear upon the question of probable cause.

Accordingly, the Court finds that summary judgment dismissing the second and fourth causes of action based on false arrest and imprisonment is appropriate.

      c.       **As to the Claims Based on Assault, Battery, and Excessive Force**

The Plaintiff's third cause of action alleges that he was assaulted, battered, and subjected to excessive force at the hands of Officer Sickles, in violation of his Fourth Amendment rights. His seventh cause of action alleges that certain unidentified "John Doe" police officers witnessed the beating, but failed to intervene – itself a constitutional tort. However, in court filings and deposition testimony, the Plaintiff conceded that there is no factual basis for these claims.

As noted above, with respect to the events at issue in this case, the Plaintiff specifically denied at his deposition being physically abused or subjected to excessive force or police brutality. He also denied any complaints about the manner in which he was handcuffed, and stated that, although he experienced some stiffness and soreness from being forced to the ground – which he treated with ice and a topical pain reliever – he suffered no injuries. He described the extent of any physical interaction as "a little shove"; "a little pop"; and being "lightly roughed up." He also denied being verbally abused by police personnel on the date in question.

Moreover, even if there had been evidence of excessive force, the Plaintiff conceded that it could not have come at the hands of Officer Sickles. As discussed above, the Plaintiff admits that it was unidentified ESU officers who placed him on the ground and arrested him. He admits that non-ESU personnel, including Officer Sickles, did not enter the Residence until after the tactical officers had secured all of the occupants. Most importantly, he admits that, by the time he even encountered Officer Sickles, he was already handcuffed in the living room.

Accordingly, with respect to the Plaintiff's Fourth Amendment claim based on Officer Sickles' alleged assault, battery, and/or use of excessive force, the Court discerns no genuine issue of material fact and concludes that summary judgment dismissing the third cause of action is appropriate. Given that the allegations of excessive force by Officer Sickles are without merit, so too are the allegations that other police personnel deprived the Plaintiff of his constitutional rights by failing to intervene. Accordingly, summary judgment dismissing the seventh cause of action based on a failure to intervene against the use of excessive force is also appropriate.

> d.   As to the Issue of Malicious Prosecution

Finally, the Court notes that both sides argued extensively in their legal memoranda about whether summary judgment is appropriate on the question of malicious prosecution. However, a review of the complaint in this action reveals that none of the Plaintiff's 13 causes of action is specifically premised on a theory of malicious prosecution.

Rather, in a pleading spanning more than 200 numbered paragraphs, the Plaintiff references malicious prosecution only three times and in wholly conclusory terms. *See* Compl. ¶¶ 95 & 104 (alleging that "[t]he plaintiff was . . . taken to court where he was maliciously prosecuted for crimes he did not commit"); *id.* ¶ 159 (alleging, in support of a *Monell* claim, that the assault and battery by Officer Sickles occurred pursuant to certain police customs and policies, including supervisors' encouragement and/or approval of perjury and fabricating evidence "to initiate and continue the malicious prosecution of civilians").

In any event, regardless of whether these limited allegations make out a properly pled claim based on malicious prosecution, for substantially the same reasons as discussed above, the Court finds that no such claim can survive summary judgment on the current factual record.

Under New York law, a malicious prosecution claim requires a demonstration of the following essential elements: "(1) commencement or continuation of a criminal proceeding, (2) termination of the proceeding in favor of the accused, (3) the absence of probable cause for the criminal proceeding, and (4) actual malice." *Weintraub v. Bd. of Educ. of N.Y.*, 423 F. Supp. 2d 38, 59 (E.D.N.Y. 2006) (quoting *Silver v. Kuehback* ); *see Willey v. Kirkpatrick*, 801 F.3d 51, 70 (2d Cir. 2015) (reciting elements under New York law).

However, the Court need not look beyond the third element, namely, the existence of probable cause, to conclude that a claim based on malicious prosecution fails, as a matter of law. In this regard, the Court's analysis necessarily begins from the proposition, determined above, that there existed probable cause for the Plaintiff's arrest.

Under similar circumstances, courts have recognized that, since "the police had probable cause to arrest, [the] plaintiff in a malicious prosecution case must show that facts emerged following the arrest to vitiate probable cause." *Carthew v. County of Suffolk*, 709 F. Supp. 2d 188, 202 (E.D.N.Y. 2010).

This is no small feat: "[i]n order for probable cause to dissipate [between an arrest and an indictment], the groundless nature of the charge must be made apparent by the discovery of some intervening fact." *Stone*, 2014 U.S. Dist. LEXIS 92950, at *26 (quoting *Kinzer v. Jackson*, 316 F.3d 139, 144 (2d Cir. 2003)). Stated otherwise, "probable cause to arrest 'is a defense to a claim of malicious prosecution [so long as] it is not later nullified by information establishing the [accused's] innocence.' " *Stone*, 2014 U.S. Dist. LEXIS 92950, at *26 (quoting *Betts v. Shearman*, 751 F.3d 78, 82 (2d Cir. 2014)).

Further, where, as here, an indictment has been returned, "the law holds that the Grand Jury action creates a presumption of probable cause," which may only be rebutted by proof "that the indictment was procured by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith." *Colon v. New York*, 60 N.Y.2d 78, 82-83, 468 N.Y.S.2d 453, 455 N.E.2d 1248 (1983).

In this case, the Plaintiff relies primarily on the nondisclosure of Officer Sickles' drug dependency as evidence that the Defendants lacked probable cause to prosecute the charges against him. However, in the Court's view, the fact of Officer Sickles' drug dependency is not information that would tend to establish the Plaintiff's innocence or otherwise render the charges against him groundless. As the Defendants properly note, ADA McPartland testified that the decision by his office to dismiss the Plaintiff's charges was not based on any perceived lack of probable cause; lack of evidence; or other belief that he had not, in fact, committed the charged offenses. Rather, the DA's decision not to re-try the Plaintiff was apparently informed solely by a concern over Officer Sickles' vulnerability to impeachment at trial.

In opposition, the Plaintiff relies on the following portion of McPartland's deposition testimony as proof that Officer Sickles' condition on the date in question did, in actuality, bear on his innocence:

> After the defendant's plea and sentence, our office became aware of the fact that Officer Sickles was taking significant quantities of a narcotic drug while he was on duty. We had reason to believe that he was taking those drugs at the time of the offense that Mr. Cooks was charged with. It posed a credibility issue with respect to Mr. Sickles' complete and accurate answers to which we could not answer. . . .
> There was virtually no way for me or Mr. Sickles to recall whether he had taken narcotics that day, and if he had, how it may have impaired his judgment or thinking on that day at the time he signed complaints in the matter and later when he testified in the Grand Jury. Under those circumstances, I made the determination that we should dismiss the case.

The Plaintiff contends that this testimony creates an issue of fact as to the probable cause for his prosecution. Again, the Court disagrees.

Initially, the Court finds that reliance upon this selected testimony is misplaced, as it pertains specifically to Bernard Cooks, who was arrested and prosecuted under materially different circumstances than the Plaintiff. In particular, the evidence shows that Cooks was charged with possessing drugs that were actually found by Officer Sickles during the search, and that he was indicted based on Grand Jury testimony given by Sickles. Thus, the ability of Officer Sickles to recall and competently testify about the events pertaining to Cooks' arrest and prosecution were of paramount importance to establishing *his* guilt or innocence. However, the Plaintiff expressly concedes that neither of those circumstances was present in his own case – that is, it is undisputed that Sickles did not sign any accusatory instrument upon which the Plaintiff was prosecuted and did not testify before the Grand Jury that ultimately indicted him.

In this regard, it also warrants noting that, even considering the apparently high level of direct involvement in Cooks' prosecution by a potentially impaired officer, ADA McPartland testified that the DA's office nevertheless determined that the criminal complaint against Cooks had been properly filed based on probable cause and there was nothing improper about his arrest or his guilty plea. In the Court's view, there is nothing in the current record to suggest that that a different conclusion is warranted for Opoku, whose arrest and prosecution were far less likely than Cook's to be tainted by Sickles' fitness for duty on the date in question.

Other than pointing to Officer Sickles' condition, the Plaintiff identifies no other facts that he contends establish his innocence or otherwise serve to erode the probable cause that existed after his arrest. In the Court's view, the Plaintiff's self-serving denial, offered during his deposition in this civil lawsuit, that the contraband recovered during the search of the Residence was not his, is patently nsufficient to warrant the relief sought. *See Brandon v. City of New York*, 705 F. Supp. 2d 261, 273 (S.D.N.Y. Mar. 30, 2010) (noting that "where a plaintiff's only evidence to rebut the presumption of the indictment is his version of events, courts will find such evidence to be . . . insufficient to rebut the presumption of probable cause").

Finally, for the reasons already stated above, the Court's reasoning is not altered by the Plaintiff's reliance upon the disciplinary charges filed against Lt. Kiernan, which the Plaintiff again fails to adequately connect to the issue of probable cause in this case.

Accordingly, to the extent the Plaintiff's complaint can be construed as asserting a claim based on malicious prosecution, the Court finds that no genuine issue of material fact exists for trial, and concludes that summary judgment dismissing that claim would be warranted.

2.      The *Monell* Claims

The Plaintiff's fifth, sixth, and eighth causes of action allege various *Monell* claims – that is, that the Town of Southampton should be held liable for failing to properly train, supervise, and/or discipline its employees; and for creating or otherwise promoting customs, practices, and/or procedures within the SHPD that resulted in the deprivation of the Plaintiff's constitutional rights.

In general, municipalities, such as the Town, cannot be held vicariously liable under § 1983 for the conduct of their employees or agents. Rather, "to hold a [municipality] liable under 1983 for the unconstitutional actions of its employees, a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2009).

However, it is well-settled that " '*Monell* does not provide a separate cause of action for the failure by the government to train its employees; it extends liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation.' " *Guerrero v. City of New York*, No. 12-cv-2916, 2013 U.S. Dist. LEXIS 25476, at *8 (S.D.N.Y. Feb. 25, 2013) (quoting *Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006)). Therefore, where, as here, the Court has determined that the Plaintiff's underlying § 1983 claims based on independent constitutional violations are insufficient to withstand summary judgment, it follows that *Monell* liability against the municipiality cannot lie, as a matter of law. *See*

*Henry-Lee v. City of New York*, 746 F. Supp. 2d 546, 567 (S.D.N.Y. 2010) (holding that "[b]ecause a constitutional violation by a municipal employee is a necessary prerequisite to municipal liability under *Monell*, a court granting summary judgment for the defendants on the underlying constitutional claim must also grant summary judgment on the associated *Monell* claim[s]").

Accordingly, the Court finds that summary judgment dismissing the fifth, sixth, and eighth causes of action based on § 1983 municipal liability under *Monell* is appropriate.

### 3.     The § 1985 Conspiracy Claims

As noted above, the Plaintiff also appears to incorporate into each of his causes of action a claim against every Defendant based on a civil rights conspiracy in violation of 42 U.S.C. § 1985. However, similar to *Monell* liability, " '[s]ection 1985(3) provides a civil cause of action only when some other defined federal right has been violated; it creates no substantive rights.' " *Knight v. City of New York*, 303 F. Supp. 2d 485, 501 (S.D.N.Y. 2004), *aff'd*, 147 F. App'x 221 (2d Cir. 2005).

Therefore, having granted summary judgment on each of the Plaintiff's constitutional claims, summary judgment is also warranted as to his claims for civil rights conspiracy under § 1985. *See Richardson v. N.Y. City Health & Hosps. Corp.*, No. 05-cv-6278, 2009 U.S. Dist. LEXIS 25247, at *51 (S.D.N.Y. Mar. 25, 2009) (finding that "because Plaintiff has not produced sufficient evidence that a constitutional violation occurred to survive summary judgment, 'there can be no civil rights conspiracy to deprive that right' " (quoting *Young v. County of Fulton*, 160 F.3d 899, 904 (2d Cir. 1998)); *see also Edwards v. Ctr. Moriches Union Free Sch. Dist.*, 898 F. Supp. 2d 516, 555 (E.D.N.Y. Aug. 7, 2012) (Report and Recommendation) ("Given the undersigned has concluded that plaintiffs have failed to prove any claim establishing a violation of a federal or constitutional right, there is no basis on which plaintiffs can seek recovery under § 1985(3)").

Accordingly, to the extent the Plaintiff alleges claims against all of the Defendants based on a civil rights conspiracy under § 1985, the Court finds that summary judgment dismissing those claims is appropriate.

C.      The Plaintiff's State Law Claims

As noted above, the Plaintiff's ninth through thirteenth causes of action allege numerous theories of liability arising under New York state law, including claims based on: (1) failure to properly train, supervise, or discipline; (2) negligence; (3) negligent retention and/or hiring; (4) intentional infliction of emotional distress; (5) violations of the New York State Constitution; and (6) vicarious liability under common law principles of *respondeat superior*.

However, having dismissed all of the claims over which it had original jurisdiction, the Court declines to exercise supplemental jurisdiction over the remaining state law claims. *See* 28 U.S.C. § 1367(c)(3); *see also Norton v. Town of Islip*, 97 F. Supp. 3d 241, 267-68 (E.D.N.Y. 2015) ("Where, as here, any federal 'claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine – judicial economy, convenience, fairness, and comity – will point toward declining to exercise jurisdiction over the remaining state-law claims") (citations omitted); *Spiteri v. Russo*, No. 12-cv-2780, 2013 U.S. Dist. LEXIS 128379, at *235-37 (E.D.N.Y. Sept. 7, 2013) (collecting cases for the proposition that "[c]ourts routinely decline to exercise supplemental jurisdiction where the only remaining claims are state law claims . . ."), *aff'd*, 622 F. App'x 9 (2d Cir. 2015).

Accordingly, the Plaintiff's ninth, tenth, eleventh, twelfth, and thirteenth causes of action are dismissed without prejudice to refiling in an appropriate forum.

### III.    CONCLUSION

Based on the foregoing, the Court grants in part the Defendants' motion for summary judgment dismissing the federal claims – namely, the first through eighth causes of action – over which the Court has original jurisdiction.

Further, the Court declines to exercise supplemental jurisdiction over the remaining state law causes of action, which are dismissed without prejudice to refiling in the appropriate forum.

The Clerk of the Court is respectfully directed to close this case.

It is **SO ORDERED:**

Dated:  Central Islip, New York
          October 17, 2016

*/s/ Arthur D. Spatt*
ARTHUR D. SPATT
United States District Judge